# THE ATTORNEY–GENERAL *ex rel.* COLES BASHFORD,

*vs.*

# WILLIAM A. BARSTOW.

The office of governor created by the constitution of this state, is an office within the meaning of that term as used in chapter 126 of our Revised Statutes.

This court has original jurisdiction conferred by the constitution, of the writ of *quo warranto*, and may exercise it either by proceeding at common law, or by information in the nature of a *quo warranto* under the statute.

The office of governor in this state is a civil office, and an unlawful intrusion into, or usurpation of the same, may be tried in this court by information in the nature of a *quo warranto*, and the intruder or usurper be ousted and punished.

This court has no power to control, or in any manner interfere with the functions of the executive department of the state government, but it has jurisdiction of the citizens of the state to prevent them from usurping the offices and franchises of the state, and to punish such usurpation when consummated.

In a suit commenced by information in the nature of a *quo warranto*, filed by the attorney-general upon the relation of a private citizen claiming the office or franchise in dispute, the court will protect the interests of all parties interested, the people, the relator and the respondent.

The attorney-general, having filed an information upon the relation of a person claiming an office, will not, without the concurrence of such person, be permitted to dismiss the suit to the prejudice of the person whom he has made relator.

The attorney-general may dismiss or discontinue an information so far as the rights or interests of the people may be involved, but in such case, the relator will be allowed to prosecute his own claims or rights in a suit so instituted.

In a proceeding by *quo warranto*, to ascertain and determine the rights of persons claiming an office, the court will go behind the certificate of the canvassers to ascertain who was legally elected; for it is the election and not the canvass of the votes, or the certificate thereof, that confers the right.

The duty of the state canvassers is mainly ministerial, to count the votes returned, and make a state of the result; they have no judicial power to try and determine a contest between disputing claimants.

Under our statute, according to strict legal right, the court is authorized upon the default of the respondent to render judgment of ouster against him, and in favor of the relator, especially when the attorney-general has discontinued in behalf of the people; but in a case of great importance to the people, in which they are deeply interested, the court may, and will in their discretion, require the relator to produce evidence to establish the fact of his election.

The canvass and statements of the board of canvassers are *prima facie* correct, but their correctness may be impeached by testimony. They are not final and conclusive, but upon an inquiry by *quo warranto*, the court may go behind the certificate of the canvassers to ascertain the fact of the election.

The duty of inspectors of election in the several towns and wards of the state, is

to make their returns to the clerk of board of supervisors of the proper county. They have no authority to transmit a copy of their return to the state canvassers, and if so transmitted, it cannot be rightfully considered as evidence of any fact before that body.

The state board of canvassers are required to make their statement and determination of the result of an election from the certified statements of the county canvassers alone; and they have no authority to hear, receive, or determine upon any other evidence.

No effect can be given by the board of state canvassers to statements made and returned by any other than the county boards, and by them only in such time and manner as the statute authorizes.

Additional or supplementary returns from the county canvassers or clerks of the board of supervisors, and returns of election made from the inspectors of election in towns or precincts, direct to the state canvassers, are unauthorized by law, and should be rejected.

THIS was an information in the nature of a *quo warranto*, filed originally in this court by the attorney-general. The following is the information:

On the 15th day of January, William A. Barstow having been inaugurated into office on the 7th of the same month, and Coles Bashford having taken the oath of office the same day, the following information was filed in the Supreme Court:

"*State of Wisconsin, Dane County, ss.*—Wm. R. Smith, Attorney-General of the State of Wisconsin, who sues for the people of the state in this behalf, comes into the Supreme Court of the said state, before the justices thereof, at the capitol, in the village of Madison, in the county of Dane, in the said state, on the 15th day of January, A. D. 1856, and for the said people of the state of Wisconsin, at the relation of Coles Bashford, of the city of Oshkosh, in the county of Winnebago, in the said state, according to the form of the statute in such case made and provided, gives the said court here to understand and be informed, that Wm. A. Barstow, of the county of Waukesha, in the said state of Wisconsin, for the space of one day and upwards now last past, hath held, used and exercised, and still doth hold, use and exercise the office of governor of the state of Wisconsin, without any legal election, appointment, warrant or authority whatsoever therefor; and the said attorney-general further gives the court here to understand and be informed, that at a general election for state officers of said state, held at the several election districts of said state, in the several counties thereof, on the 6th

day of November, A. D. 1855, the said Coles Bashford was duly elected and chosen governor of the state of Wisconsin aforesaid, and that the said Coles Bashford hath ever since been and still is rightfully entitled to hold, use and exercise said office; which said office of governor of the state of Wisconsin aforesaid, the said Wm. A. Barstow, during all the time aforesaid, and since the time of said election, hath usurped, intruded into and unlawfully held and exercised, to wit: at Madison, in the county of Dane aforesaid, and still doth usurp, intrude into, and unlawfully hold and exercise, to wit: at Madison, in the county of Dane aforesaid, in contempt of the people of the state of Wisconsin, and to their great damage and prejudice; whereupon said attorney-general prays the court now here, for due advice in the premises, and for due process of law against the said Wm. A. Barstow in this behalf to be made, to answer to the said people by which warrant he claims to hold, use, exercise and enjoy the aforesaid office of governor of Wisconsin.

"WM. R. SMITH, *Attorney-General of the State of Wisconsin.*"

On the 17th day of the same month, the following summons was issued:

"*State of Wisconsin, Supreme Court, ss.*—The state of Wisconsin to the sheriff of Dane county, greeting:—You are hereby commanded to summon William A. Barstow to appear before the Supreme Court of the state of Wisconsin, at the capitol in Madison, the seat of government in said state, on Tuesday the 5th day of February, 1856, at 10 o'clock, A. M. of said day, then and there to answer unto the state of Wisconsin, and to an information upon the relation of Coles Bashford, filed by the attorney-general of said state, in the nature of a *quo warranto*, by what warrant he, the said William A. Barstow, claims to hold, use, enjoy and exercise the office of governor of the said state of Wisconsin, and to stand to and abide by the order, judgment or decree of the said Supreme Court in the premises, upon what shall then and there be made to appear. Hereof fail not, and have you then and there this writ.

"Witness, the Hon. E. V. Whiton, Chief Justice of our [L.S.] said court, at Madison, this 17th day of January, A. D. 1856. (Signed,) LAFAYETTE KELLOGG, *Clerk.*

"WILLIAM R. SMITH, *Attorney-General.*"

This summons was duly served and returned, and on the 22d

day of January (it being one of the days set apart by rule of court for the hearing of motions), Mr. James H. Knowlton presented the following motion :

[*Title.*]  " And now comes Coles Bashford, the relator abovenamed, by his attorneys and counsel, and moves this honorable court, that the information filed by the attorney-general of the state of Wisconsin, on the relation of the said Coles Bashford, be discontinued, and that the said Coles Bashford be thereupon at liberty to file in this court, in lieu thereof, an information in the nature of a *quo warranto,* on his own relation, whereof a copy was delivered to said Attorney-General, Wm. R. Smith, by James H. Knowlton, on behalf of the said Coles Bashford, on the 12th day of January instant, and that upon and from the filing thereof, the said Coles Bashford be at liberty to prosecute and control the same by himself, or his counsel, as he shall be advised ; and for such other or further order as the court shall deem proper in the premises.".

A notice of this motion served upon the attorney-general was then read by Mr. Knowlton, as follows :

" *To the Hon. Wm. R. Smith, Attorney-General, &c.*

[*Title, &c.*]  " SIR,—You will take notice that a motion will be made to this court, in this cause, on Tuesday, the 22d day of January instant, on the opening of the court on that day, or as soon thereafter as it can be heard, on behalf of Coles Bashford, named in the information in this cause as relator, that the information filed by you in this cause be discontinued, and that the said Coles Bashford be at liberty to file in this court, in lieu thereof, an information, in the nature of a *quo warranto,* on his relation, whereof a copy was delivered to you by James H. Knowlton, on behalf the said Coles Bashford, on the 12th day of January instant, upon and from the filing thereof, to prosecute and control the same by himself or his counsel as he shall be advised, and for such other and further order as the court shall deem just in the premises ; which motion will be founded on the information filed by you in this cause, on the said information whereof a copy was so delivered to you on the 12th inst., and on the affidavits of Coles Bashford, James H. Knowlton, Nathaniel W. Dean and Edward G. Ryan, whereof copies are herewith served upon you.                    JAMES H. KNOWLTON,

" *Att'y for Coles Bashford, Relator.*"

The affidavits on which the motion was founded were then read:.
[*Title, venue, &c.*] " Coles Bashford, of the county of Winne-
bago, in the state of Wisconsin, being duly sworn on oath, says:
That at the general election held in the state aforesaid, on the
6th day of November last, he was a candidate for the office of
governor of said state, and that he is informed, and believes,
that a majority of the votes cast at said election for the office of
governor were cast for this deponent, and that he was duly
elected to said office at said general election. Deponent further
saith, that William A. Barstow, as he is informed and believes,
on the first Monday of January, A. D. 1856, usurped and in-
truded into said office of governor, at Madison, in the county of
Dane and state aforesaid; and that said Barstow has, from the
date last aforesaid, withheld said office from the deponent, and
still usurps and intrudes into said office, and enjoys the honors
and emoluments thereof against the rights of this deponent.

" And deponent further says, that on or about the eleventh day
of January, A. D. 1856, he called upon William R. Smith, the
attorney-general of said state, and stated to said attorney-general,
in effect, that he was desirous to file in the Supreme Court of
said state an information in the nature of a *quo warranto* against
the said William A. Barstow in the premises, and that this de-
ponent requested the use of the name of said attorney-general
for that purpose, and then and there the said attorney-general
told this deponent to make his request in-writing, and that he
(the attorney-general) would take the same under consideration.

" Deponent further saith that by his attorneys and counsel he
had prepared, carefully and concisely, an information in the
nature of a *quo warranto*, for the purpose of contesting his right
to said office of governor, showing that he had been duly elected
to said office, and showing wherein gross error had been com-
mitted by the state canvassers of the said state of Wisconsin, by
reason of which said errors in part, said Barstow assumed to
usurp and intrude into said office, a copy whereof, this de-
ponent is informed, was presented to said attorney-general on
the 12th day of January, A. D. 1856, by James H. Knowlton,
one of the attorneys of the deponent, with the request that the
said attorney-general would sign and file the same, as attorney-
general, as provided by law. And this deponent says that the

said information was founded upon facts ascertained by careful and laborious investigation, which deponent believes to be true, and that he is advised by his counsel, and believes it to be very important to his success in litigating the right of said William A. Barstow and this deponent to the said office, that an information should be filed substantially drawn as the said information presented to the said attorney-general.

" And deponent says that, as he is informed and believes, the said attorney-general has not filed the said information,. so prepared and presented to him for that purpose; but on the contrary, as this deponent is informed and believes, the said attorney-general, on the 15th day of January, 1856, filed in the Su-. preme Court an information in the nature of a *quo warranto,* upon the relation of this deponent, without the request, knowledge or consent of this deponent, a copy whereof is hereunto annexed, differing materially from the information presented to the said attorney-general, and which he was requested to file as aforesaid. And this deponent further says that the said information so filed by the said attorney-general, in the form and character of the same, is calculated to delay and hinder this deponent in the prosecution of his rights before the said court, as governor elect of the said state of Wisconsin.

" And this deponent says that he is informed and believes, that the said attorney-general, William R. Smith, is in favor of and friendly to the claim of the said William A. Barstow to the office of governor.

[*Jurat.*]                              " COLES BASHFORD."

[*Title, venue, &c.*] " N. W. Dean being sworn, &c., says, that on the 11th day of January, A. D. 1856, he went, in company with Coles Bashford, to the office of the attorney-general, at the capitol, and was there present at an interview between the said attorney general and the said Coles Bashford. The said Bashford at said interview stated to said attorney-general in substance as follows: that he (Bashford) was elected to the office of governor of the state of Wisconsin, at the general election held in said state on the 6th day of November last, and that he (Bashford) was en-. titled to the use and enjoyment of said office and to the honors and emoluments thereof, and that William A. Barstow had intruded into and usurped said office. And said Bashford further

stated to said attorney-general, that he (Bashford) desired to file in the Supreme Court of said state an information in the nature of a *quo warranto*, against the said William A. Barstow, to the end that said Barstow should show before said court, by what authority he usurped and intruded into said office and withheld the same from the said Coles Bashford; and the said Bashford then and there requested the use of the name of the said attorney-general for the purpose aforesaid. And deponent further saith, that the only reply made by the attorney-general to said request, was, that he (Bashford) might make his request in writing, and that he (the attorney-general) would take the same under consideration.                                N. W. DEAN."

[*Title, venue.*] "Edward G. Ryan being duly sworn, deposes and says: That he is retained by Coles Bashford to contest the right of William A. Barstow to the office of governor, and to establish the right of the said Coles Bashford to the said office; that on the morning of this eighteenth day of January, now instant, this deponent called upon the attorney-general, at his office in the capitol, on behalf of the said Coles Bashford, and stated, in substance, to the said attorney-general, that deponent was one of the said Coles Bashford's counsel in this matter, and thought the said attorney-general should either give the control of the information filed in this cause to the said Coles Bashford and his counsel, or should dismiss it, and decline to prosecute the claim of the said Coles Bashford to the said office, and thus enable the said Coles Bashford and his counsel, to litigate the question at issue between him and the said William A. Barstow; the said attorney-general replied, in substance, that he thought differently, that the prosecution of such an information, and the litigation of such a question, belonged to his office, and that he could not consent to surrender the power of such prosecution and litigation to any one; that deponent thereupon represented to the said attorney-general, in substance, that a cause should never be litigated by counsel inimical to its success, or whose opinions and feelings were strongly against its right, and that deponent thought no counsel should have the charge of legal interest, to the success of which they must be unfriendly; that deponent thought it natural that said attorney-general, elected on the same ticket on which the said William A. Barstow ran, should be prejudiced in favor

of the right of the said William A. Barstow to the said office of governor, and in favor of his continuing to hold the same, and understood that it was so in fact, and that the right of the said Coles Bashford could be prosecuted with proper vigor and chance of success only by counsel who were in favor of his success therein; that the said attorney-general thereupon said, in sub-stance, that it was different in regard to his official duties as at-torney-general, which he must perform for himself and of him-self; that deponent represented to him that the act of last winter (meaning chapter 23d of the general acts of legislature of 1855) was meant to provide for such a case; that the said attorney-general again insisted, in substance, that he would not relinquish the prosecution and control of this cause, and of the litigation of the question whether the said William A. Barstow or the said Coles Bashford be entitled to the said office, to any one; saying, in substance, that the counsel of the said Coles Bashford might submit any papers in this cause to him, the said attorney-general, but that every step taken, and every paper filed in this cause, must be taken and filed by the said attorney-general only as his judgment should determine him; that he had not filed the infor-mation submitted to him on behalf of the said Coles Bashford, but had filed an information which opened the whole election; and that that ought to satisfy the said Coles Bashford and his counsel.                E. G. RYAN."

And thereupon the information prepared by the counsel for the relator, and which it was proposed to file in lieu of that filed by the attorney-general, was read at length.

This information set forth as usual all the general and formal matters in pleadings of that nature, and in addition stated at great length the votes cast in the different counties at the general election, together with the returns made to the secretary of state, and the canvass thereof, and particularly specifying the errors and frauds in such returns and canvass, which the relator alleged to have occurred, which it is not necessary to report. The alleged object of which was to present at once the particular in-stances and cases of fraud and error, upon which the relator claimed to rely, and to be prepared to establish by proof.

Mr. *Knowlton* contended that the relator had the right by virtue of the act of the legislature, approved March 6, 1855, to

control and prosecute the suit in his own way, by his own coun·sel; that the attorney-general refusing to file the special in·formation prepared by the relator, the case came within the pro·visions of that act.

The *attorney-general* opposed the motion, and read the follow·ing affidavit:

[*Title, venue, &c.*] " William R. Smith being duly sworn, de·poses and says: That on the 11th day of January, 1856, at the office of the attorney-general, in the capitol at Madison, at 10 o'clock A. M., Coles Bashford, accompanied by N. W. Dean, came into the room; there were then present William R. Smith, Attorney-General, Moses M. Strong and Henry M. Billings, Esqrs. Mr. Bashford said that he had a communication to make when Mr. Smith was at leisure. Mr. Smith said he was at leisure now. Mr. Bashford then said that his business was in respect to the filing of an information on part of the state against William A. Barstow to ascertain by what right he exercised the duties of the office of governor of the state of Wisconsin. Mr. Smith said that if Mr. Bashford would make his application in writing it should be attended to, examined and judged on the part of Mr. Smith. Mr. Bashford said that an application should be made in writing, and asked Mr. Smith if it was necessary any facts should be furnished to him. Mr. Smith said undoubtedly it was necessary to furnish him with a statement of the facts relied on. Mr. Bashford then asked Mr. Smith if he would be found in his office all day. Mr. Smith said he would, or, if absent for a few minutes, he would be found in the office of the secretary of state, where his business often temporarily called him. Mr. Bashford and Mr. Dean then left the room.

"The whole substance of the above conversation was then immediately reduced to writing in the presence of Messrs. Smith, Strong and Billings, and is true and correct as herein stated.

"And this deponent further says, that on the night of the 12th day of January, Mr. Smith was in a box at the theatre in Madison, in company with the Hon. William Hull and M. M. Strong, Esq., at about half-past eight o'clock, H. H. Gray, Esq., came into the box and told Mr. Smith that a gentleman wished to speak with him at the door. Mr. Smith went out of the box, and he was then addressed by James H. Knowlton, Esq., who

presented to him a packet of paper tied with tape, and said that it was the information of Coles Bashford, which he then presented for the consideration of Mr. Smith. The packet was taken by Mr. Smith, and Mr. Knowlton then retired to some other part of the theatre.

" And this deponent further saith, that on Tuesday, the 15th day of January, in virtue of his official character of attorney-general of the state of Wisconsin, he filed in the Supreme Court an information in the nature of a *quo warranto*, on the relation of Coles Bashford, claiming to be the elected governor of Wisconsin, against William A. Barstow, who is alleged to have usurped and intruded into said office.

" And this deponent further saith, that it appears on the records of said Supreme Court, that process was issued on the said information, which was served on Governor Barstow on the 17th day of January, and so returned.

" And this deponent further says, that on the 18th day of January, at 9 o'clock A. M., Edward G. Ryan, Esq., came into the office of the attorney-general, at the capitol in Madison, and stated that he was one of the counsel of Mr. Bashford, and that he wished Mr. Smith would, as a personal favor to him (as he was about to leave town), agree to answer to a motion to be made in the Supreme Court this morning, in relation to the filing of another and special information in Coles Bashford's case, in place of the one filed by Mr. Smith, and also agree that this should be done. Mr. Smith said that he could not agree to answer to any such motion; that he did not acknowledge any right in any person to file another information in the case, as there already was one filed, on which process had been issued, and had been served; that he, Mr. Smith, had opened the whole door for Mr. Bashford, who claimed to be the governor *de jure*, to contest the claims of Mr. Barstow, whether as governor *de facto* or not; that he, Mr. Smith, acknowledged no superior control over the case than his own, so far as regarded motions and filing of papers in the Supreme Court, more especially as he was the legal officer of the whole people of the state, who are also interested in the question of ' who was governor?' as well as Mr. Bashford. Mr. Smith also said, that, as attorney-general, he had exercised his judgment in filing the information as he had done, and would

not voluntarily consent to its withdrawal, in order to the intro-duction of a new one, in a confined and partial shape, as in so doing he, Mr. Smith, would consider himself as derelict in his official duty. Mr. Ryan then said that he was sorry that Mr. Smith would not consent to his proposition, and that he must seek to get into court his own way; and further asked Mr. Smith if he would be present at the opening of the court at 10 o'clock. Mr. Smith said he would, and he accordingly attended in the Supreme Court at that hour, when Mr. Ryan told him he need not wait any longer there on his account, as it had been con-cluded not to do anything further in the matter until next Tuesday. Wm. R. Smith."

He contended that the information which he had filed was in the usual form, and adequate to all the exigencies of the case; that having done so, he had fulfilled his duty; that he was not bound by the law of 1855 to file *any* information that might be presented to him; but if the one he had filed was in due and legal form, and adequate to the legal objects sought by a pro-ceeding of this kind, it was all that the law required of him. He further contended, that it was his right and duty to control the prosecution of the suit. That the people, whose representa-tive he was in this case, had interests which he was bound to protect.

At this stage of the argument, Mr. Jonathan E. Arnold ap-peared as counsel for the respondent, William A. Barstow, and requested the appearance of the latter to be entered by himself, Messrs. H. S. Orton and M. H. Carpenter, which was accordingly done.

*Mr. Arnold* then proceeded in opposition to the motion of the relator.

He stated his belief that the whole subject of this suit was not within the jurisdiction of the court, but now is not the time to argue upon this point. It was the privilege of any individual to present his information to the attorney-general, and request him to act. If he consents to act, he is the sole counsel in the suit. The attorney-general could refuse, however, to act, when the party could bring his own information. But any substantial compliance with the request—the filing of proper papers, of

those known to the law, of that information or any other infor-
mation in substance the same, precluded the party from proceed-
ing on his own relation.  He had called it absurd to suppose
that the attorney-general must file just the paper, and none
other, handed to him.  Suppose it were fatally defective, lacked
form and substance, is he bound by its defects?  It was his
duty to place it in proper form, or such form as he in his judg-
ment deems best.  Such was this case.  The attorney-general
has not refused.  He has filed substantially the information he
was requested to file.  Where is the difference between the two
documents?  That filed by the attorney general is in the form
used in England, is known to our laws, and has been twenty
times used in this very court.  Theirs made special averments,
and raised restricted and special issues.  They have raised spe-
cial and limited issues, to attain, not a special, but a general re-
sult.  The question to be tried here is whether Coles Bashford is
entitled to the office held unlawfully by Wm. A. Barstow.
Should not that information aver the general fact and raise the
general issue ?  Allow us, for the sake of the argument, to con-
cede every special averment, in that information of Mr. Bashford,
to be true—does that make Coles Bashford governor ?  By no
means!  Because there may be in other counties, frauds and errors
sufficient upon the other side to counterbalance them.

What then follows?  Upon finding these special averments to
be true, you issue judgment of ouster against Gov. Barstow, and
declare Bashford to be the governor.  Gov. Barstow then files
his information upon the other errors ; his special averments are
found to be true.  Bashford is ousted and Barstow again declared
governor, and thus each in turn occupies the office and contests
it till the term has expired.  Why do they object to the informa-
tion already filed ?  Is it not broad enough—is the field of in-
quiry which it opens not large enough ?  It is too large !  They
seek to aver and set up just fraud enough to cypher Coles Bash-
ford into office, and tell us to fight that.  Instead of such a course,
the attorney-general has opened the doors as wide as the state.
This court could never rightly decide the question till the whole
election was investigated.  He was surprised, as a citizen of the
state, to see anything less asked for by a contestant for its high-
est office ; and especially as the newspapers in the interest of the

relator, had day after day charged that the respondent shunned investigation and sought for delay.

He was authorized to say that the respondent sought and desired the fullest and most speedy inquiry into the legality of his election. We are ready to meet the trial of his right to the office which he holds—to meet it promptly, and to meet a fair, full and honest trial. He then went into an examination of the language of the statute of 1855, holding that a substantial compliance with the request of the relator, left the latter with no right to come into court. It was a public prosecution, and the officer of the people should prosecute it.

*H. S. Orton*, for the respondent, opposed the motion and contended that inasmuch as the respondent had appeared in the suit brought by the attorney-general, was a party to it, that there now existed no right to change the nature of the suit without his consent. If a public officer is prosecuted, he has a right to demand that it be in due form of law. The position assumed would render every public officer of the state continually subject to the annoyance of suits by every briefless holder of a lawyer's certificate. It is not the desire of the respondent to evade or deny the summons of this court, but to come to a speedy trial without evasion or demurrer. It was thought, therefore, proper that the suit should be brought, controlled and prosecuted by the legally appointed officer of the state. Private rights are not litigated in such a suit as this. Public rights alone have a voice here, and through the public officer should the voice be heard. But he saw the object of this motion. It was not an objection to this or to that form of information. It is to remove the attorney-general from his position, and replace him by the partisan and private counsel of the relator. Why is it sought to file an information different from the one which universal custom and precedent had established? It was to embarrass the respondent, and place upon him the burden of bringing affirmative proof that frauds or errors existed otherwise than as averred in the information. The respondent asked not for delay. He asked only for reasonable time to prepare and submit his defence. But the case he will meet manfully, properly, and with due dispatch.

*E. G. Ryan,* counsel for the relator, argued in support of the motion. He insisted that it was apparent that the views and feelings of the attorney-general were hostile to the relator, and that the latter had the right to control the prosecution and conduct of the suit. He believed that the result of this motion would determine whether there could be any real investigation into the alleged frauds or not. Where the matter was wholly in the nature of a public right, such a thing as a relator was unknown. Where a private right is involved the public do not act. It is then on the relation of the individuals interested, who are wholly responsible for the costs, and always take control of the suit. If the doctrine asserted here to day were true, the attorney-general might at any time turn out half the attorneys in this court. Large numbers of suits were brought here in the name of the state. The rights involved were chiefly of a private nature. The attorney-general had nothing to do with them, and the manner in which they were brought was a mere form. He claimed that whenever private rights were involved the relator might use the name of the attorney-general or the state, the former in the case of an information, the latter in the case of a *quo warranto.* The information in this instance, without the request, knowledge or consent of Mr. Bashford, was filed on his relation. By this act the attorney-general and the respondent's counsel were estopped from pleading that this is a public cause. The insertion of the relator's name deprived the attorney-general of the control of the suit. Any other construction would be to authorize that officer to use the name of any person, place him in the breach between the state and the respondent, and make such person responsible for the costs. He held that the use of the words "an information," first, and subsequently "the information," in the act of 1855, clearly demonstrated that the attorney-general must either file the paper desired by the relator, or refuse altogether. The statute committed to the judgment of the relator and his counsel the determination of what was and what was not a proper information, and it was peremptory on the attorney-general either to file it or refuse. The law trusts whatever public rights are involved to the selfishness of the individuals, to the selfishness of the relator, that he will prosecute the suit thoroughly, in order to gain his own

alleged rights, to the selfishness of the respondent that he will defend with vigor to retain his alleged rights; and the law was pretty safe. But the attorney-general is at the best a mere third person, comparatively indifferent to the result.

On the 24th day of January the decision of the court was announced.

WHITON, C. J. There is no substantial conflict between the affidavits on both sides. It is apparent to the most casual observer, that there are now three parties before the court, viz: The people, the relator and the respondent, and that the public interests are not hostile to those of either of the parties. Heretofore the attorney-general, as the officer of the people, has been allowed to manage cases of this kind, as it was presumed that the most vigorous prosecution would come from that source. The public is probably in little danger here, because the interest of the parties will bring out the facts for adjudication. Of course, this method would not be the best for all where the attorney-general does not act in good faith.

The question is, who shall control this suit? The attorney-general and the relator both ask it.

The information filed by the attorney-general, and that sought to be filed, both set out such a case of intrusion into office as is contemplated in the law. The law gives the attorney-general power to proceed in his own name or that of the relator. *Sec.* 22 *of chap.* 126, *Rev. Stat.* gives the court power to inflict a fine of $2,000 on the intruder, if found guilty. The attorney-general must prosecute to the end, but when the right is established, then the relator may sue in his own name, for damages.

The counsel for the relator contend that there is a difference between the two informations, and that when the attorney-general has commenced in the relator's name, he (the relator) has a right to control the suit, as one of private right.

But the relator is not alone interested, the people are interested that the rightful person should have the office. The public interest steps in and modifies the private right; and this public interest is not hostile to either the relator's or the respondent's private right.

This case must be decided upon the various statutes. Nu-

merous cases occur in English practice, but they are not of paramount authority, unless in harmony with our statutes.

But it is claimed that the law of 1855 gives the right to the relator to sue in his own behalf. That statute is as follows:

"Section 1. Chapter 126, of the Revised Statutes, is so amended, that, whenever any citizen of this state shall claim any public office, which is usurped, intruded into, or unlawfully held and exercised by another, the person so claiming such office shall have the right to file in the Supreme Court, either in term time or vacation, an information in the nature of a *quo warranto*, upon his own relation, and with or without the consent of such attorney-general, and such person shall have the right to prosecute said information to final judgment, in all other respects, as provided in said chapter. *Provided*, He shall first have applied to the attorney-general to file the information, and the attorney-general shall have refused or neglected to file the same; and in such case he shall be liable for the costs, if he shall fail to establish his right to the office.

"Sec. 2. This act shall take effect immediately after its passage."

It is not easy to give a satisfactory construction of this law, but after due consideration, it is certain that the right of the individual to proceed depends on compliance with the condition of an application to, and refusal by the attorney-general. The relator contends that this condition has occurred.

The relator's counsel contend that a fair construction of this law requires that the attorney-general shall file the information presented to him, or if he neglects or refuses to do this, then the relator has the right to proceed.

What is the intent of the law of 1855? Suppose the attorney-general had, of his own will, on the day after the governor was sworn in, filed an information, could the relator come next day and file another, and thus two suits proceed at once? Clearly not; and it is clear that the law contemplates a case where no information is filed, and the attorney-general absolutely refuses to move in the matter. It is hence not necessary to inquire which of the two informations is the best, or whether time is gained or lost; and the court does not see that the contingency has arrived when it should interfere. The motion must be

*denied*, without, however, expressing any opinion as to the course of the court if the attorney-general shall show bad faith towards the relator. There are three parties in court, and the rights of all shall be protected, if the court can protect them.

SMITH, J.—This is an application for an order of court to discontinue the information filed by the attorney-general, and to permit the information presented by the counsel for the relator to be filed, and henceforward to commit the control of the case to the relator or his counsel, to the exclusion of the attorney-general.

On the 11th instant, application was made by the relator to the attorney-general to file an information against the respondent. On the 12th an information *was* presented to the attorney-general by Mr. Knowlton, as counsel for the relator, with a request that he should file it by the hour of 11 o'clock on the 15th instant. On the 15th, about the hour of 11 o'clock, the attorney-general *filed* an information in the usual form, but not *the* information drawn up and presented to him by the counsel for the relator. The draught of the latter differs from that of the one. filed, in that it sets forth the specific facts on which the relator bases his right to the office of governor, and whereon he bases the charges of usurpation and intrusion by the respondent.

The attorney-general objects to the motion of the relator, and insists upon his right to conduct the prosecution of the suit.

The respondent, whose appearance has been regularly entered, objects to the motion, and

The relator insists upon, and urges his right to dismiss or to control the suit.

Under these circumstances what are the legal rights of the respective parties?

1. The office of governor is one of high dignity, in which the people have the paramount interest.

2. It is one of honor and emolument, in which the person legally elected has a peculiar and individual interest, and

3. The respondent, who is charged with usurpation and intrusion, has a deep interest in the proper, legal conduct of the proceedings, which involve both his fortune and reputation.

In ordinary prosecutions of this nature, controversies of this

kind seldom arise. We look in vain for authority upon the precise question here involved. It seemed to be conceded, however, that the proceedings must be commenced and carried on in the name of the attorney-general. The usual practice is, for that officer to institute the proceedings upon his own relation or that of another ; or, for the relator to apply to that officer for the use of his name ; or, if he refuse on such application, to apply to the court, who may allow the information to be filed or not, in their discretion, in view of all the circumstances of the case.

It is only in case the attorney-general refuse, or so conduct the suit as to indicate hostility to the right of the relator, or on leave granted by the court under all the circumstances of the special case, that the relator will be permitted to control the proceedings, against the authority of the attorney-general.

It is apparent to my mind, that the respective interests and rights of the several parties represented in this proceeding do not stand in the same relation, as they are ordinarily arranged in personal actions in which private rights are alone involved. Were the rights of Mr. Bashford and Mr. Barstow, only involved, there would be no difficulty in designating the field of action and arranging the combatants. Should the law officer of the government, for and in behalf of the people, disclaim all interest in the controversy, and thus leave the relator and the respondent to contest their personal rights in relation to the office, or had the legislature, the representatives of the people, so clearly indicated their will that we could be justified in holding that they had intrusted their interest in this office to the selfishness of the private parties litigating in relation thereto, in such case we might readily dispense with the further attendance of the attorney-general. But the attorney-general does not disclaim in behalf of the people, nor does he retire from the controversy, leaving it to the contest of individual right. On the contrary, he insists that the people are deeply interested, and that it is his duty to protect those interests. Nor can we so construe the several acts of the legislature on this subject, as to justify the conclusion that the public interest is left to depend solely upon the character and result of the personal contest.

It is impossible to read chapter 126 of the Revised Statutes without perceiving that the statute has provided for the deter-

mination of the rights of the three parties litigant in one suit, viz: the people, the relator or claimant, and the respondent. The statute contemplates that a double judgment may be rendered, one against the respondent, and another in favor of the relator, but not necessarily. dependent and correlative; for though the respondent may be found an usurper, the relator might be found a pretender, in which case, though the one would be ousted, the other would be denied accession.

But it seems to me quite certain that in the passage of chapter 126 of the Revised Statutes the legislature never contemplated the occurrence of such an antagonism between the public interest and that of the citizen who might become the relator, as seriously to impede the due protection and prosecution of the rights of the latter. Ordinarily the public concernment has been so trivial that the public prosecutor was content to leave the suit to the management of those personally interested, or the interests of the relator have so harmonized, or so failed to conflict with those of the public, as to afford ample scope to the efforts of both parties. Perhaps it is not improper for me to remark, that from the public history of the late election, as well as from the conceded facts shown by the documents accompanying this motion, I have been utterly unable to discover any adequate occasion for such an antagonism here. But two persons were before the people as candidates for their suffrages for the office of governor. The public concern is, that the person having the greatest number of the votes lawfully polled and returned, should hold and exercise the office. But two persons claim to have been legally elected. One of the two most probably is, and the other is not elected. To ascertain which one is so elected is the object of this proceeding, and however the fact may ultimately appear, the public interest is, that it shall be legally determined, and that the law shall be found adequate to its full and perfect vindication.

It is obvious that this is a tri-partite proceeding, one of the parties being the people represented by the attorney-general. This officer has also made the relator a party, averring his right to the office. He has therefore undertaken a double duty.

This information is in the usual form, and is adequate to the exigencies of the relator's interests; and until the attorney-general shall manifest some hostility to the relator's rights, or fail

to perform the duties which he has voluntarily assumed, it would be wrong for this court to interfere.

This court has the constitutional power to protect all the parties litigant before it, and will doubtless interpose such protection whenever it may become necessary. But the mere preference of one mode of pleading over another, both being legal and proper, cannot oust the attorney-general from his proper position in this case. It does not appear that there is any sufficient cause for sustaining this motion. All the parties before the court have their respective rights. All can be heard in their maintenance, and all will be protected in their prosecution.

On the 2d day of February, the parties, by their counsel, were again in court, when Mr. Arnold asked leave to file the the following motion :

[Title.] Supreme Court, December, A. D. 1855: "And now comes the respondent in the above entitled suit, by his attorneys, Messrs. Arnold, Orton and Carpenter, and moves the said court to quash the summons issued herein, and to dismiss the same and all proceedings herein, for the reason that the court has no jurisdiction in the premises.

> J. E. ARNOLD,
> H. S. ORTON,       } Att'ys for Respondent."
> MAT. H. CARPENTER,

The motion was filed, when the counsel for the respondent requested the court to grant the term of thirty days for the preparation of the argument of the motion, which was objected to by the counsel for the relator, and the argument set down for the 11th day of February.

On the 11th day of February the argument of this motion commenced, and was argued at great length by Messrs. Carpenter, Arnold and Orton for the motion, and by Messrs. Randall, Howe and Knowlton in opposition. It was desirable to report a synopsis of the arguments of each of the counsel who took part in the discussion, and to that end they were severally requested to furnish a synopsis for that purpose; Mr. Carpenter and Mr. Howe have done so, but none other.

*Mr. Carpenter* contended that the proceedings should be dismissed for want of jurisdiction. This court is called upon to

consider whether it has the constitutional power to. render a judgment of ouster and eviction against the chief magistrate of the state, and contending against this power, the following propositions are urged :

1. The three departments of the state government, the legislative, the executive and judicial, are equal, co-ordinate and independent of each other ; and that each department must be, and is the ultimate judge of the election and qualification of its own member or members; subject only to impeachment and appeal to the people.

2. That this court must take judicial notice of, who is governor of the state; when he was inaugurated; the genuineness of his signature, &c. ; and therefore cannot hear argument or evidence upon the subject. That, who is rightfully entitled to the office of governor can in no case become a judicial question; and

3. That the constitution provides no means for ousting a successful usurper of either of the three departments of the government; that that power rests with the people: to be exercised by them when they think the exigency requires it.

The subject opens before us a vast field of elemental thought and research, taxing history and political philosophy more than municipal law. All modern governments are the result of experiment; and all the blessings they secure, flow from improvements in the science of government, from time to time suggested by observation and experience. The writers upon political economy who are most esteemed, have but followed in the train of events, faithfully recording the details of history. Even our own government was no bold original conception, but simply the reducing to practice the wisdom of the past. All the restraints of power our system contains, had been attempted—sometimes with, and sometimes without success—by the whigs of England. The violence of factions (that often fatal-result of popular governments) as experienced in England, during the wars of rival Roses, had suggested to her Parliament, many, indeed most of the safeguards which to day we rely upon to keep power within bounds. It is the highest praise that can be bestowed upon our system, that it is no schemer's dream, but the practical wisdom of a practical age.

The revolution of 1668, in England, had awakened the keen-

est discussion of the fundamental principles of government, by the greatest statesmen the British empire ever produced. The minds of men had been long directed to the methods of polity; and the most elaborate treatises upon the science of government, and particularly upon the relations of governors and governed, had been given to the world. The theories espoused by the whigs in that discussion, the right of the people to cashier their rulers, was learned by all our statesmen, and the sharp tyranny practiced upon the colonies had prepared the hearts of our people to receive it with great joy. The declaration of independence, severing our connection with the parent power, transferred what writers call *the sovereignty*, to the respective colonies. And in the constitutions of the several governments they established, the people carefully avoided the hazard of departing from established institutions, beyond what was absolutely necessary.

One axiom laid down by all writers of that day, illustrated by all history, and as true now as then, is that power tends to corrupt those who possess it, and the consequent necessity of prescribing its arrogance with something more than paper limitations and written constitutions. To those who now claim that power is bestowed upon governments and its officers only upon the charitable belief that it will not be abused, a few quotations may be of service.

" Political writers have established it as a maxim, that in contriving any system of government, and fixing the several checks and controls of the constitution, every man ought to be supposed a *knave*, and to have no other end, in all his actions, than private interest. By this interest we must govern him, and by means of it, make him, notwithstanding his insatiable avarice and ambition, co-operate to public good. Without this, say they, we shall in vain boast of the advantages of any constitution, and shall find, in the end, that we have no security for our liberties or possessions, except the good will of our rulers; that is, we shall have no security at all.

" It is, therefore, a just *political* maxim, *that every man must be supposed a knave;* though, at the same time, it appears somewhat strange, that a maxim should be true in *politics* which is false in *fact*. But to satisfy us on this head, we may consider, that men are generally more honest in their private than their public

capacities, and will go farther lengths to serve a party, than when their own private interest is concerned. &ast;  &ast;  &ast; When there offers, therefore, to our censure and examination, any plan of government, real or imaginary, where the power is distributed among several courts, and several orders of men, we should always consider the separate interest of each court, and each order; and if we find that by a skillful division of power, this interest must necessarily, in its operation, concur with the public, we may pronounce that government to be wise and happy. If on the contrary, separate interests be not checked, and be not directed to the public, we ought to look for nothing but faction, disorder and tyranny from such a government. In this opinion I am justified by experience, as well as by the authority of all philosophers and politicians, both ancient and modern." *Hume's Philosophical Works*, *Vol. III*, *pages* 39 *and* 40.

"Moralists have embraced different systems respecting the origin of moral evil, and the natural disposition of man as affected to virtue and vice. Political writers have uniformly agreed. From Machiavel to Dr. Price, all have asserted, or admitted, that in a political character, when intrusted with power, man is totally depraved, wicked and corrupt; that in power, the utmost perverseness is inherent in his very nature; that he is never good, but through necessity. Hence mutual checks, restraints *and opposition* of powers are found necessary to guard against the oppression of rulers." *Chipman on Government*, 44.

Montesquieu says: "Constant experience shows us that every man invested with power is apt to abuse it. So endless and exorbitant are the desires of men, that they will grasp at all, and can form no scheme of perfect happiness with less."

The English government, which is in substance a republic, though a monarchy in form, furnished to our fathers the model of our republic. They looked to its constitution, and to its history; changed what could be amended, guarded against its abuses, and established their own government, a republic in form and fact. They knew very well how the liberties of England had been preserved; and that their only safety was in the division of power among different courts, and different orders of men. The commons were at first compelled by the king to attend his court, to enable him to balance the great power of his

lords and barons. Subsequently, the king and commons, the king and lords, or the lords and commons combined could control the state, until in 1688, by the remodeling of the English constitution, the commons became the prevailing power in the government. The patriots of our revolution abhorred titles of nobility and arbitrary distinctions among the people; they had no desire for a king and nobility; and hence they had to resort to some other device to effect the check and control of power. This they endeavored to do, by dividing the sovereign power, *or that portion of it which is represented by the government*, among three independent co-ordinate departments. The kingly power, with certain specified exceptions, under the less offensive name of *executive power*, they conferred upon the president. The legislative power, with like exceptions they bestowed upon two houses of congress, which like the lords and commons of England, were to constitute one legislature. And the judicial power, was conferred upon a court independent of both the other departments.

The proposition that our government consists of three independent and co-ordinate branches, will not be questioned, as an abstract proposition. But the question will here be, what are the consequences of this division of power; this existence of co-ordinate authority?

It has grown common of late for writers and speakers to lose sight of this practical division of power, and to represent the three departments as mere agents of an incomprehensible, undefined *something*, which they call *the law;* which is to be declared by this court, and to which, when thus declared, all departments of the government are bound to yield implicit obedience. Sometimes it is said, sovereignty is with the people, the law is the will of the sovereign, the court declares the law; therefore, the courts are above all that is subject to the law; and hence the governor must yield obedience to the court. All this jargon comes from confounding the rights of the people *under* the government, with the right of the people *to overthrow* the government. The sovereignty of the people, is to a politician, a sweet morsel; to a lawyer and judge, an unmeaning and senseless sound. The sovereign is above the law; his will, changing a thousand times a day, changes the law, as often. The sovereign can do no wrong,

for his actions form the standard of right. The people, under a government, have none of these attributes of sovereignty. The people establish the government, and in so doing, part with their sovereignty, and the government, when established, is as completely sovereign as Alexander is sovereign in his dominions; and the sovereignty of the people *under* a government, is a fiction. "We have said that sovereignty is that public authority which commands in civil society, and orders and directs what each citizen is to perform to obtain the end of its institution. This authority originally and essentially belonged to the body of the society, to which each member submitted, and ceded his natural right of conducting himself in everything as he pleased, according to the dictates of his own understanding, and of doing himself justice. But the body of the society does not always *retain* in its own hands this sovereign authority; *it frequently intrusts it to a senate or to a single person. That senate or that person is then the sovereign. Vattel, ch. 4, § 38.* For instance, suppose Wisconsin contained but one thousand souls, under our present constitution. A. is indicted for murder, tried at the circuit, found guilty and brought up for sentence. The thousand souls constituent, *the people of Wisconsin,* come to the bar of the court, and pray the judge not to pass sentence. The judge refers them to the law, which, until repealed or changed, is the standard of his duty. They reply, "*We are the people,* we established this government, made this law, and elected you a judge to administer it. You are our agent, we are sovereign, our will can dispense with the law." These arguments would certainly not deter a faithful judge from passing sentence on the prisoner; and if they should, the fickle multitude would speedily punish the weakness which consulted temporary popularity instead of duty. Again, suppose our legislature should, in defiance of the constitution, pass a bill of attainder. The governor proceeds to execute it, and this court pronounce it constitutional. Such proceedings would justly exasperate the people. They would elect a different legislature, governor and court. But suppose the new legislature will not repeal the law, the new governor will execute it, and the new court declare it constitutional. What would the sovereignty of the people avail them? Some one will answer, they would resist. Precisely—they would overthrow the government. In this

sense the people are sovereign; so are the subjects of Alexander sovereign in the same sense. This right of the people, (which I am by no means trying to controvert), is the right of might; the law of the strongest. And the serfs of Russia have an equal right with us to exercise it—and are therefore as truly sovereign, as the people of the United States. The government, while it exists, is sovereign, and the people are subject. The courts of law, a constituent part of the government, are bound to disregard the will of the people, unless it be expressed in the constitutional mode. And it is one of the chief objects of the people in forming a government of any kind, to place the exercise of the delicate functions of government beyond the reach of every caprice and changing humor.

It is common to hear government spoken of as a sentient being, and the executive, legislative, and judicial departments, as so many members moved by one all-pervading impulse. But this is only when theory triumphs over common sense, and speculation denies the fact. Government, aside from those who administer it, is merely a creature of the fancy, and is as impotent to any practical end, as would be the laws of gravitation with no object for them to attach to. Put it in what pleasing disguise you will, *man must govern man.* And in framing a government, the problem to be solved is, how can man be so checked and controlled, as to exercise power, and not abuse it? To bestow the supreme power upon any man, or any one set, class or sect of men, is fatal to liberty; and it is only by dividing the supreme power, among different classes, or different departments, that liberty can be preserved. This was one of the earliest discoveries in the science of politics, and dates back to the days of Rome. *Millar*, in his *View of the English Government*, speaking of the disorders incident to the intrusting of unlimited power in the ruler of a province, under the Roman government, says: "For preventing these disorders, it was thought prudent to associate different leaders in the supreme power. * * The same plan was further extended by Dioclesian, who *divided the sovereignty* between two emperors and two Cæsars. * * The Emperor Constantine rendered *this division* more permanent by erecting a great eastern capital, which became the rival, and even superior, in opulence and dignity, to that of the west. In conformity to such views

of *dividing the sovereignty* among those bodies, who might otherwise be disposed to tear the empire asunder, subdivisions were made in those territories which had formerly composed a single province, and in each subdivision a chief officer was appointed, whose authority might serve to limit and circumscribe that of him who had the government of the whole.   *   *   The direction of the civil, and that of the military establishment, were for the same reason separated, and placed in different hands." *Vol. I, p.* 2, § 29.

From the days of Trajan to the present hour, this principle of division of powers among rival possessors, has been gaining credit, and has now become the great axiom of politics.   Never was it more universally accredited, than among those who formed the American republics.   In 1778, M. Turgot wrote a letter to Dr. Price, criticising one of our constitutions, and its divisions of power into different departments, in which he says: "I see in the greatest number an unreasonable imitation of the usages of England.   Instead of bringing all the authorities into one, that of the nation, they have established different bodies, a house of representatives, a governor, a council, because England has a house of commons, a house of lords, and a king.   *They undertake to balance these different authorities, as if the same equilibrium of powers which has been thought necessary to balance the enormous preponderance of royalty,* could be of any use in republics formed upon the equality of all the citizens; and as if every article which constitutes different bodies was not a source of divisions."

This objection, if well taken, applied to our national as well as state governments; and to justify the necessity for this *division of powers,* this *balancing* and *equilibrium* of powers, Mr. Adams put forth his defence of the constitution, which as a general treatise upon the science of government, and a commentary upon our own, is regarded as an authority.   What the dreaming, theorizing Frenchman regarded as a blemish, the great American patriot regarded as a crowning excellence.   In his preface to that work Mr. Adams says: "Representations, instead of collections of the people; a total separation of the executive from the legislative power; and of the judicial from both; and the *balance* in the legislature, by three *independent, equal branches,* are perhaps the only three discoveries in the constitution of a free gov-

ernment, since the institution of Lycurgus. * * We shall learn to prize the *checks and balances* of a free government, and even those of modern aristocracies, if we recollect the miseries of Greece, which arose from its ignorance of them. The only balance attempted against the ancient kings was a body of nobles; and the consequences were perpetual alternations of rebellion and tyranny, and the butchery of thousands upon every revolution from one to the other. When kings were abolished, aristocracies tyrannized; and then no balance was attempted, but between aristocracy and democracy. This, in the nature of things, could be no balance at all, and therefore the pendulum was forever on the swing.

"It is impossible to read in Thucydides, his account of the factions and confusions throughout all Greece, which were introduced by this want of an *equilibrium*, without horror. * * * Such things ever will be, says Thucydides, 'so long as human nature continues the same.' But if this nervous historian had known *a balance of three* powers, he would not have pronounced the distemper so incurable."

I have quoted thus at length, to show that something more was intended by the division of the *supreme power into three parts* than a mere separation of duties to be performed by different officers, in obedience to some superior will, to which all are supposed to bow. Another writer represents the government held in place by this division of powers, and this conflict of opposing forces, like a ship "*acted on by contrary winds.*"

According to these writers, the three departments of the government are not three mere agents of one sovereign will, acting in obedience to a common impulse; they are represented as acting and re-acting upon each other—as manifesting opposition of will and collision of strength. They are equal, co-ordinate, and independent of each other.

"The executive, legislative and judicial departments are co-ordinate, because each in the sphere of its powers, is equal and independent of the others, and because the three united make the government." 1 *Calhoun's Works, p.* 197.

This is the precise definition of two sovereign powers; and so the departments stand to each other. Neither can interfere with, or control the other, further than the constitution has expressly

given the power to do so. And the moment a power of inter-
ference or control to any extent is given, that moment, and to
that extent, the departments cease to be equal and independent.

This doctrine is laid down in Jackson's veto message. Speak-
ing of the constitutional question, and disposing of the argument
that the Supreme Court had settled the question, the president
says: "If the opinion of the Supreme Court covered the whole
ground of this act, it ought not to control the co-ordinate author-
ities of the government. The Congress, the executive and the
court must each for itself be guided by its own opinion of the
constitution." And again: "It is as much the duty of the
House of Representatives, of the Senate, and of the president to
decide upon the constitutionality of any bill or resolution which
may be presented to them for passage or approval, as it is of the
supreme judges, when it may be brought before them for judicial
decision. The opinion of the judges has no more authority over
Congress than the opinion of Congress has over the judges; and
on that point the president is independent of both. The author-
ity of the Supreme Court must not, therefore, be permitted to
control the Congress, or the executive, when acting in their leg-
islative capacities, but to have only such influence as the force
of their reasonings may deserve." *Vol. II, Statesman's Man.,* 772.

Equally decisive is the opinion of Mr. Wirt. One Cathcart
had obtained an allowance of money by the commissioners under
the Spanish treaty, which, according to his memorial, he alone
was entitled to. Other persons having an interest in the claim
filed a bill in chancery, and enjoined the officers of the treasury
department from paying to Cathcart. It was referred to Mr.
Wirt, Attorney-General, 1st: Whether, in any case, an injunc-
tion is binding upon the executive department of the govern-
ment; and 2d: If so, whether an injunction is binding upon the
officers of the treasury. Mr. Wirt says: "On the first and sec-
ond questions I am of the opinion that it is not in the power of
the judicial branch of our government to enjoin the executive
from any duty specially devolved upon it by the legislative
branch of the government, or by the constitution of the United
States. If it were otherwise, it would be in the power of the
judicial branch of the government to arrest the whole power of
the other two branches. My opinion is, that the judiciary can

no more arrest the executive in the execution of a constitutional law than they can arrest the legislature itself in passing the law. It would be easy to show that the existence of such a power in the judiciary would place the existence, not only of the government, but of the nation itself, at the mercy of that body in every crisis, both of war or peace. It is therefore, in my opinion, essential to the government to assert for the executive this independence of action." 1 *Vol. Attorney-General's Opinions*, 681.

If the three departments are equal in power and independent in action, does it not follow, as a corollary, that each department must judge of the election and qualification of its own member or members? How else can the three departments be said to be independent? Is it not one of the most important characteristics of an independent state, that it elects its own officers, and determines for itself ·who is elected and rightfully entitled to hold and exercise office? Would the American people be independent of the crown of England, if the queen could remove our president and order a new election? If she was clothed with the ultimate power of determining whether the acting president was legally elected and otherwise qualified to hold his office, and, ascertaining that he was incapacitated or not legally elected, could declare his election void, and put a rival candidate in his place, how little short would this be of an unlimited power of removal? How much do removals for cause differ from other removals, when the removing power is the sole judge of the existence of the cause? William A. Barstow is holding the office of governor under color of an election, has the records and seal of the executive department; has been recognized by the legislature, and is in the daily and hourly exercise of its duties; all its duties; approving or vetoing the laws which the legislature enact. It will not be contended for a moment that this court could control him in the discharge of a single duty pertaining to the executive office, because such power on the part of this court would be incompatible with the independence of the executive department. But it will be contended that this court, while it has not the power to control Governor Barstow in a single official duty, can nevertheless extinguish his official life, drive him from the executive chamber and put another in his stead. This absurd claim of power in this court should be sustained by some

very powerful reasons on the part of the attorney general, before this court should adopt it. . I say *reasons*, for to require *authorities* would end the question at once; they cannot be found.

If the power of this court extends to entertain this proceeding, it extends equally in any possible state of things. If this court has the power to decide who is governor in a clear case, it has the power to do so in a doubtful one. If it has the power to turn out a governor when the court are satisfied that he is not legally elected, then it has the power to do so when satisfied that he is legally elected. It would in one case be an honest, and in the other a corrupt exercise of power; but the power exists in this court to evict any governor that ever will be elected, and put any man in his place. It is idle to say that the trial by jury is a sufficient check upon your power; for you alone can determine what evidence shall be given; and what is the legal effect of the evidence given. You can by your charge, cover the whole case, and direct a verdict; and if the jury disregard your charge, you can set aside the verdict *for that cause;* and so on, until you put *whom you please* in the executive chair. Again, if you have this power over the executive, it is not less over the legislative branch of the government. It may be said no; the constitution provides that each house shall be the judge of the election and qualification of its members. But I will show your honors how you can send away the legislature with the governor.

First: The provision that each house shall be the judge of the election and qualification of its members, occurs where the constitution is defining the powers of the two houses, and trying to make each independent of the other. It is not intended to limit the judicial power, but is saying that one house shall not interfere with the other. The provision may be read thus: Each house shall be, as against the other house, the sole judge of the election and qualification of its members. But suppose this is not a fair reading of the constitution, you may decide that it is, and then your power is ample.

Second: The provision is, that "each house" shall be the judge of the election, &c. This pre-supposes a legal house; a majority unquestionably elected and qualified to judge of the election and qualification of the disputed members.

Take now an extreme case—for in examining a question of

power no matter how extreme the case—suppose by a mistake, or by a sudden change in our election laws, not yet published and understood, not a single member of the assembly was elect-ed on the right day. Yet a member from every district comes; they all organize, declare their election legal, are recognized by the senate and by the executive, and go on in the ordinary forms, performing the ordinary acts of legislation. Here by supposi-tion every member is an usurper, and of course all taken together are no better—for a hundred usurpations could not cure one. Could you summon them to your bar and declare their election void, and their seats vacant? If you could do so in this state of things, you could declare in any case that this state of things existed, and you could send home this legislature and every other one that shall assemble. And no matter how corruptly you decide, or how erroneously, if you have the jurisdiction over the persons and the subject matter, no one can question the correctness or the honesty of your decision, though everybody should know it to be entirely corrupt.

Has the constitution clothed you with this unlimited power over the other branches of the government? If so, then you have the power to usurp the whole government; and that, too, without transcending your constitutional authority. You are the state, as completely as Louis XIV attested he was, and the three departments of the government are at your mercy. They depend for existence, not upon any vital principle of life breathed into them by the constitution, but upon your honesty alone—*your honesty alone*, for if you become corrupt, they are at an end. If this be your power, it is an insult to the com-monest understanding to say that the three departments of the government are equal in power and independent in action. They have no powers; they exist but at your mercy. They live not by drinking at the constitutional sources of power; they live only on the hope that the judges are good men and true; that they regard their oaths, and confine themselves with-in amiable and good natured bounds. They have no shield to raise in their own defence; they have no sword to strike at encroach-ment and usurpation; they stand no longer erect like warriors, they supplicate and plead like women for their own existence. They have become the lesser stars in the constellation of the

state, and humbly and hopefully revolve around their centre, the Great Triumviri.

But, it may be said, these evils result only when this court shall become corrupt. All power may be abused, but that is no reason why it should not be granted; it is supposed the court will be just. I have already shown that no such thing is expected. They who founded our republic did not look to honest judges to keep the government in proper balance. On the contrary, they supposed you would become corrupted by power, and they, in one sense, relied upon such being the case; at all events, they expected and counted upon the fact, and hence concluded that as the three departments would be equally corrupted; equally ambitious; equally jealous; equally struggling for the chief command and supremacy; so would each department be equally powerful; perfectly independent; and so, as poison kills poison, it was thought that in the jostling, the balancing, the acting and re-acting of the different departments upon one another, the tripping and confusion in this scrub race of the three departments for the supreme power, the people would be able to keep all in check and in subjection. It was not to an equal division of honesty, nor yet to the immaculate character of this court, that they trusted. It was to the equal balancing and division of power; it was that each one would check the other; that sword would clash upon sword, and ambition foil ambition; this it was they expected, and to this they trusted. It was not that you would not abuse your power by usurping the other departments, but that you had not this power to abuse. The presumption that courts will not abuse their power, is the presumption of the lawyer and of the suitor under the constitution, it is not indulged in by the people in the formation of governments.

To show that the sweet confidence of judges in their own incorruptible character, is not shared to an equal extent by all men—I read from 1 vol. Jefferson, 81. "Before the revolution, we were all good English whigs, cordial in their free principles, and in their jealousies of their executive magistrate. These jealousies are very apparent in all our state constitutions; and in the general government in this instance, we have gone even beyond the English caution, by requiring a vote of two-thirds

in one of the houses for removing a judge; a vote so impossible, when any defence is made, before men of ordinary prejudices and passion, that our judges are effectually independent of the nation. But this ought not to be. I would not, indeed, make them dependent on the executive authority, as they formerly were in England; but I deem it indispensable to the continuance of this government, that they should be submitted to some practical and impartial control; and that this, to be impartial, must be compounded of a mixture of state and federal authorities. It is not enough that honest men are appointed judges. All know the influence of interest on the mind of man, and how unconsciously his judgment is warped by that influence. To this bias add that of the *esprit du corps*, of their peculiar maxim and creed, that 'it is the office of a good judge to enlarge his jurisdiction,' and the absence of responsibility, and how can we expect impartial decisions between the general government, of which they are themselves so eminent a part, and an individual state, from which they have nothing to hope or fear? We have seen, too, that contrary to all correct example, they are in the habit of going out of the question before them, to throw an anchor ahead, and grapple, for a farther hold for future advances of power. They are, then, in fact, the corps of sappers and miners, steadily working to undermine the independent rights of the states, and to consolidate all power in the hands of that government in which they have so important a freehold estate."

There are certain powers conferred upon this court, for the faithful exercise of which the people trust only to your consciences and your honor, and to the terrors of impeachment when you may corruptly act. Within your department, you are like the executive within his; supreme, answerable only to the people. But while you confine yourselves within the prescribed bounds of your jurisdiction, you may become ever so corrupt; you cannot destroy the equilibrium of the government, nor usurp its powers, nor protect yourselves from impeachment. In an action of trespass, for instance, you may decide just what you please; you may overrule, override, and put under foot every principle of law, disregard every mandate of the constitution, and outrage the common sense of all mankind. No department of the government can interfere with you; the executive cannot review

your proceedings, nor reverse them; the legislature cannot interfere with vested rights, nor can it any more interfere with vested wrongs. Even an impeachment of the judges would not reverse their judgment, nor correct their wrongs. When honest men should succeed to the bench, they could not annul the judgment rendered. In administering the criminal law, when acting within your jurisdiction, you are not less omnipotent. You may send innocent men and women to the rack, to the dungeon, and to the death; yet there is no power to review your decisions. Our lives, our liberties, all that we hold sacred and dear, we commit into your hands and your power, when we create you the supreme judiciary. But all this outrage and tyranny, this cruelty and wickedness, would never advance you a step towards supreme power; never disturb the independence of the departments, nor mar the harmony of the government; but would consign you to everlasting contempt and infamy. This is our guaranty that you will not thus pervert justice. The other departments may be at the same time devising or executing encroachments of their own, but they will start back with horror from yours, and they will impeach or remove you. You may tyrannize for a while, but the vigor of the other departments will sooner or later overtake you, and hurl you from the place disgraced by your presence. This supremacy, this absolute omnipotence in your sphere, is necessary to enable you to perform the judicial office, and protect us from harm, and secure us our rights. Power that must be granted we grant; but we check it, we bind it with limitations, we prescribe its arrogance and say to its pride, "Thus far shalt thou come and no farther." It will be thus seen, that the power we grant to you cannot usurp the government; it is a power to act on particular cases, and on individuals, but can never raise you to the chief command, never enable you to interfere with other departments, never gain for you immunity from impeachment and removal.

I have shown that as a question of power, if you can remove Governor Barstow, you may remove any governor, and place your friend or servant in his place. Must I stop to show that such a power is inconsistent with the independence of the executive department? It seems to be self-evident; and I should not dwell one moment upon it, but that it is made the question

before the court, and must therefore be expected to encounter the whole strength of the opposite argument. It is intimated that counsel will argue a distinction between the power of removal, and the power to control the incumbent in his office before he is removed; that the former does not, as the latter, it is conceded, would annihilate the independence of the executive. A moment's reflection shows the fallacy of such a distinction. As well say light is independent of the sun; the stream of the fountain; as say an officer can be independent of the power that can remove that officer. To state the proposition is to refute it. Consider the cases where it is designed to give one officer control over another. The president is charged with the executive administration, and in exercising the functions of executive power, the heads of the departments are the servants and clerks of the president. He is responsible for them and ought to have, and it is designed to give him, power to control them. How is this effected? By the power of removal vested in the president. The clerk of this court is subject to the court, and the court are supposed to control his actions. How do you exercise this control, but by the power of removal? A sheriff is responsible for the acts of his deputies. How does he control them, and save himself from the ruin a reckless deputy might bring upon him? By removal. How are all the officers from the highest to the lowest, subjected to the will of the people, but by the power of the people to elect successors, which is an indirect power of removal? If, then, in all cases where our constitution and laws intend to give one officer the control over another, the object and design is accomplished only by giving such officer the power to remove the subject officer; it is a libel upon the intelligence of our fathers—it is pronouncing all our constitutions failures, to say, that an officer may be subject to removal, and still be independent of such removing power.

It has been said, too, that although this court could not call the governor to its bar, it may call William A. Barstow, because he is not the governor. According to this argument you obtain the jurisdiction to inquire whether Barstow is the governor or not, by deciding that he is not. This makes your jurisdiction to render any judgment depend upon the particular judgment you are to render. It is a jurisdiction to decide one way; a jurisdic-

tion that may be ousted by the proof on trial, for if it turns out that Barstow is the governor, that will show your whole proceedings to have been *coram non judice;* and you cannot render any judgment whatever. Besides it is reasoning in a complete circle. You turn him out because he is not the governor, and he is not the governor only because you turn him out. So far as regards jurisdiction, any such distinction is nonsense. If your jurisdiction once attaches to the case, and to the parties, it is full, ample, complete. If you can decide that Barstow is not the governor, you can decide that he is; you can call the governor to your bar, and send him away, as you can call and dismiss any other suitor. You have dominion over him, governor though he be.

The unsound distinction taken between the governor and the office of governor, is the source of innumerable errors in this case. Manifestly there is no such distinction. In legislative and judicial bodies, there is a difference between the body and the members of that body. We may meet legislators in the street; but the legislature can only be seen during its actual and regular sessions, as a body. When its members separate, the legislature is temporarily extinct. So with this court. The constitution and the laws make a great distinction between the duties and powers of the court, and of the judges of the court. We may follow a judge to his lodgings, to his home; he is still a judge, may grant rules, and make orders, but he is not the court, nor any fraction of the court. Our constitution declares that the judicial power shall be vested in a Supreme Court, &c.; not in the judges of the court. Mark now the delegation of executive power. "The executive power shall be vested in a governor." The executive power is not vested in the office of governor, as the judicial power is vested in the court; but in the governor; and he is the executive, independent of times and places. In the city, or in the country; in the battle or at the banquet; in anger or in love; he is the governor still.

> "The attribute to awe and majesty
> Wherein doth sit the dread and fear of kings,"

the constitution has breathed into him; into him as a natural person; a mortal man. And, except in the manner the constitution provides, he can no more separate himself from his official character, than he can depart from his soul. He is not an officer at-

tached to an office, as a judge to the court; but he is the executive department; the repository of executive power; and executive power goes with him and remains with him; and has no existence apart from him. Who is the governor to day? In whom does this power reside? All agree, in Wm. A. Barstow. His approval or disapproval renders a bill passed by the legislature a law or a nullity. His pardon would to-day throw open our penitentiary; his order surround the capitol with citizen soldiers. He is the governor. And what are you called upon to do? To remove him from an office? No; but you are called upon to remove the executive power from him, and give it to another. Coles Bashford is asking you to annoint him with judicial oil, and breath into him official inspiration. Adam, formed from the dust of the earth, was dust still, till God breathed into him the breath of life, when he arose a living soul, and called God his creator. Coles Bashford is to day a common man; but if he shall find that the Supreme Court with a breath of judgment, have invested him with executive power, and made his face " terrible as an army with banners," will he not hail you as his creators? and will he not owe to you all that you have given him? and as you make him governor, and without you he would not have been, will he not be the governor of this court? When you make a man governor that was not governor before, have you not created a governor? I have endeavored to show, 1. That the power claimed for this court is a power of removal; and that the power of removal is a power of control; and shall we still be told that your transferring the executive department from A. to B., and subsequently if you please, from B. to C., in a word, your unlimited power to create a governor at pleasure, disgrace him and appoint his successor, in no way interferes with the independence of the executive department? that you are only acting upon the man, and not upon the officer?

Mr. Calhoun likens the relations of the state governments to each other, to the relations between the different departments of the state governments. Suppose one state had the power of determining the election and qualifications of its own officers, and of the officers of every other state, would such a power in no way affect the equality of the states? Would they still all be equal, independent and sovereign, upon that charitable expecta-

tion that the chief state would not abuse its power? Take Wisconsin and Illinois, and let us concede to her to determine who were legally entitled to hold our offices, should we still boast of our equality with Illinois, our absolute independence of her, our sovereignty? Or should we consider ourselves in leading strings and tutilage.

2. This court must take judicial notice of who is governor of the state; when he was inaugurated; his signature, &c.; and therefore cannot hear arguments or evidence upon the subject. That who is rightfully entitled to the office of governor can in no event become a judicial question.

Prof. Greenleaf says: "They (courts) will also judicially recognize the political constitution or frame of government; its essential political agents, or public officers, sharing in its regular administration, and its essential and regular political operation and action. Thus notice is taken by all tribunals of the accession of the chief executive of the nation or state, under whose authority they act, the genuineness of his signature, &c." The trial of Governor Dorr, in Rhode Island, illustrates this principle. He was indicted for high treason in endeavoring to overturn the old charter government of the state, and was tried in March, 1844. He offered to prove on the trial, in his defence, that the charter government had been superseded by another constitution adopted by the people, *and that he had been elected governor* under such new constitution, and did the acts complained of under and by virtue of his office. This evidence was rejected, and the court said: "The court must take notice officially of who was governor of the state in 1842. If not, we should require the best evidence that the nature of the case admits, *which is the certificate of the secretary of state, under the seal of the state.*" Chief Justice Durfee charged the jury as follows: "It may be, gentlemen, that he really believed himself to be governor of the state, and that he acted throughout under this delusion. However this may go to extenuate the offence, it does not take from it its legal guilt. It is no defence to an indictment for the violation of any law for the defendant to come into court and say, 'I thought I was but exercising a constitutional right, and I claim an acquittal on the ground of mistake.' Were it so, there would be an end to all law and government. Courts and juries would

have nothing to do but to sit in judgment upon indictments in order to acquit or excuse. The accused has only to prove that he has been systematic in committing crime, and that he thought he had a right to commit it; and, according to this doctrine, you must acquit. The main ground upon which the prisoner sought for a justification was, that a constitution had been adopted by a majority of the male adult population of this state, voting in their primary or natural capacity or condition, and that he was subsequently elected, and did the acts charged, as governor under it. He offered the votes themselves to prove its adoption, which were also to be followed by proof of his election. This evidence we have ruled out. Courts and juries, gentlemen, do not count votes to determine whether a constitution has been adopted, or a governor elected, or not. Courts take notice without proof offered from the bar what the constitution is, or was, and who is or was the governor of their own state. It belongs to the legislature to exercise this high duty. It is the legislature, which, in the exercise of its delegated sovereignty, counts the votes and declares whether a constitution be adopted, or a governor elected, or not; and we cannot revise nor reverse their acts, in this particular, without usurping their power. Were the votes on the adoption of our present constitution now offered here, to prove that it was or was not adopted, or those given for the governor under it, to prove that he was or was not elected, we would not receive the evidence ourselves—we could not permit it to pass to the jury. And why not? Because, if we do so, we should cease to be a mere judicial, and become a political tribunal, with the whole sovereignty in our hands. Neither the people nor the legislature would be sovereign. We should be sovereign, or you would be sovereign; and we should deal out to parties litigant, here at our bar, sovereignty to this or that, according to rules or laws of our own making, and heretofore unknown in courts."

"In what condition would this country be, if appeals could be thus taken to courts and juries? *This* jury might decide one way, and *that* another, and the sovereignty might be found here to-day, and there to-morrow. Sovereignty is above courts or juries, and the creature cannot sit in judgment upon its creator. Were this instrument offered as the constitution of a foreign

state, we might, perhaps, under some circumstances, require proof of its existence; but, even in that case, the fact would not be ascertained by counting the votes given at its adoption, but by the certificate of the secretary of state, under the broad seal of the state. This instrument is not offered as a foreign constitution, and this court is bound to know what the constitution of the government is under which it acts, without any proof even of that high character. We know nothing of the existence of the so called 'people's constitution' as law, and there is no proof before you of its adoption, and of the election of the prisoner as governor under it; and you can return a verdict only on the evidence that has passed to you."

Woodbury, J. (7 *How. U. S. Reports*, p. 57), considering the numerous questions which are not of a judicial nature and triable in court, says: "This is no new distinction in judicial practice, any more than in judicial adjudications. The pure mind of Sir Matthew Hale, after much hesitation, at last consented to preside on the bench in administering the laws between private parties, under a government established and recognized by other governments, and in full possession, *de facto*, of the records and power of the kingdom, but without feeling satisfied on inquiring as a judicial question, into its legal rights. Cromwell had 'gotten possession of the government,' and expressed a willingness, 'to rule according to the laws of the land,' by 'red gowns rather than red coats,' as he is reported to have quaintly remarked. And this, Hale thought, justified him in acting as a judge (*Hale's History of the Com. Law*, p. 14, *preface*). For a like reason, though the power of Cromwell was soon after overturned, and Charles the second restored, the judicial decisions under the former remained unmolested on this account, and the judiciary went on as before, still looking only to the *de facto* government for the time being."

Puffendorf thus defines the judicial power: "The office of the justiciary power is to hear and decide the causes *of the subjects*, to examine the actions of particular men, which are represented as breakers of the law; and to pronounce sentence according to the legal penalties. * * * The right of judging as to the *use and exercise of any part of the sovereignty*, is understood to be implied or included *in the respective part.*"

The case of *Luther vs. Borden et al.* (7 *How. R.*), growing out of the Rhode Island difficulties, comes in here to illustrate this doctrine. Martin sued Borden and others in the Circuit Court of the United States for trespass *quare clausum fregit;* plea, an insurrection—martial law—and that defendants did what they did, under and in obedience to a military command. Replication: that the establishment of a new constitution and the election of Dorr, governor, had supplanted the government, under whose authority defendant acted. This case clearly decides, we think, that these questions as to whether a particular constitution has or has not been adopted, or a particular person has or has not been elected governor, are all political and not judicial questions; that the courts must judicially know who is or who is not governor of the state. This court must recognize the *de facto* government, and must judicially know, then, that Wm. A. Barstow is such *de facto* governor. In this position of affairs, let us suppose that the pretender (I use that word meaning no offence or disrespect: it is the revolutionary translation of relator—and we cannot forget we have a governor for our client),—suppose he should grow weary of dethronement—weary of journeying up and down, like a lost, or banished and undone prince,—weary of the tantalizing visions of the pleasures of power, and the, to him, forbidden splendors of the capitol,—suppose he should say to-day or to-morrow, I am governor of Wisconsin, and come what will, what may, I will exercise the office. He goes to the executive chamber, and demands the records and seals. Governor Barstow refuses to ·deliver them to him. He endeavors to take them; is resisted by Barstow; each appeals to his friends—each calls upon the militia to aid him—one to support him in power, the other to raise him to the possession of what he says is his right. Here it must be remembered, that if Bashford is to be the governor after you have declared that he is, he is equally so now; unless it is claimed for this court that they can elect a governor by judicial proceedings. This court can only discover—it cannot create: it can explain and declare what already is—it cannot cause that to be which is not. If Bashford will be governor after you have declared him so, it will not be *because* you have declared him so, but because he was legally elected by the people in November

last. If he was then legally elected (as he has taken the necessary oath), he is now, to all intents and purposes, the governor of the state; and this court by declaring that he was so elected, and is the governor of the state, can give him no new right, no additional authority.

Suppose, then, that Bashford being resisted by Barstow, calls the militia, and a part of them rally under his banner, this puts things in an immediate state of war, and this, Bashford may do in five days. If this occur in the vacation of the legislature, the governor, or if you please, both governors, appeal to the president to suppress the insurrection. Governor Barstow has the certificate of election under the great seal of the state; he has been recognized as governor of the state by the legislative branch; they have received messages from him as governor; the bills they have enacted, they have presented to him for approval. He is in possession of the records, the seal, and is to all intents and purposes a *de facto* governor at least. What would the president do? He cannot call a jury to try which is the governor; he cannot refer it to any court; he cannot send for the Waupacca returns; he cannot presume that the board of state canvassers, three officers elected by the whole people of the state, have committed official perjury, in giving to Barstow the evidences of election. He must recognize Barstow as the governor, and send the federal troops here to extinguish the pretensions of Mr. Bashford. No one can doubt, what would be the president's decision between Barstow and Bashford. The president would be compelled to recognize the *de facto* administration of the executive department of our state government.

Now while the troops of the federal government, were moving to the aid of the regularly constituted authorities, could this court sit here receiving proof and passing a judgment upon the same question? Must the commander-in-chief be instructed as he leaves Washington, for the seat of war, to prosecute the campaign according to the rules and articles of war, or according to the judicial direction of the Supreme Court of Wisconsin? Must he no longer consult Vauban and Turenne, but confine his readings to the Wisconsin reports? In the act of conflict, could a battalion be arrested in full charge, by a certified copy of the judgment of this court? This is too absurd to talk of. Yet

the jurisdiction of this court having now attached (if the court has the jurisdiction), could not be taken away nor suspended by the action of any department, nor of all the departments, nor of all the governments in christendom.

Within the sphere assigned you by the constitution; discharging the appropriate duties of the supreme judiciary, hearing arguments and setting up and pulling down plaintiffs and defendants; you would sit here calmly, while the contest was going on in another department of the government, and let either party succeed in the field, you would be equally protected, equally honored. But, departing from that province, and assuming to say who shall and who shall not be the head of another independent department, you instantly become embroiled and involved in this question, take sides in this strife of arms, assume to commend one force and denounce the other, and virtually to command both.

But to leave this branch of the argument, which savors more of the camp than the court, let us consider it in another point of view, and see if it does not lead to similar conclusions. If, who is governor be a judicial question; then it must be tried and determined by the courts, as often as it is presented by the pleadings in any civil or criminal cause. Suppose Governor Barstow issues his warrant for the extradition of an alleged fugitive felon. The felon resists and arrests Governor Barstow, on a civil warrant for false imprisonment. Nothing is better settled in the law than that while the acts of a *de facto* officer are valid as regards the public, and third persons, they are void as a protection to himself. Whoever would protect himself by an office for any act done under it, must show himself an officer *de jure*. 23 *Wend.* 490; 1 *Denio*, 574. To this action Governor Barstow pleads his office, and the proceedings on the part of the state and its governor, from which the plaintiff is alleged to have escaped. The plaintiff replies that Barstow is not governor. A jury are called to try the issue; they decide that he is not, and mulct him in heavy damages. Mr. Bashford then takes the matter in hand and issues a warrant for the same felon. He again resists and arrests Bashford, and the same proceedings are had to issue joined; a regular unterrified democratic jury may be called; they decide Bashford never was governor; most of

them have won money on the election of Barstow; they know that Bashford is not governor, that he is withheld from the office both by votes and upon general principles, so they mulct Mr. Bashford. As the first judgment would not have been an estoppel upon Bashford in the second suit, if decided against him, because he was not a party to it, for that reason it is no estoppel upon the plaintiff, in the second suit; for estoppel must be mutual. So that, who is our governor, or have we any governor, must, so far as the courts are concerned, be a question of fact forever, and the fact be forever undecided.

Suppose you decide that Bashford is the governor, and Barstow should surrender to him ; Bashford would be no better off than Barstow is now. The very first official act he performed, might be one, for doing which he would be a trespasser, unless protected by his office. ▲ If it is a judicial question, open to hearing now, whether Barstow is governor, any·citizen except Barstow perhaps, who is a party to this proceeding, could in the common action of trespass, before any justice of the peace, raise the question of Bashford's right to the office of governor, and the justice would be compelled to hear and try it, and render judgment accordingly. There can be no doubt that this argument leads to this result. If you proceed with this hearing, it is not because you wish to do Bashford a favor, but because in the course of hearing and determining causes, you have reached one in which this question is presented; and because you are compelled to adjudge upon it as you are upon any other legitimate subject of judicial inquiry. And when another suit shall, by its pleadings, present the same question, you cannot refuse to hear and decide it. To illustrate, take a subject where the right of the court to examine it is conceded—twenty different men sue the sheriff of Dane county, in as many different suits, for as many different acts of trespass. In each one he justifies on the ground that he is the sheriff of Dane county, and the twenty suits are on the calendar together, and all for trial at the same time. After one was tried, and it was determined that the defendant was or was not such sheriff, the court could not refuse to try the same question over again in each of the successive suits; and in every suit after the first, the verdict might be different from the one which preceded it. If the right to inquire

thus into the right of the governor to hold the office he is exer-
cising, exists in this court, it exists because it is a legitimate ju-
dicial inquiry.   The same must be conceded of the other two
branches of the government.   Why may not a *quo warranto* as
well be issued to inquire into the existence of the constitution
itself?   If it be the supreme law of the state, it is so because it
received a majority of the votes, at the time it was voted on by
the electors.   Why may not the certificate of the governor of
the territory, that it had been adopted, be also inquired into ?
It will be difficult for the court to stop its inquiry short of that,
unless it also stops short of inquiring as a judicial question, into
the right and authority of the *de facto* departments of the govern-
ment.   How is it with this department of government ?   Do
your honors judicially know you are the judges?   May it not
be proper for you to stop this inquiry, until you ascertain whe-
ther you constitute the Supreme Court or not ?   If you have no
judicial knowledge of Barstow's right to exercise his office, what
judicial knowledge have you of your own official capacity ?   You
may judicially know that there is a Supreme Court, but do you
know that you are the judges of it ?

   In further illustration of the position that each department of
the government is the sole judge of the election and qualifica-
tion of its own member or members, and that the right of him
or them who exercise either of the three departments cannot be
inquired into by either of the other departments; let us press
this inquiry ; can we judicially inquire into your honors' official
character ?   Let us go first to the organization of this court.
Suppose at the first election the canvassers had fraudulently
given the certificate of election to J. Larabee, to Mr. Strong and
Mr. Knowlton.   They enter into the office, take possession of
the seal and records of the court, and open a *de facto* court.   J.
Whiton, J. Smith and J. Crawford come and wish to contest the
election.   Could they come into this court and request Larabee,
Strong and Knowlton to issue a summons commanding them-
selves to appear before themselves, to show cause why they ex-
ercise the office of justices of the Supreme Court?   And could
they then sit to hear and determine the writ ?   Suppose they
did, and hearing the proof, should be convinced that they were
usurpers, would not that very conviction incapacitate themselves

to pronounce any judgment in the case? So that after all, it would be left with them to stay and perform the office or not, as they should please. But, it may be said, this could be contested in the circuit. Yes, and this renders the whole claim more absurd still. From the circuit, appeal, or writ of error, lies here. Suppose the judgment of the Circuit Court should be adverse to those who were holding this court, would they vacate their seats and let the opposite party hear the exceptions taken below and reverse or affirm the judgment? But the fact that a Circuit Court may as well issue this writ, as this court, is an additional argument to show it cannot issue to the *de facto* officers of either branch of the government. It is little less than absurd to say, that while you are in the very act of pronouncing a judgment reversing one of Doolittle's judgments, he may stop your mouths by deciding that you have no right to decide at all.

III. That the constitution provides no means for ousting a successful usurpation of either of the three departments; that that power rests with the people, to be exercised when they think the exigency requires it. By successful usurpation I mean such an one as baffles and triumphs over all efforts which the department *itself* can put forth to overcome it.

If your honors, the judges of this court, were to be pulled from your seats to-day, you could assemble elsewhere, and punish with fine and imprisonment, as for contempt of court. But in this your honors would be your own protectors. You would pronounce judgment, and your sheriff would 'call the militia, if need be, to lodge the usurpers in jail. But, should the usurpation so far succeed as to. gain possession of the records and seal of this department, be recognized by the sheriff, the clerk, and by the legislative and executive branches of the government, as the Supreme Court, become, in fine, a *de facto* tribunal, your honors' judgments upon usurpers would fall as harmless as the bulls of the pope upon the bayonets of Napoleon. And no department of the government has the power to interfere and decide between the rival claimants. This necessarily results from the equality and independence of the three departments. The people could in the formation of the constitution have authorized each department to judge of the qualification, and election of him or them, who exercise the other depart-

ments; or it might have made one department the sole judge for itself, and for the other two departments. There are doubtless contingencies in which such a power in one department would be very convenient, and the people might have conferred it. But then the departments would no longer have been equal and independent. Among the things a boy learns is, that he cannot buy the candy and keep his copper also. He can have either—not both. This great truth is as tyrannical over manhood as over boyhood—over nations as over individuals. They cannot create a government with three departments, and have them independent, and yet dependent; equal, and still have one the guardian of the others. There are reasons, doubtless, why one department should have such a power, but so are there dangers to be apprehended from it. There are strong reasons why the three departments should be equal and independent, and yet like every other human contrivance, it is not perfect, and evils sprung out of it.

*Chief Justice Whiton*—Do you hold then, Mr. Carpenter, that the executive is the judge of his own election?

*Mr. Carpenter*—Certainly, I hold that the governor is the ultimate judge of his own election and qualification; subject only to the people; that there is no other department of the government authorized to decide. I say there are arguments for and against granting to one department the right to judge for itself and for the other departments. The people of Wisconsin, in establishing a constitution, doubtless considered all these arguments *pro* and *con;* they decided; and of all the evils, they chose what they feared the least; they made the three departments independent, and now when the first inconvenience of this arrangement is felt, they clamor for this power in one department to judge for another. With equal reason the boy, when his candy is gone, cries for his copper.

It is said the constitution authorizes this court to issue and determine writs of *quo warranto*, and therefore you can hear this case; that it can make no difference to whom the writ is directed. But could you examine into the election or qualification of members of the legislature? It is conceded you could not. There is an end, then, to the assertion that you can determine

the writ, *no matter who is defendant.* Again : you have decided that you cannot compel the governor by mandamus to perform any executive duty. Why not? Your power to issue the writ of mandamus, is as unqualified as to issue the writ of *quo warranto.* The reason why you cannot compel the governor by mandamus, is that he is above the mandate of your writ, and may obey or disobey it, as he pleases, being answerable only to the people. It is the duty of the legislature to elect a senator to the Senate of the United States, when a vacancy occurs. Suppose they should neglect to do so; could you compel them by· mandamus? No·; and yet your power to issue writs of mandamus is unqualified, and the legislature are, in terms, no more exempted from obedience to it, than is the governor to this writ of ·*quo warranto.* Every argument that can avail here would equally prove your power to compel the legislature to elect a senator. The legislature is the ·servant of the people, the creature of the constitution, and owes obedience to its provisions ; you are the oracle of the constitution and the laws·; and have full, unlimited power to issue the writ of mandamus. There is no one above the law, or authorized to disobey it; you are the ·only tribunal that can award the writ; it is a great wrong ·" that we should be unrepresented in Congress, and there is no wrong without a remedy."

To all this you would answer that although the power to issue a mandamus was not limited as to the ·legislature, yet, it was conferred on you to enable you to exercise the *judicial power ;* and that it was not a judicial use of the writ that was demanded. It ·was not asked as a writ to enforce a private right, but a political ·act, outside of your usual jurisdiction. This same answer suits this application as well. This is not a litigation about any private right under the laws, but an attempt to transfer ·a branch ·of the supreme power from one man to another. This has never been a judicial duty·; and with one exception, in the 13th century, which cost a chief justice of England his head, no judge has ever attempted to decide any such question.

It is opposed ·to ordinary experience, and therefore, at ·first blush, seems impossible that there can be any dispute ·between two men, and no place in ·the state to litigate it. But if ·Bashford ·had· called out·the militia, and ·the governor appealed ·to the president, and conflict was ·actually raging, we ·should then under-

stand that the question had swollen beyond the control of a court of justice. Still, the question would remain the same, the power of this court to try it, the same.

It is said, this power in this court must exist, or Gov. Barstow returning from his dinner some day, may find his private secretary in possession of the executive chamber, the records and seal of the department, and claiming to exercise the office of governor. What, it is said, could the governor do? What would Napoleon have done, if, returning from Austerlitz or Jena, he had found some jackanapes—strutting in imperial purple, and calling himself emperor? And what would he have done; gone blubbering into a court of justice, or would he have done what Jupiter did, *call for his thunder?* That would not be a successful usurpation—merely an unsuccessful and ridiculous attempt at it —which the power of the department could put down at once. If a man enter my house while I am asleep, or at church, must I go into court with an action of ejectment? No, I order him out, then throw him out.

*Chief Justice Whiton.*—Suppose, Mr. Carpenter, we should return from dinner to-day and find three members of the bar in our seats, who threaten to remain by force, could not the governor displace them?

*Mr. Carpenter.*—Certainly not. This court, I should suppose, would not concede such a power to the governor. If the governor may come here and establish the right claimants, then he must have the right to decide who the right claimants are. If he can decide that you are entitled to the bench, and establish you there, then he can also decide that the three usurpers are the rightful judges, and put them there. You would assemble elsewhere, punish by fine, send the sheriff to call the militia to arrest your rivals. But if the sheriff and the governor adhered to the pretenders, not to you, then you would be powerless, except by appeal to the people.

If, however, it were necessary in such a case for the governor to come into this court to displace his secretary, the seats of your honors could be just as easily usurped by any careless adventurers, and that would end the government at once. The constitution confers upon each of the departments, all the power neces-

sary to protect themselves against outside usurpation; and against encroachments on the part of the other departments. The people have conferred upon the executive, all the power they thought necessary to protect him in office, and they have not authorized this court to do any more. There is no resulting trust of power in this court; it is not set up to speak the voice of the people, and utter the people's commands to the other departments of the government; but is commissioned to act and speak with the other departments, on terms of absolute equality and official brotherhood.

I have said the people could have conferred upon you this guardianship of the other department. Why did they not? Simply because you would then have been as supreme as the czar of the Russias, and " with the sovereignty all in your hands," to quote from C. J. Durfee. You could, indeed, in this case, have kept the other departments all right; but who would have kept you all right? Suppose you should wax ambitious; become corrupt; who would hold you in check? Could the people expect that a department that was in your power, that must act as you prescribed the principle; and perform its constitutional duties as you should expound them; could they expect that a governor whom you could any hour declare illegally elected; would check you?

It is the natural, expected consequence of power to advance, to progress; it is a law, too, of the human mind; a principle developing itself in every department of human action. The ambitious school boy having wrestled with and thrown the boy next smaller than himself, wishes to try the boy next larger. The king who has conquered one neighbor, casts his covetous eye upon another; until, at last, all at his feet, he weeps for another world to conquer. Who ever heard of any body politic or corporate, any institution or officer, willing to surrender any once acknowledged power or prerogative. On the contrary, how often do we see them claiming powers to-day they renounced yesterday. The history of this court furnishes us with a charming illustration in point. Of course, I do not propose to criticise or question it; but I refer to the fact as it bears on the subject in hand.

Section 3, article 7, Constitution of Wisconsin, declares: The

Supreme Court, except in cases otherwise provided for in this con-
stitution, shall have appellate jurisdiction only, which shall be
co-extensive with the state; but in no case removed to the Su-
preme Court, shall a trial by jury be allowed. The Supreme
Court shall have a general superintending control over all inferior
courts; it shall have power to issue writs of *habeas corpus, man-
damus, quo warranto, certiorari*, and other (which of course means
all other) original and remedial writs, and to hear and determine
the same. *See also Rev. Stat. p.* 410, §§ 5, 6. The legislature
here gave their construction to this part of the constitution, and
say the Supreme Court shall have only appellate jurisdic-
tion.

The first Supreme Court decided under this constitution, that
the power to issue writs of *quo warranto*, &c., was a means to an
end; was a power granted to enable this court to exercise its ap-
pellate jurisdiction and superintending control over inferior
courts, and that this court could not issue these writs, and hear
and determine the same, except it was for the appellate hearing
and review of a suit before instituted in some inferior court.
That decision would end this question. But this court have re-
versed that judgment; and have concluded that their duty to
the people requires them to exercise more power than was at first
thought they could do ; that the power to grant these writs, and
hear and determine the same, is, in the constitution, a substantive
grant of power; and that this court may hear and determine
any matter, of a judicial nature, which may be brought before
it by writs of *habeas corpus, mandamus, injunction, quo warranto,
certiorari*, and other original remedial writs, which I believe covers
the whole field of litigation. According to this new rendering
of our constitution; this section, taken down from its stilt walk-
ing style, and down into young American vernacular, will read
thus: " The Supreme Court shall never have original jurisdic-
tion, *only it shall* have it in all cases whatever."

It is not my purpose to express any opinion upon these con-
flicting decisions of the Supreme Court, as to its own power, nor
say which is right. I mention the fact, however, that such de-
cisions have been made for a two-fold purpose. First, as an ex-
cellent illustration that courts in expounding their own powers,
are progressive. They do not relinquish powers to-day, they

exercised yesterday; but they do sometimes claim powers to-day, they disclaimed yesterday. And second, to ask the court whether they think their decisions in matters within their jurisdiction binding on the executive? And if so, are their decisions as to what is their jurisdiction, also binding upon the executive? If yea, if your decisions within your jurisdiction, are binding upon him, and if you are sole judges of the extent of your jurisdiction, then which decision is the governor at liberty to regard as law? To-day you decide solemnly, on full argument, that you do not possess a certain power; the governor is bound to take you at your word; to-morrow you decide you have the very power you disclaim to-day. Is the governor still bound to bow to your exposition of your authority? If so, is it not perfectly apparent that you are the state, and your power limited only by your good pleasure?

They will tell you on the other side, that your honors form the great barrier of the people against usurpation; that the people are looking to you and holding in their wrath, which else might break out in civil war. That you are the guardians of the public safety, and the shield of the people; that the people will hail you—thank you as their deliverers. This is the most acceptable incense ever burned at the altar of official pride. How charmingly sweet must be the reflection, that the people must look to us for protection. The dear people, we protect them; how they must love us. Ah! had we less confidence in your honors' integrity, than we have, we should fear the infection might work, the flattery corrupt; it is so difficult to exercise power, and not long to exercise more. Even Paul could magnify the apostolic office, for the good of the Gentiles. "We do this for our dear love of the people," has been the song that usurpation has sung in the people's ears ever since Cæsar crossed the Rubicon to enslave them Fear not that the people are helpless, or that war must follow, unless you stretch your power to protect them, and avert it. The ballot box is a weapon quite sufficient to their purpose. If Governor Barstow is fraudulently holding his high office, satisfy the people of it, and there will be no set of men found bold enough to gainsay their will at the next canvass. The people will remember him, and if satisfied that he has usurped the office now,

"They'll whistle him off, and let him down the wind,
To prey at fortune."

The people are not so helpless as those in power are apt to regard them. Every ballot that falls, silent as a snow flake falls in the valley at midnight, will reverberate through all the labyrinths of power, and is a thunderbolt to a wicked ruler or an unjust judge.

In conclusion, then, I have endeavored to discharge my duty to this case and to the court, and have endeavored to convince the court that this motion must prevail. I hope I have succeeded. But however that may be, content that I have done my duty, I shall be content entirely. There is one, however, who is interested in these proceedings, who cannot blindly submit to whatever you may decide, who owes your honors no such official allegiance as binds us, your subordinate officers, to silence when you speak.

The governor is clearly of opinion at present, that this court has no right to entertain these proceedings; and he has no doubt they will be dismissed. Should he, however, be mistaken in this expectation, should your honors take a different view of the constitution, and differently construe your own powers, the governor would then, out of habitual respect for this branch of the government, reconsider, step by step, the grounds of his conclusion. There we, his counsel, cannot follow him; there we shall not venture to advise him. In the solitude of official separation, in the quiet of his own thoughts he must commune with himself.

As it cannot for a moment be conceded that in a conflict of power between the judicial and executive departments of the government, that the judiciary has the sole right to judge the contest, or any better or further right than the executive, to judge of the relative powers of the two departments, the governor will, in reviewing the whole subject, carefully examine the decision of this court, giving to the opinions of the judges, in the language of President Jackson, "only such influence as the force of their reasoning may deserve." He will then be obliged to determine for the executive branch of the government, 1st, whether this court can exercise original jurisdiction

over any suit commenced by an information in the nature of a *quo warranto ;* and 2d, if so, whether this writ can, in any case, be directed to the executive of the state.

If he should, when assisted by the reasoning of the judges, come to the same conclusion, he may send us here to your honors' bar again. Should he, however, be so unfortunate as to be compelled to an opposite determination, he would be bound by his official oath of fidelity to the constitution, to regard the proceedings of this court as unwarranted by the constitution, and a gross usurpation of power; and to treat any judgment this court may presume to render therein as an absolute nullity. Whatever conclusion his excellency may arrive at, he will pursue such a course as a proper self respect and a just sense of the honor and responsibility of his high office shall dictate to him, relying upon the people to sustain him in a conflict with this court, which has been forced upon him.

*Mr. Attorney-General* declined at present to take any part in the discussion of the motion before the court.

*Mr. A. W. Randall* opened the argument for the relator, but has furnished no synopsis to the reporter, and he is therefore compelled to omit it.

*Mr. H. S. Orton* followed in behalf of the respondent, for the motion. Although he has not furnished his argument to the reporter, yet from a few notes taken at the time, some points made in his argument may be stated.

He contended that the proceeding by *quo warranto* was akin to that of mandamus; that they were entirely analogous in their character, and the same end was contemplated by both; that this court has already, in repeated instances, decided that the writ of mandamus cannot issue to the executive. Such have been the uniform decisions of this court on all applications made for that purpose.

The leading proposition of his argument was, that the sovereignty of the state is lodged in the several departments of the government; that it was so under our constitution, and must be so, or it can exist nowhere. The sovereignty of the people,

in a government like ours, is lodged in the executive, the legislative and judicial departments of the government; that these departments were co-equal, co-ordinate, and independent; that neither was inferior to, or dependent upon the other, but all three alike responsible to the people, from whom they each derived whatever power they respectively possessed, to be exercised in view of their own direct responsibility to the source from which they derived it.

This proposition was argued at length, and with great force, but it is impossible to pursue the train of argument and illustration without incurring the risk of failure in doing justice to the style, as well as substance of the argument of the counsel.

Mr. Orton further insisted that the executive is not an "officer" in the limited and legal construction of the term. What is an "officer?" Blackstone defines it. Its definition is well known to the common law. An officer is a minister of the government, inferior to the government. Officers, strictly speaking, in this country, as well as in England, are *subordinate* to the government. The three great departments of state, are not offices in this sense, but are co-ordinate branches of the government. They are created by the constitution, by a nicely balanced and independent distribution of powers, and are in every sense co-equal and independent of each other.

The language of our constitution is, "the executive *power* of the state shall be vested in an executive"—"the legislative *power* of the state shall be vested in a legislature," &c. These departments do not simply discharge official duties, but they exercise the great civil powers of the government, and in this respect they are not simply officers. The governor may be an officer of the state, but while he is so, he is something more, he is the *executive* of the state, and in him is vested the great and sovereign powers of that department.

That the writ of *quo warranto* would not go to the executive, because he is a *branch* of the government—he is a part of it, one of the three departments which constitute the government. The distinction will not hold between the individual and the executive, between the governor and department. If there were more than one person forming that department, the distinction might exist. A member of the legislature is an officer, but the

entire legislature is not an office. One of the justices of this court is an officer of the court, but the court is not an office. It is so with the governor. He is the executive department, the executive branch of the government. The constitution says that writs of mandamus may issue to inferior courts. The analogy is perfect. It may also issue to inferior officers. But to a department, an independent and equal branch, it cannot issue.

The first and general definition of the term usurpation is, the wrongful seizing of *political* power; the confined meaning is, the intrusion into a mere office. It will be perceived, that this alleged usurpation of the executive power, is a political, and not a judicial question; a wrong, not to be redressed by the courts, who have uniformly held that *political* usurpations of this kind are to be left for redress to the judgment and action of the people. The words " usurp and intrude into " have no reference to a co-ordinate department of the government, but are used in reference to the offices *under* the government, or in other words in the confined and limited sense before mentioned.

Each department must be the ultimate judge of the qualifications and election of its own members. Each house of the legislature judges of the qualifications and election of its own members. There is a judicial tribunal within the legislature. The house of commons has a committee—a judicial committee, which decides all contested cases. There is a legislative court. But if they decide wrongly, appeal does not lie to you. You cannot review their action. The power is original and final in the legislature. Why was this power given to the legislature, and not given to this court? Because in you the power exists inherently.[1]

*Mr. Jas. H. Knowlton*, followed for the relator, but as he also has failed to furnish a synopsis of his argument, nothing further will be attempted than a report of the points which he made.

This is a *judicial proceeding*, and so he should treat it, notwithstanding the menaces of resistance, under the full expectation

[1] The foregoing is not intended to be a report of Mr. O.'s argument, but is believed to indicate the positions assumed by him, which were thoroughly and ably argued.—REPORTER.

that the judgments and decrees of this court are to be respected and executed hereafter, as they have been in time past.

The constitution, in providing that each house should be the judge of the election and qualification of its members, limited the power of this court in that direction. When no such limitation was made, it was fair to presume that the constitution included jurisdiction in its grant of general powers to the court. The opposing counsel seemed unable to distinguish between the individuals and their offices, but he could not believe there was so much difference in men in this state. We were proceeding against the respondent as an individual. When an individual became so inflated with an idea of his importance, as to consider he had a right to an office, and that he could not be distinguished from the office, he wished to mark such individual. This was worse than the doctrine of the divine right of kings.

The position assumed by the counsel for the relator, that the executive is the sole and ultimate judge of his own election and of his own qualifications, is incorrect. So far is this from true, that he is not even allowed to assist in canvassing the votes by which he was elected. If true, he might defy the judgment of a court of impeachment. He might plant himself on this doctrine, declaring himself the ultimate judge of his own qualifications, call out the militia, and defend his position. In that case suppose the lieutenant governor should file an information. Would not this court respect the judgment of the Court of Impeachment? Would it not see that that judgment was enforced? He supposed this court had power to execute its decrees, and could call to its aid the military force. It was more important that there should be power to oust usurpers from high offices than from low. Mr. Knowlton proceeded to show that the judiciary and the legislature both possessed power over the executive in certain cases. The governor was a creature of laws. The province of this court was to decide what was law, and to see that such law was enforced. None of the departments is as absolute in its independence as has been contended by respondent's counsel.

The constitution of the state created and defined the powers of the several departments, and the mode of accession of the incumbents thereto. That constitution declares that the man receiving the highest number of votes should be declared elected.

A man cannot be canvassed into office against the votes of the people; and this court was bound to see the constitution enforced. The office of governor was a civil office, and there was nothing in the nature or magnitude of the office, to prevent the judiciary from acting to protect that office from usurpation.

*Mr. T. O. Howe,* for the relator ;[1] came here supposing that the determination of this motion rested upon two or three simple and clear provisions of the constitution of this state and of the laws framed under that constitution. He did not suppose it was to involve him in an elaborate review of the writers upon constitutional history, or of the essayists upon the theory of government. And, after a careful consideration of the arguments urged in support of the motion, he remained of the same opinion as at first—that this motion must be considered in the light of the constitution and the laws of our own state.

He would, nevertheless, remark briefly upon some points made by the opposing counsel. He could not foresee what weight might be given them by the court; and for that reason, as well as out of respect for the ability of the gentlemen making them, he would spend a little time, and but a little, in commenting upon what they had said.

He was surprised at the assertion of the gentleman who made the opening argument in favor of the motion, that he found no authority in the books of his profession bearing upon this case; that the books usually found in a lawyer's office all commenced this side of the question involved in this motion. He was surprised when the gentleman who followed upon the same side declared that he would have no occasion in his argument to refer to the constitution or to the laws of this state.

He supposed that all the power vested in this court was derived from those very sources; and if the authority to hear and determine the information in this case be not found in the constitution and laws of this state, he would not ask the court to look elsewhere for it. It was not derived from any history of

---

[1] Mr. Howe forwarded his argument as requested, which is here inserted, with the exception of a few unimportant portions, which, for want of room, have been necessarily omitted.

constitutional law, nor was it granted by any other government than our own.

He denied, also, that this was, as had been claimed by the respondent's counsel, the most important cause ever tried in this court. The real case which is presented to this court is, who is entitled to discharge the duties of governor of this state and to receive therefor an annuity of $1,250 for two years? There is, to be sure, a question of jurisdiction presented in this cause, and it is so presented as to call for its determination before the cause itself can be determined. But the same question is involved in every cause. Jurisdiction, indeed, is not, in every cause, denied by the pleadings, or denied by the argument; but the question necessarily arises in every case, and is affirmed by the court in every judgment it pronounces. Even if the opinion of the court makes no allusion to the question of jurisdiction, the very act of giving judgment is of itself an assertion, or at least an assumption, of the right to give that judgment. And the question of jurisdiction is just as momentous in one case as in another, and the consequences of an erroneous decision of that question may be just as disastrous in one case as in another. If this court usurp jurisdiction of an action of assumpsit, it commits a wrong as flagrant as when it usurps jurisdiction of the writ of *quo warranto*. In either case the true harmony of the government is disturbed, and the will of its framers is defeated. And he would add, that he had himself as little doubt of the jurisdiction of the court in this cause as in any which the court was ever called upon to determine. The most that distinguishes this cause from others, so far as the question of jurisdiction is concerned, is, that here the question is urged with more ability and more marked pertinacity than is often observed in the conduct of causes in court.

The information in this cause alleges that the relator, Coles Bashford, is entitled to exercise the office of governor of this state, but that he is prevented from so doing by the usurpation and intrusion of the respondent, Wm. A. Barstow. The pending motion does not deny either of these allegations. It simply assumes that, if the fact be so, the court cannot so decide, and can give no redress.

But, while the motion admits the right, and the injury to that

right as averred in the information, the argument in support of that motion has, so far, treated the cause as if it were an appeal to this court to depose the lawful governor of the state, or, where it has departed from that idea, it has affected to consider the suit as an attempt to destroy and absolutely to annul the very office which the relator seeks to gain. The arguments of the respondent's counsel seem to present an almost inextricable confusion of two very distinct things. They have blended the person occupying the office with the office itself. They seem to have labored under the idea that the moment a man gets possession of the office of governor he was somehow dissolved in the office— held in solution in it—until by the analysis of revolution he shall again be deposited with the mass of the people. By their argument, there is no process for removing an intruder into the office of governor, except by revolution, by force and violence, or by the voluntary abdication of the individual himself.

It certainly would be most singular if the framers of our constitution had created an office so important as that of governor— had provided for conferring the right to that office by election— and had provided no mode for getting possession of it but revolution!

Revolutions have often been resorted to, for the purpose of overthrowing governments, but never to get possession of an office under a government. It may, indeed, be found necessary to employ force to put the relator in possession of his rights. If the intimations of the respondent's counsel are to be relied upon, force will be necessary. But if so, the question remains, shall constitutional force be employed, or shall the relator be turned over to revolutionary force? May he rely upon the force of the government to give him that place in the government to which he is confessedly entitled, or must he rebel against the government in order to expel a usurper from one of the offices under it? It must constantly be remembered, for the purposes of this argument, that the relator is *de jure* the governor of Wisconsin, and that the respondent holds the office only by usurpation, and the question to be settled is, how that usurpation shall be terminated. The relator does not seek to subvert the government, but only demands a constitutional right under it. Revolution, therefore, clearly cannot be his appropriate remedy. Revolu-

tion, if successful, would be as fatal to the purpose of the relator as to that of the respondent. While it might drive the latter from the office, it would abrogate the office itself. Whatever position the relator might assume in the state after a successful revolution, he would hold by conquest and not by election.

The relator therefore claims the employment only of the constitutional force of the state to install him in his rights. But the only constitutional force of the state is that vested in the executive arm of its government. The constitution makes it the duty of the governor "to take care that the laws be faithfully executed." Whatever right, therefore, the laws of the state give to any of its citizens, the governor must "take care" to enforce, and to that end may employ the whole or so much of the executive power of the state as shall be needful. Ordinarily, indeed, the governor is not required to act in person. Where the people frame the laws, the people demand obedience to the laws. Submission to the laws is therefore in all republics the first duty of the citizen.

So universally is that duty recognized, that, where the law has spoken in a given case, the ordinary police force of the respective municipal or judicial district has almost always been quite sufficient to enforce its mandates. But even that force cannot be applied to enforce a right against one in possession until the claimant produce higher evidence of his right than possession affords. Thus, if A. have in law a good claim to land in the possession of B., and he desires to dispossess B., he does not apply to the governor, or to any other executive officer, to examine his claim and eject the tenant, but he appeals to the judicial authorities to determine the validity of his claim, and, if found good, to grant him, in the name of the state, a writ which shall be a sufficient warrant to the executive power for dispossessing the tenant, and re-seizing the claimant. Not until the law is *so* declared, and *so* evident, does the command of the constitution go to the executive power to see it "faithfully executed." Until then, the humblest squatter and the boldest trespasser are alike protected in their possessions by that compact which declares that "no man shall be deprived of his liberty or property but by the judgment of his peers, or the law of the land."

Yet it has been argued here, that the governor has, within his official sphere, the same right to interpret the constitution, and construe the laws, that the courts have. The authority of Mr. Jefferson has been invoked for that position; and the respondent's counsel have reasoned (perhaps not so *very* illogically) that if one who lawfully succeeds to the office is clothed thereby with the extraordinary authority of determining what laws he will see executed, therefore one who steals or usurps the office may determine how long the law will permit him to hold it.

There is as little doubt that Mr. Jefferson was mistaken in the proposition attributed to him, as that the counsel were in the application they had made of it. · If it be true that the president of the United States, or the governor of this state, may in all cases determine for himself what laws he will execute, and what shall not be executed, he has that very power which Charles I sacrificed his life, and James II his throne, in the vain endeavor to secure—a power to dispense with the laws. On the 4th of July, 1776, the Congress of the United States, in the most public manner and solemn form, and in the name of the people, charged the king of Great Britain with numerous acts of tyranny and usurpation, and among those acts they specified this: that he had "obstructed the administration of justice, by refusing his assent to laws for *establishing judiciary powers.*" Is it possible that the same people, within twelve years from that time, voluntarily clothed their executive with power to obstruct the administration of justice by refusing to execute judgments judicially pronounced? Is it possible that a governor under any of our free constitutions possesses that monstrous authority? Of what possible utility are judicial tribunals, and the solemn, deliberate and cautious forms of judicial trials, if the executive power of the state may, of its own motion, and without a hearing of parties interested, or with such hearing, revise their determinations, deny the validity and dispense with the execution of their judgments?

But, if it were true that the people of this state had agreed to clothe their *chosen* executive officers with such terrible authority, it would by no means follow that one who should usurp that office, would thereby acquire the authority to legalize his own usurpation, and thus to bar the right of the lawful claimant;

or, rather, to bar the right of him whom the people had chosen to wield that power.

The British Parliament has enacted sundry laws confirming the acts of such of her kings as have been deemed *de facto* and not *de jure*. But we are told such "resolutions were made to avoid anarchy and confusion, because the common people cannot judge of the king's title." But no law has ever been enacted, to enable a king *de facto* to bar the right of a king *de jure*.

Indeed it is not pretended that the strange power we are considering has ever been conferred upon the governor of this state by express grant. It is claimed, on the contrary, to be *inherent* in the office itself and *because* that office is of itself one of the leading departments of the government. It is claimed that the governor is endowed by the very fact of his being in office with an absolute and final power of determining, not for himself alone, but for the whole people of the state and for each department of its government, his own right to the office and how long he may remain in it. Not because of the *supremacy* of the executive department over the other departments of the government, but because of its *equality with* the other departments.

But it is certain that no kindred right or power belongs to either of the other departments.

The legislative department, for instance, cannot say, and never attempted to say, who is entitled to represent a given district in the Senate or Assembly. *Each house* does indeed decide upon the qualifications and election of its own members; but neither house constitutes the legislature nor the legislative department. But even that is not the exercise of an inherent power; it is the exercise of a power judicial in its nature, but expressly granted to each house by the constitution; without which grant it would have gone to the courts, under the general grant of judicial power.

The judicial department of the government certainly does try and determine the election of members of that department. But each judge does not act upon his own case. Nor do all the judges or all the courts comprising the department act in conjunction. The judge of the Circuit Court for Dane county cannot try an information filed to test his own right to his seat. But

there is no doubt, if circuit courts had general jurisdiction in cases of information, they might hear and determine one filed against one of the judges of this court. Their judgment would not necessarily be final, to be sure; but it would be as conclusive against the sitting, as against the claiming judge; as final upon the rights of the respondent as upon those of the relator. And there is quite as little doubt that a convocation of all the judges and justices connected with the judicial department of the government would be utterly incompetent to remove an usurping justice of the peace, upon information or otherwise. And the reason is, that, as a department, they have no power, inherent or granted; but when acting in their several tribunals, as supreme, circuit or county courts, they have the powers expressly granted to those tribunals respectively. Trying the right to the office of judge is the exercise of judicial power. Judicial power is distributed by the constitution amongst those courts by the express grant of the constitution, and thus, and only thus, do the courts acquire jurisdiction of such questions.

But, while the respondent's counsel upon the argument, admit him to be a usurper, and deny that there is any power under the government adequate to determine that usurpation, they do not like to tell us that such usurped authority must be perpetual, and so, with a strange disregard to the consequences of their own doctrine, they tell us that the people will terminate it at the next election; that, if the respondent decides he is entitled to the office when he is not, or persists in holding an office which does not belong to him, that the people will turn him out. But how turn him out? They may elect another man for governor. Indeed, this is precisely what the relator claims the people did at the last election. But if there be no power in the government to enforce the popular will as declared at the last election, what power will enforce that will two years hence? The constitution indeed says that "the person having the highest number of votes cast for governor" shall be governor. But counsel say that the person who usurps the office, holds by a title equally valid, and equally undeterminable by any power in the state. The respondent is now in office. He usurped it. He does not acquiesce in the result of the last election. We have no reason to believe he will be better satisfied with the result of

the next. If his doctrine prevails, he will be still in office at the end of the present term; still denying the jurisdiction of the courts; still defying the power of the state. There can be no usurpation that is not in defiance of the people and of the constitution, and when forcibly persisted in, usurpation must be terminated, not by ballots, but by bayonets. The question still recurs, shall the claimant of that office resort to bayonets to enforce his rights before or after his rights shall have been judicially indorsed?

The opposing counsel have told us that never before was a court called upon to decide between different claimants to the chief magistracy—that amidst all the upheavals—the setting up and pulling down of dynasties in England during the last 1,500 years, they say there never has been an instance wherein the crown has been transferred by the potent magic of *quo warranto*. Mr. Carpenter has told us in thrilling terms, of the shadowy forms that haunted Richard upon Bosworth field, but more merciful than the relator in this case, he says, that in all their threatenings and imprecations they never " once croaked a *quo warranto*." This seems like an admission of the weakness of their cause. It seems to indicate that nothing is so discouraging to the respondent's hopes as a judicial determination of his rights— that in a court of justice the respondent can find nothing so consoling as even the " ghost of a chance." He believed, however, that the respondent's mental condition had been misunderstood by his counsel. He believed that the respondent would rather meet the process in this case, than one-tenth of the ghosts that thronged around the sleeping Richard.

It surely requires no argument to convince a lawyer of the entire want of analogy in the relations existing between the courts of this state and her governors, and those existing between the courts of Great Britain and her kings. Upon that point let this suffice, that the king of England is the sovereign of England, while the governor of Wisconsin is only an officer under the sovereign state. The courts of Great Britain are the courts of her kings, and administer justice in the name of her kings, while the courts of Wisconsin are the courts of the state, and administer justice in the name of the state. In England judges are commissioned by the crown, and until the reign of George III, they

held office only during the pleasure of the crown, or their offices terminated within six months after the demise of the crown. So that a judgment of ouster against the king pronounced in the courts of the king, would be *ipso facto* a judgment of ouster against the judges who pronounced it. The judges of Wisconsin are not commissioned by her governors. They are elected by the people and hold in spite of the governor, for a term specified by the constitution. The cause must be poor indeed, that is driven to such beggarly arguments for support.

But counsel have agreed at length upon the supposed equality and independence of the three departments of government. They have read from numerous political essayists in support of the position that the legislative, executive and judicial departments of the government are, or ought to be, separate, independent, co-ordinate and co-equal. There are indeed strong reasons why these departments should be separate and independent; but in fact no government ever existed in which they were wholly so. Writers mean only this—that in all governments these three powers exist. They are the sum of every government; inherent in every government. Whenever the autocrat of the Russias performs an official act, he exercises one of these three powers. It is essential in a republic that each of these powers should be deposited with a different tribunal or agency—when combined in a single individual the rights of persons are exceedingly precarious. Then the only hope of the citizen is, that the depository may be wise, virtuous and just.

When distributed, there is a chance, that if the judiciary be corrupt, the executive power may be placed in upright hands— and *vice versa*—and that if both be corrupt, the immediate representatives of the people in legislature assembled, may hold both in check. The sultan of Turkey may register what arbitrary edicts he pleases—may apply them to the rights of his subjects as he pleases, and execute them or not as he pleases, and the security of the multitude depends upon the integrity of the individual. But in Wisconsin, if her legislature enact an oppressive law, the governor may veto it. Or if he approve, the courts may pronounce it unconstitutional. But if all combine to oppress the citizen, the citizens have only to combine to remove them all. So that here the security of the individual depends upon the in-

tegrity of the multitude. Such are some of the advantages of having these three great powers deposited with separate tribunals.

But when legal writers speak of the co-equality of these powers, they doubtless mean no more than that each is absolute in its sphere—that when the judicial power is appealed to, the whole judicial power of the state is put in motion, and so of either of the other powers—that each alike represents the sovereignty—that the judicial power declares, in the name and by the authority of the state, what the law is—that the legislature in like manner declares what the law shall be, and the executive in like manner executes the law when it is declared. But to argue that these powers are equal to each other in any other sense, would be as profitless as to argue that lightning is equal to an earthquake. There is no similitude between them.

By reading promiscuously from various political essayists, counsel have confused themselves. They urge the importance of keeping the several departments of government separate and independent; and why? Because we are told they thus operate as checks upon each other. But how can two powers, entirely separate from and independent of each other, mutually check each other at all? In practice it is easy to see they do so; but that results not from their mutual independence, but from a certain constitutional dependence of one upon the other.

The reason why the relator has appealed to this court for the vindication of his rights, is this; he believed that before the physical power of the state could be rightfully called upon, to put him in possession of the right now usurped by the respondent, he must present the highest and most conclusive evidence of his right known to the law. Judicial judgments be believed to be that highest species of evidence. His right must therefore be adjudicated by some court, and he deemed this the proper court. * * * But the independence of a department is a very different thing from the independence of a person or persons filling that department.

The orbits of Mars and Jupiter are independent of each other, but the orbs themselves mutually act and re-act on each other, and it is only by that mutual and constant re-action that each of the planets is preserved within its own sphere. It is something

so with the leading departments of government. No matter who the individual may be, or how dignified may be the position he occupies, if he come within the judicial sphere he is acted on by judicial power.

So, if either or all the members of the judiciary should interpose in the path of executive duty, the executive sword does not turn aside. Each power when moving in its own sphere moves with the whole authority of the state and against whomsoever and whatever may be found arrayed in opposition to it ; and this is essential to the harmony of the system and to the integrity of the government. The entering of Mars into the orbit of Jupiter would create no more derangement in the planetary system than the refusal of the latter to move in its own constitutional sphere.

And before we become too nervously apprehensive of that "judicial usurpation" which counsel have inveighed against so eloquently, we will do well to reflect that their judicial usurpation is to be equally guarded against, and that if this court shall refuse to exert the authority it possesses, usurpation as certainly will ensue as if the court shall assume to wield a power it does not possess.

The counsel for the respondent complacently tell us that he has himself, by the marvelous virtue of the office into which he intruded, decided upon his own right and has thus legalized his intrusion. If this be so and he has that power, then he is no longer a usurper, but the rightful governor, and, the judgment of this court should be accordingly ; but if he has not that power—if the decision of that question is as the relator claims, an exercise of judicial, and not of executive power, and if this court shall refuse to exert that power, then the respondent will not only have successfully usurped the whole executive, but also a portion of the judicial power. The court will not, therefore, simply by denying jurisdiction of this cause, necessarily avoid all danger of usurpation, but only by deciding the question of jurisdiction aright; by exercising jurisdiction if the constitution gives it, and by refusing to take jurisdiction if the constitution withholds it, will usurpation be effectually prevented.

The relator, upon looking at the facts which transpired at the last election, ascertained, as he thought, that the highest number

of votes given for governor was given for himself. He looked into the constitution of the state, and he read that the person who received the highest number of votes should be governor. He looked into the office and found it filled by the respondent.

He reasoned, and reasoned correctly, as all men will say, that he had no more right forcibly to dispossess the respondent of an office wrongfully held by him, than so to dispossess him of a farm which he wrongfully held. He read in the ninth section of the declaration of rights, that "every person is entitled to a certain remedy in the laws for all injuries or wrongs which he may receive in his person, property or character; that he ought to obtain justice freely and without being obliged to purchase it, completely and without denial, promptly and without delay, conformably to the law." He saw, therefore, that he must seek his remedy under the very constitution which gave him his right. The constitution of the state gave this right; the power of the state must therefore afford his remedy. But to what power of the state should he appeal. He examined the constitution of the legislature. Clearly the law-making power could do nothing to give vitality to a right which the fundamental law already expressly declared to be his. He turned to the executive power; the only clause in the constitution of the executive department, which seemed at all suited to his purpose, was that which charged the governor to take care that the laws be faithfully executed. But he saw at the same time, that the executive power never moved to enforce the legal rights of individuals until it had legal warrant for so doing.

How, then, was he to obtain that legal warrant? He knew from immemorial usage that if money or goods or lands were wrongfully withheld from him, the judicial power would provide a warrant for its restoration. He examined the constitution of the judicial power. He found that the whole judicial power of the state, except that of impeachments, was vested in the Supreme Court, and certain inferior courts named in the constitution.

The constitution does not define judicial power, or specify the causes it may entertain. To the governor, specific duties are assigned, but to the judiciary, it has given in general terms, the whole judicial power of the state, with specified exceptions; and to the legislature it gives the whole legislative power of the state,

with specified exceptions. It does not enumerate the causes which are within the jurisdiction of any one of the courts created by it; but among all the courts it distributes jurisdiction, both original and appellate, in all matters both civil and criminal, not excepted in the constitution, and not prohibited by law. Since this is a matter either civil or criminal, and since it is not excepted from the jurisdiction of the courts by the constitution, nor prohibited by any law, it is claimed by the relator, that some court has cognizance of it, and no one has denied but what if the cause is within the jurisdiction of any court, it is within the jurisdiction of this.

But it is said there is no precedent for this proceeding. It is said that never before has a court attempted upon information to adjudicate the rights of contested claimants to the office of governor. This is so. The reason is obvious: in some states the courts have not the power to adjudicate such questions—in this state, where the courts do possess that power, no occasion has before this occurred for claiming its exercise. But courts in all the states have adjudicated questions strictly analogous to this. The writ of *quo warranto* is known to the common law, and its office is, says Blackstone, to inquire by what authority a man who claims or usurps *any* office supports his claim, " in order to *determine the right.*"

Our statute substitutes the proceeding by information for the writ of *quo warranto*, and authorizes it to be filed in this court without its leave, " whenever any person shall usurp or intrude into, or unlawfully hold or exercise *any* public office civil or military." Upon information the courts of this and of other states have decided upon the title to a great variety of offices, among which are included almost every grade of municipal offices—judges, treasurer of state in New York, and secretary of state in Illinois. The *status* of a governor is but that of an officer; it is so denominated throughout the constitution, and by counsel throughout their argument. It differs from the other offices mentioned, if at all, only in degree, not in kind. It may be of higher dignity or greater importance ; but if more important, title to it is so much the more to be protected. When it was once decided that the felonious taking of a copper was lar-

ceny, it was never doubted but the felonious taking of gold was equally larceny.

And while the authority which the court is now called upon to exert is strictly analogous to that which it asserts every day, it is utterly unlike any authority which the constitution vests in either the executive or legislative departments, or which they ever attempt to exercise. Indeed so unlike is judicial to executive power, so broad and unmistakable are the distinctions between the two, that there is no more danger of this court clothing itself with executive power by mistake, than there is, that its members will clothe themselves in their neighbor's garments.

Again, it is said the usurpation complained of is successful and there is no power in the state to redress a successful usurpation. To this it may be replied, that there can be no occasion to redress an unsuccessful usurpation. But let the principle once be established that a wrong cannot be redressed, simply because it is complete, and the next burglar who is indicted in this county will plead in bar that he had got into the house before the officer caught him—that he was entrenched in his castle before his crime was detected—that he had perpetrated a successful burglary.

Counsel have argued as if this was a proceeding to choose a new governor. They say if the respondent be ousted by the judgment of this court and the relator put in possession, he will hold the office not from the people but in fealty to the court. With equal propriety it may be said that all the land of which possession has been recovered by ejectment in this state is held in fealty to the courts which gave judgment upon the right. But in fact the relator does not ask this court to put him in possession of the office he claims. He only asks this court to try and determine according to its long established and well known forms of procedure, his right to the office. When his right shall thus be determined he expects the executive power to enforce it. The power which decrees a man's rights is one—the power which executes that decree is another. Strictly speaking, the courts have no power, but only authority. They grant writs—what comes after, is the exercise of executive power. The end of judicial power is the awarding of process.

In spite of the *power* of this court, I might pick the pockets of

my friend Mr. Arnold, in its presence, with entire impunity. True, if the act was complained of, the court might grant a war- rant for my apprehension, if it was satisfied that my experiment resulted in the taking of anything which it is criminal thus to ap- propriate. If an executive officer could be found to serve the warrant, my personal movements might be embarrassed. And if no such officer *would* serve the warrant, the court might grant a warrant for the arrest of any officer refusing to serve it—the execution of which would be liable to defeat upon the same con- tingency—that no one would execute it. Indeed, if the governor have, as is claimed for him, the right to decide what judgments shall be executed, and what shall not—picking pockets may not be a very precarious business at this juncture, provided always a judicious selection is made of the victims.

It has been strongly intimated that the respondent may disregard the decision of this court, if it shall be adverse to his pretensions. It is quite unusual for parties to inform the courts in which they are impleaded how they will treat their judgments. It is to be hoped the respondent has been misrepresented. But it is not for me to say he has been. It may well be that a man who con- fesses to have usurped the executive power of the state, will, if he be able, overthrow the judicial power also. But such con- siderations are not to deter the court from the discharge of its duty. This court is not responsible for the non-execution of its own judgments. And counsel have no right to throw out such intimations here. Their talk of civil strife is all out of place in this court. But were it not for this presence, I might be tempted to say to counsel, that even *if* the parties in this cause were to be remitted to the ancient right of kings—if they are to be told by this court, to resort, like the Richards and the Henrys of England, to arms for the arbitrament of their rights—the *relator* has no just cause to fear the result of such a trial.

*Mr. Arnold* closed the argument on behalf of the respondent, for the motion, contending that the question before the court was a political, not a judicial question ; that the alleged usurpa- tion in this case, was a *political usurpation* of the functions of one of the co-ordinate departments of the government ; a wrong, if

such it be, to be remedied by political, and not by judicial power.

The first part of the argument of Mr. A. is necessarily omitted, for the reason that the same has not been furnished for report. From the brief furnished by him, however, the main points and positions made and argued, may be stated :

1. In our system of government, the people are the source of all political power; and as a matter of course, all governments " derive their just powers from the consent of the governed." This is the universally received American principle, and it is fully recognized in the first section of the " declaration of rights " in our constitution. *See Federalist,* chap. 39, 46.

In this sense the people are sovereign; but that is not the sovereignty which acts daily in the exercise of sovereign power. The people, as such, cannot act on all occasions. Hence the people establish what is called government, and invest it with so much sovereignty as they may deem proper; and this sovereign power being thus delegated to, and invested in the government, that government becomes what is called the sovereign state. But again: the people cannot act *per capita* in exercising the powers of government. It is done through representatives or agents. The basis of representation or agency is suffrage. The exercise of this is every man's part in the exercise of sovereign power. This is the mode in which power emanates from its source (the people), and gets into the hands of different branches of the government—the legislative, the executive and the judiciary. Suffrage is the means of the delegation of power. Hence the importance and the necessity that the exercise of suffrage should be prescribed by law, as to time, place and manner, and that the results should be certified in some certain form, in order that every man may vote, and the result may be rightfully ascertained.

Another obvious principle is, that the people may not only limit their government, but may limit themselves. They may limit the former as to the extent of its powers, their distribution, and mode of exercise. They may limit themselves as to the manner in which they may alter, or change it, protecting it from the impulse of mere majorities. Also, as to who may vote, who may be voted for, and in various other ways. The expression

of this delegated sovereignty and of these limitations of its powers, and the powers of the people, is termed the constitution.

2. Another important principle lying at the foundation of the American system of government is, that the different departments of the government, the executive, legislative and judicial, ought to be separate and distinct. This political maxim is an American axiom, and has been adopted in the formation of every national and state form of government since the declaration of independence.

By reference to the journal of the convention which framed the constitution of the United States, it will be seen that the first resolution adopted by that body was that " a national government ought to be established consisting of a supreme legislature, judiciary and executive."

It is the celebrated maxim of Montesquieu, who if he be not its author, is justly distinguished as its great and leading advocate and teacher. His great model was the British constitution, which he seems to have regarded as the standard of liberty. It was reserved to the Union and to the states which compose it, to embody clearer conceptions and a more definite and practical application of the invaluable precept.

The great and difficult problem here has been, how best to secure the harmonious independence of each branch of the government, and yet to make each a check and balance upon the other. *See the Federalist, chap.* 47, 49; 2 *Story's Com. on Constitution, p.* 11 *to* 25.

So well settled and universally received is this principle, that some of the newer states, our own among the number, have omitted to assert it in their declaration of rights. It is an obvious incident, or corollary to this principle, that the head or representative of each department of the government should in its organization, whether by appointment or election, be independent of the control of any other department, and controlled only by the party or sovereignty having the right to appoint or elect.

In all our systems of government, the legislative department is elected by the great source of power, the people. In nearly all, so is the executive. In very many, perhaps most of them, the judiciary is appointed by one or both the other departments,

in which case the appointment is subject to no control beyond the appointing power.

In this state the judiciary (unwisely I think) as well as every other department, is the immediate and direct creature of the people. And it would seem on the doctrine stated, that the election of each should be equally and alike a matter to be passed upon, and determined by the same authorized agents of the political power.

And, on principle, that any one department should possess the power to revise, reverse and annul the acts of such political agents, and of itself to decide absolutely the election of any other co-ordinate department and the title to its powers, is a strange and dangerous incongruity. It is such an anomaly in government, such a solecism in science, that it ought not be found in our constitution, if it can possibly be avoided. By the constitution, the Supreme Court has, subject to certain limitations, general law and equity jurisdiction. It has the power to issue and to hear and determine the writ of *quo warranto*, and that, inherently from the constitution, and without regard to any law. *See sec. 3 and 4, art. 7.*

In fact it may be observed, that the jurisdiction of this court is complete, original and constitutional. It does not depend upon any grant of the legislature for its powers, nor can any act of the legislature alter, modify, or take away these powers. In this respect the Supreme Court, although organized by the act of the legislature, is in nowise different from the old. Its jurisdiction is wholly of the constitution, and not at all of the legislature. *See sec. 4, art. 7.*

It follows as a necessary consequence that this court cannot directly and originally take any jurisdiction merely from any act of the legislature. Upon this basis I raise two propositions:

1. The jurisdiction sought to be obtained in this case is foreign to the organization and general powers of the court—the subject matter of information is matter of political and not judicial inquiry. It proposes to inquire into, and determine the manner and the result of the exercise, by the people of the right of suffrage, reserved to them to elect their representative or agent, who is clothed with the possession of another and independent, co-ordinate department of the sovereign government.

I say the court cannot inquire into the facts stated in the information, because they are facts which prove (if they prove anything) the establishment of a new and different sovereignty in another and independent department of the government, and that is a question to be settled elsewhere and otherwise. From the very nature of the case it is not a matter to be settled by judicial inquiry. The claim is that the relator at the last general election was elected governor by a majority of the legal votes cast at such election.

What does the decision of this claim call on you to do? To ascertain how many votes were cast at such election; for whom they were cast; to ascertain the qualifications of each voter who cast the same; to administer the laws protecting the purity of the ballot-box; to revise and pass upon the various canvasses, and the qualifications and conduct of the officers conducting the same; the legality of the returns, and to foot up and figure out the majority.

In short, it is required of you to exercise, nay, to usurp all these political and administrative duties, and finally as a board of state canvassers, to make a final count and declare a final result. It seems enough to state such a proposition to show its absurdity.

This reasoning is not without authority. A similar question arose in Rhode Island in 1844 on the trial of Thomas W. Dorr for treason. *Opinion of C. J. Durfee. State vs. Dorr,* 7 *How.* 1.

This case is analogous to the one at bar. The principle involved is the same. If Dorr had applied for a *quo warranto* setting up his claim *de jure* to the office of governor on the ground of his election under the people's constitution, and alleging that Gov. King was a usurper into the office, the court must have refused jurisdiction upon the same grounds. And why, let me ask, did not Dorr pursue that course and file his information? The Supreme Court of that state has as broad jurisdiction as the Supreme Court of Wisconsin. It was because no lawyer supposed that it was a case within its jurisdiction.

I am able to cite no further authority. It is a new case; and so far as my knowledge extends, the first case in which this question has directly arisen in the history of the American government.

2. The jurisdiction is not granted by any terms of the constitution. It is not pretended that it is in express terms. But it may be insisted that it is embraced in the power to issue, hear and determine writs of *quo warranto.*

This, of course, leaves out of view the statute as to informations, and raises the question of the real scope of the writ of *quo warranto* at common law. I assert that no instance can be found in which it was held to reach the title of the elective head of an independent department of the government.

These positions, if well taken, dispose of the whole matter; and here, perhaps, I might wisely leave it.

But it is claimed that the statute bestows the jurisdiction; and I observe that the papers in the case are made out in reference to the statute, and present a case under it. I remember, also, the flippant remark of one of the counsel for the relator, when this question was first raised before the court, that this was a very simple question, and he was ready to discuss it at any time —that the only question was, whether the office of governor was a "public office." *See Rev. Stat., page* 636.

In regard to this law, I contend that allowing to it the scope now claimed, it does not relate to a rightful subject of legislation.

And because—

1. It is not on the general principle I have discussed, to commingle the action of the separate departments of the government; and having already vested the power to decide the result of elections (which is a political matter) in the hands of another and political body, it is not right to bestow the same power in another form upon another foreign and judicial department of the government. It is an attempt, in a mere political matter, to give to the judicial department power to revise and annul the action of the legislative or political power, where no question of the constitutionality of law or conduct is involved. This is foreign to the judiciary.

2. The law is unconstitutional and utterly nugatory. If, as I have urged, the jurisdiction be found in the constitution, if it exists at all, and it cannot be found there, then this law cannot confer it, and the court, by virtue of the law, cannot take it.

In other words, the powers of each department of the government are distinct, complete within itself, independent and ex-

clusive, except as otherwise expressly provided in the constitution; and the legislature can no more give this jurisdiction, or the court take it by virtue of this enactment, than it could in the case of a law which should impair the obligations of a contract, or a law which should give a trial by jury in every case in the Supreme Court, or a law which should enable the court by a *quo warranto* to pass upon the qualifications of the members of the legislature.

In all these cases the constitution is conclusive and imperative. In the case at bar (as to the title of the executive) the constitution has made no provision; and it is a political power which, as I shall hereafter undertake to show, the legislature has properly disposed of. The court can never legislate. It can never exercise political power. It can never assume jurisdiction, not even by consent.

3. Supposing this law to be constitutional, I contend that the executive is not a "public office," civil or military, within the purview of the statute. The term "office," is one of very comprehensive signification, and in its broadest and most popular acceptation, would include all persons who perform service, or do business within the state in any civil or military capacity. It would include not only the executive, but the judiciary, members of the legislature, senators and representatives in Congress, and all down to the lowest of the civil or military officers within the state. And in point of fact, the term is thus used throughout the constitution.

This course of reasoning would prove too much, for it would embrace numerous persons holding public offices, who are admitted not to be within the operation of the law, and as to whom the constitution places a positive prohibition.

There must, therefore, *ex vi termini*, be some limitation, and there must be some definite class of persons holding public office, who are within the operation of the statute. Now offices, in the law, are public and private; and the distinction between the two is well marked, and characterized by their different employments.

An office, says Mr. Webster in his dictionary, in its primary signification, is a "particular duty, charge or trust confirmed by public authority, and for a public purpose; an employment un-

dertaken by commission or authority from government, or those who administer it."

A public office, says Justice Blackstone, " is a right to exercise a public employment and to take the fees and emoluments thereunto belonging." 2 *Black. Com.* 36.

Again, he says, " the king is the fountain of honor, of office, and of privilege." 1 *Black. Com.* 271, 272.

Just in this connection, let it be remembered that of those styled public officers in the constitution, the greater part are merely business men (so to call them) in the public service, such as agents, servants, contractors, commissioners, &c., &c. And the constitution recognizes this very distinction which I make, and lends force to the definition which I am about to propose. *Const. Wis.*, Art. 4, § 26.

With these lights and for other reasons which I shall proceed to assign, I define the class of officers intended by this statute to be, those who hold (or rather intrude into) any public office of the state, subordinate to and emanating from the government, whether by election of the people, appointment of the executive, or ballot of the legislature.

The very legal idea of office is that it is derivative—that it has a source from whence it proceeds—a power which creates it, and to which it is responsible. In this sense of the term, the king is not a public officer, and he is never so regarded in the British constitution. Nor is the president of the United States such an officer, nor is the governor of this state such an officer, for they are original creations of the very sovereign power in the organization of government, and emanate directly from the constitution itself. They constitute the executive head or department of the sovereign government. And here let me ask on principle, why should not the same power of the court which is invoked in this case, extend to the legislative department, and in fact become the final arbiter of the organization of every department of the government? Is it claimed that it was designed in this case as a check or an appeal to a disinterested tribunal to guard against partisan feeling, corruption or fraud?

I answer, that all political writers agree, and all experience has shown it to be true, that while the executive is the weakest, the legislature is the strongest, most overshadowing and dangerous

department of the government. The immediate representative of the sovereignty of the people, and clothed with almost undefined and unlimited powers, it is in that quarter that there is the greatest danger of encroachment, and an undue predominance in the conduct of government. In many of our systems the legislature directly canvasses the votes of the executive, and all elective offices, and declares the result. In ours, the legislature (in pursuance of article 5 of the constitution) has delegated that power to a certain body of the highest administrative officers of the state.

Let me ask, is there any more danger that they will be influenced by partisan feeling, corruption or fraud, than the members of the people's court? In each case there are but three men— in each case high public officers—in each case acting under a similar oath.

And if in the one case, in a close and exciting contest the board of canvassers might, through partisan feeling or corruption, or fraud, strive to declare the election of one candidate for the executive, might not the judges on an appeal by a proceeding like the present, be impelled, by like motive, to strive to declare the election of the opposing candidate? What absolute advantage, therefore, or more perfect safety as against error or wrong, is there in the one case, more than in the other?

But this is not all; nor by any means the worst. If frauds and illegalities in the election or in the returns, or canvass of votes, be alleged (as we well know is done in the present case), whether these frauds or illegalities relate to holding of the polls or the conduct of the officers, or the return or canvassing of votes, or the act of casting the votes, or the qualifications of the electors, they will necessarily involve issues of fact; and these are foreign to the jurisdiction of this court.

The spirit of our institutions requires that these should be tried and passed upon by a jury and ordinarily in jury of the vicinage. A jury is of the electors; and while a jury in one county of one political party may find a verdict one way against the evidence and law, a jury in another county of the opposite party may find a verdict the other way, equally against the evidence and the law—and thus the judgment of this court might

be doubly wrong; by the misconduct of the judges, and by the misconduct of the jury.

But perhaps I am departing from the logical order of my argument. The proposition is that the governor is not a public officer of the state within the operation of the statute. It is conceded that in common parlance he is a public officer. So equally may it please the court, is a member of the legislature. They are treated and spoken of as such in the constitution and the laws. It is so not only in our state system, but it is equally true in our national government. In acts of Congress it has been legislatively used to comprehend the members of a representative and legislative body. *See act of July* 13, 1787 ; *Sec.* 10, 11, 12.

More particularly is this true of senators, whose functions extend occasionally to every department of government. And I admit in the argument that if an officer is excluded from office he may have a mandamus for admission or restoration, and that a writ of *quo warranto* will lie against one who usurps an office, to inquire by what authority he holds it. But will these remedies apply to a senator? Clearly not. Nobody pretends that they do. But it is said, the constitutional power of expulsion, and to judge of the qualifications of its members, renders such proceeding unnecessary. But that is not an answer. Why do these constitutional provisions except that the senator is to be removed, censured or restored by methods adapted to the members of a supreme department of the government, and not by methods applicable to subordinate officers under the government?

Says an able jurist, " the legislative department is, in all free governments, considered as the sovereign ; and those who compose it cannot properly be classed with civil officers, the subordinate functionaries of the state."

Again ; I propose to prove the distinction which I have drawn as to who are and who are not, public officers within this statute, and to illustrate the definition which I have given, by an argument based upon another branch of the constitution.

By section 1, of article 7, the power to impeach is conferred on the House of Representatives (no doubt meaning the Assembly), and the duty of trying impeachments is devolved upon the Senate.

The language is, " the House of Representatives shall have the power of impeaching civil officers of this state for corrupt conduct in office, or for crimes and misdemeanors." And it is further provided that "judgment in cases of impeachment shall not extend further than to removal from office, or removal from office, and disqualification to hold any office of honor, profit or trust under the state."

Now can a member of the legislature be impeached? Can a senator be impeached? Clearly not. It is not pretended; and yet he is, in the common acceptation of the term, beyond all question a civil officer of the state.

A brief statement of the reasons why a senator is not impeachable, may tend to illustrate the distinction I have drawn, and while it shows who are constitutionally subject to impeachment, will show also what civil officers of the state are subject to this statute. They are nowhere in the constitution made impeachable in direct terms. The governor and lieutenant-governor and the judiciary are so made, and also " all civil officers of the state."

If members of the legislature were impeachable the independence of the two branches would be at once destroyed? The house would be enabled to drive a senator from his seat. It would arm a majority with the instruments of personal vengeance against their political opponents. It would render senators the judges in their own cause.

Again; the reasons which show the propriety of rendering the executive, the judiciary and the subordinate civil officers liable to impeachment, do not apply to these officers. In their case official neglect may be a pretext, while legislative firmness is the real cause of offence. Firmness in the discharge of his duty might subject a senator to impeachment. It is a power of ostracism in the hands of the most numerous branch, already sufficiently powerful, which would enable them to remove from his seat any member of the Senate who might dare to oppose a favorite measure. He is supreme, independent and sovereign in his legislative capacity; and refine as we will, this proceeding is aimed at his legislative character. The impeachment destroys his influence as such; and then common fame may be a sufficient foundation for this mode of proceeding.

But it is said that his functions extend to the executive and judiciary departments? I answer, this is merely an incident to his legislative character, conferred for conservative purposes by the constitution. For such he has no separate source of power. His judicial and executive power emanate from the same source as his legislative. He is elected by a single district, to which alone he is responsible, and can reach his office in no other way. If he die or resign in the recess of the legislature, his vacancy cannot be filled by appointment under any power of the state, it can only be filled by an election in the district.

What judge or lawyer ever denominated the members of the House of Lords, the officers of the government or crown. Yet their judicial powers, as the court of last resort, extend to every civil action. True, they are subject to impeachment, because by the common law of England, all persons may be impeached, and for offences of every character. But in this country the power of impeachment has been limited in all our constitutions, to certain persons and for certain offences. Then, certainly, the judicial character of the senator does not make him impeachable. And by similar reasoning, it may be shown that any participation he may have in the appointing power, does not subject him to this proceeding.

The governor is the executive of the state, and yet he has a part in the legislative power; he has a qualified veto upon every law. Yet, " *all* legislative power is vested in the Senate and Assembly."

But again ; if a senator, he is liable to be impeached, for the reason that he occasionally acts as a judge, and occasionally makes appointments, then it follows, that he is only liable to impeachment for what he does in his judicial or appointive character ; and thus, under our constitution, he might be prosecuted in one character, and disgraced and punished in another. And, further, if in these two attributes of his character, he is a civil officer of the state, and subject to impeachment " for corrupt conduct in office, or for crimes and misdemeanors," then you include offences in his legislative character, and thus confound all the distinctions of the constitution, as well as destroy the independence of the Senate. And what is to be the judgment? and what the effect? Will the judgment disqualify? May he not

again be returned as senator? Would the judgment remove him as senator? Would it be a disqualification as to part of his character, and not as to the other part? But on this whole sub-ject the constitution itself is sufficiently explicit. By sec. 12, art. 4, it is provided " no member of the legislature shall, during the term for which he was elected, be appointed or elected to any civil office in the state, which shall have been created, or the emoluments of which shall have been increased during the term for which he was elected." This provision contem-plates:

1. That they are not civil officers in the state, otherwise the language would have been, "any other civil office."

2. That they may be elected or appointed to a civil office, but not one created, or with emoluments increased during their term.

And the following section (13) recognizes the same distinction under the government of the United States. Again; the mem-bers of the legislature have no responsibility but to their con-stituents, and what they do as legislators can nowhere else be questioned. But executive or judicial magistrates are responsi-ble for all their acts in the ordinary course of criminal prosecu-tion, as well as in the extraordinary course of impeachment.

And this distinction is no novelty. It existed in the articles of confederation, and it exists in the constitution of the United States, and in the constitution of most if not all the states. In-deed it is founded upon the very nature of our government. The legislature is the people acting through representatives. Over these the people have a complete control, and if one set transgresses they can appoint another, who can rescind all previous laws. But this is only the power to make laws. They have directly nothing to do with executing or expounding them. Hence arises the diversity in the modes of remedying the griev-ances which they may suffer by the conduct of their different representatives or agents. If a legislator acts wrong he may be expelled during his term. He may be rejected at the next elec-tion, and the laws which he has aided to pass may be repealed. But if an executive or judicial magistrate acts wrong, the people have no immediate power to correct; and prosecution and im-peachment are the only remedies. In this connection I refer to

two provisions of the constitution which have an important bearing.

By section 8 of article 4, each house may expel a member, "but no member shall be expelled twice for the same offence." By section 6 of article 5, the governor is prohibited from granting pardons in cases of impeachment. In case of expulsion, the member is sent to the people, but if they choose to return him again he has a perfect title to his seat. In the case of impeachment the officer is dismissed and may be subjected to perpetual disqualification. In fact impeachment is with respect to executive and judicial officers, what expulsion is with respect to members of the legislature. As expulsions enable the people to decide whether they will restore the evicted member to their service, a conviction on impeachment enables the representatives of the people to decide whether the delinquent shall be partially or totally excluded from the honors and emoluments of office. And the difference in the two cases shows that the people in the constitution did not intend so much to guard against their own exercise of sovereignty, as against the abuse of their delegated power.

In these views, and in drawing the distinction which I have attempted, we are not without authority. By section 4 of art. 2 of the constitution of the United States, it is provided that, "the president, vice-president, and all the civil officers of the United States, shall be removed from office on impeachment for, and conviction of treason, bribery, or other high crimes and misdemeanors." As early as 1798, in the celebrated impeachment of William Blount, then a senator from the state of Tennessee, after full argument by the ablest lawyers of the day, Messrs. Bayard and Harper, for the prosecution, and Messrs. Dallas and Ingersoll, for the respondent, it was held that the term "civil officers" did not embrace members of the Senate, but only the subordinate civil officers of the government who were appointed and commissioned by the president. And the impeachment was dismissed for want of jurisdiction. The argument there used is equally good as to our state constitution, but, perhaps, not so pointed and irresistible, because under our system every department of the government as well as most of its officers, have been made elective. Under our system the governor is not clothed

very extensively with the power of appointing and commissioning public officers, but he has in several instances the power of removal. As to all such they are no doubt public officers within the meaning of this statute.

From this examination it is apparent that while the governor, lieutenant governor, the judiciary and the subordinate civil officers of the government are impeachable, the members of the legislature are not, because they are not civil officers within the meaning of the constitution; and that neither the members of the legislature, nor the executive, are subject to proceedings by *quo warranto*, because they are not civil officers of the state, within the meaning of this statute. I will add further, that, although as I have said, the executive and the members of the legislature are civil officers of the state within the ordinary acceptation and use of the term, yet I do not remember any sentence of the constitution in which they are thus directly called. They are spoken of as "the executive," "the members of the legislature," "the members of the Senate or Assembly," "the members of each house," and "their office," and "term."

The third section of article 5, I think, throws some light upon the subject. The jurisdiction is in this case claimed in a close contest, where the incumbent is alleged to have a small majority made up of illegal votes, which, if rejected, would leave him in a minority. Suppose it was a little closer, and was a tie, and it was claimed that there were illegal votes on each side; would this court have jurisdiction?

This section provides, "The persons respectively having the highest number of votes for governor and lieutenant governor, shall be elected. But in case two or more shall have an equal and the highest number of votes for governor or lieutenant governor, the two houses of the legislature at its next annual session, shall forthwith by joint ballot choose one of the persons so having an equal and the highest number of votes for governor or lieutenant governor." And then it is added, "The returns of election for governor and lieutenant governor shall be made in such manner as shall be provided by law." The object seems to be, to reserve the organization of the executive department, to the people directly, or to the representatives of the people

directly, or by such means as they shall by law provide for that purpose.

3d. And, lastly, I remark that the legislature in pursuance of the constitutional provision above cited, has by law provided for the manner in which the returns of election for governor shall be made and canvassed. *See chap. 6, Revised Statutes.* And by reference to sections 74 and 75, it is apparent that the board of canvassers is clothed with certain judicial powers, and that their decision was intended to be final in the case. And further, to show that it was intended, and that it was regarded as a political matter affecting a sovereign department foreign to judicial inquiry, I refer to the mode in which the first canvass was to be conducted as prescribed in section 11 of article 14 of the constitution. If between two candidates at that election there had arisen a contest growing out of alleged errors, illegalities or frauds, could this court have taken jurisdiction under this statute? If it could not then, I contend that it cannot now, and that the power then reserved to the legislature has been vested constitutionally in the board of canvassers. The complaint in this case is, that the respondent " usurps, intrudes into, or unlawfully holds " the executive office. And yet we have been sufficiently informed that he holds the office not only under colorable title, but under a certificate exactly in conformity to the law.

And in conclusion, if this court has jurisdiction in this case, is it not singular that no case has arisen or can be found in which it has ever been exercised? The proceedings of mandamus and *quo warranto* are proceedings especially applicable to the possession, the right, and the acts of public office. How does it happen that in no instance has either of these proceedings ever been brought to bear in the case of the executive department of the government? And it is in vain to attempt to draw a distinction between these proceedings, on which to found the jurisdiction of this court in the one case, while it will not lie in the other.

There is, and can be no such distinction as is claimed between the office and the individual who claims to hold it. The relator claims the right to it *de jure;* the respondent is alleged to hold it *de facto,* but wrongfully. It is the right to the office that is in controversy; it is the office itself that is to be disposed of—and if the court has no jurisdiction as to mandamus, how has it by

*quo warranto?* The one commands the executive; the other makes or unmakes him. The one commands the officer; the other disposes of the office. They are both alike beyond the jurisdiction of the court—

"Est boni judices ampliare justitiam non jurisdictionem."

Mr. A., on submitting his written brief on the motion on the conclusion of his argument, remarked, that "it has been prepared in haste and amidst other and pressing engagements. I feel that it is incomplete and unsatisfactory. But such as it is I submit it, and I submit this case with hopeful confidence.

"In my judgment this case is fraught with as much political and judicial importance as any case that has arisen since the organization of our government. If in these sovereign and independent states there is reason to fear the overshadowing power of the general government, and especially the encroachments of the federal judiciary, then in each individual state there is reason to fear that some one department may acquire an undue weight and crush and overwhelm the government. And just so certainly as any one department attempts the subordination and the subjugation of another, then there is danger either of revolution, or that the liberties of the people may fall with the integrity of their government.

"We want in this land no such ruins for the mournful admiration of posterity. The traveler who in the elder world gazes on the ruins of the Colisseum or the Pantheon, may wonder and admire over the magnificent relics of a work of perfect art. In this land we have erected an edifice neither Doric, nor Ionic, nor Corinthian, nor yet Gothic, but purely American in its order, the most beautiful and perfect which this world has ever seen—the edifice of constitutional, American liberty. It is the work of the people. It is the hope of the people. It is the hope of the world for the emancipation and progress of our race. And I place the mark of treason upon the brow of every man, be he of the north or the south, on the bench or off the bench, who dares to cast one spark of fire beneath the pillars of that glorious edifice. In this contemplation I have lost long ago all partisan feeling and all political ties. The platform of the constitution is the only

ground of safety. I have endeavored to plant myself there to-day, as I have always done before; and what I have said elsewhere to a jury I now say to the court, that I intend to stand there to the last, shoulder to shoulder with all those of whatsoever name or kindred or tongue who will swear by the oracles of our fathers and stand fast to the covenants of the Union!"

*Mr. Howe*—We propose to now submit the question of the power of the court to go behind the certificate held by Barstow. I do not wish to speak more than fifteen minutes to that question.

*Mr. Orton*—I do not suppose that at this stage of the case there is any intention to raise that question.

*Justice Smith*—It is so understood—the argument does not apply to that question.

*Mr. Howe*—In that case, the references in the argument to that certificate will of course be excluded from the consideration of the court.

*By the Court*, WHITON, C. J.   In this case the attorney-general filed an information in the nature of a *quo warranto*, on the relation of Coles Bashford, setting forth that the respondent held and exercised the office of governor of this state, without any legal election, appointment or authority whatever; and that at a general election, held on the 6th day of November last, for the election of state officers, the said relator was duly elected and chosen governor of this state, and that ever since the seventh day of January, A. D. 1856, he has been and still is entitled to hold and exercise the said office; but that on the said seventh day of January, the said respondent usurped, intruded into, and unlawfully held and exercised the said office, and ever since, and still doth usurp, intrude into and unlawfully hold and exercise the same, &c.   The respondent was required to plead to this information, and appeared and filed a motion to dismiss the proceedings, for the alleged reason that this court has no jurisdiction in the premises.   The question which we are called upon to decide arises upon this motion.   Before proceeding to con-

sider the question presented, upon its merits, it may be well to determine what effect the motion has upon the allegations contained in the information; and we are of opinion that the filing of the motion must be considered as an admission by the respondent that they are true.

The question then presented for our consideration is, whether in case of the lawful election of a person to the office of governor and an unlawful intrusion into it by another, without color of right, this court has jurisdiction to entertain proceedings having for their object the removal of the unlawful intruder, and the establishment of the right of the person lawfully entitled to the office.

The counsel for the respondent have contended that we have not this power for various reasons, and first, because it cannot be exercised without giving to the court the control of the executive department of the government.

It is contended that our government is divided into three departments—the executive, the legislative and the judicial; that these departments are co-ordinate; that each is independent of the other, and that neither can interfere with the other without destroying the harmony of the government.

To maintain the position that these departments of our government are thus co-ordinate and independent, the counsel for the respondent read very much at length from the reported debates of the convention which formed the federal constitution, and from the debates of the state conventions which ratified it, and also from the writings of eminent statesmen and jurists who have treated of the science of government.

But it must be apparent, that, as the sovereign people of this state have adopted a written constitution, in which the powers of the government are distributed among the departments established, and which is the supreme law of the land, we must look to that instrument for the purpose of determining this question.

This constitution does vest the executive power in the governor. It also vests the judicial power in this court and in various other courts and officers. Whether in any instance a power which is properly called an executive power, is vested in this court, or in some other court, or whether powers which are

properly called judicial powers are in some instances vested in the governor, by the constitution, we do not feel called upon to decide.

We have, in every instance in which the question has come before us, refused to interfere with the executive or the legislative departments of the government, in respect to matters which are by the constitution intrusted to those departments, and most assuredly shall decline to take jurisdiction of this proceeding, if we cannot proceed without such interference. The department in which the constitution vests a power, must execute the power, and no other department can be allowed to interfere, without destroying the balance of the constitution, and producing disorder and confusion.

To show that this proceeding, if it resulted in the removal from office of the person who has obtained possession of the office of governor, would interfere with the executive department, the counsel for the respondent contended, that the person filling the office of governor had authority to determine his right to the office. This position, if true, clearly shows that we are without jurisdiction, for if this authority is vested in the governor, most clearly we cannot take it from him, nor interfere with him in its exercise. But we have been unable to find any thing in the constitution, or in the nature of executive power, which can be relied upon to sustain this position. On the contrary, the constitution expressly provides (*art.* 5, *sec.* 3) that the governor and lieutenant governor, shall be elected by the qualified electors of the state at the times and places of choosing members of the legislature, and that the persons respectively having the highest number of votes for governor and lieutenant governor, shall be elected.

It was not contended that the governor has the right to canvass the votes cast at an election, and to determine that he has received the highest number; but that in a case like the present, when it is admitted upon the record, that the person filling the office, obtained it by usurpation and intrusion, and without any legal right whatever, he has authority to determine that he has a right to the office.

It is apparent that this alleged authority is not founded upon the constitution or the laws, and can only be sustained by a re-

sort to unlawful force; we dismiss the subject, therefore, from our consideration without further remark.

It was further contended by the counsel for the respondent, that a removal from office of the person filling the office of governor, and substituting in his place another person, would interfere with the executive department, for the reason that the person so substituted would be the governor of the court; that the court would in that case, elect or create the governor. We are not able to perceive how such a result can be accomplished.

As the case now appears upon the record, the respondent has no legal right to the office, and the relator has a perfect right to it, by virtue of the clause of the constitution above referred to. If the facts should remain unchanged, a judgment of ouster in this court against the respondent, and a judgment establishing the right of the relator, would not create a right in the latter, or destroy one which belongs to the former; their rights are fixed by the constitution, and the court, if it has jurisdiction of this proceeding, is the mere instrument provided by the constitution to ascertain and enforce their rights as fixed by that instrument. Its office is the same as in all controversies between party and party; not to create rights, but to ascertain and enforce them. The same argument would apply with equal force to an information in the nature of a *quo warranto* against a sheriff or any other officer. We do not think it well founded. It was contended further by the counsel for the respondent, that a judgment of ouster in this court against the respondent, and a judgment in favor of the relator, would interfere with the executive department, because it would transfer the office of the governor from the former to the latter.

We do not think this is a correct statement of the effect of a judgment of ouster, in cases of this description. It seems clear to us, that a judgment of ouster against the incumbent of an office in no way affects the office. Its duties are the same, whether the original incumbent remains in it, or whether another is substituted in his place. If a removal from an office by a judgment of ouster against the incumbent, would affect the office itself, so also, would a removal by the death of the incumbent or his resignation. In all these cases, we think the office is in no way affected. It remains as it was before the removal.

It was contended further by the counsel for the respondent, that this court has no jurisdiction of this proceeding, because the writ of *quo warranto* can only issue against officers strictly so called, and that the head of the executive department of this state, is not an officer in the strict and legal sense of that term. It was admitted by the counsel for the respondent, that this court has the power conferred upon it by the constitution, to issue this writ against any subordinate officer of the government, but it was denied that the governor in whom is vested the executive power conferred by the constitution, is properly and strictly an officer.

This brings us to a consideration of the nature of our government, and of the powers conferred upon it, and also upon the departments separately.

We regard it as a fundamental principle, that sovereignty resides in the people. The truth of this proposition is so obvious, that it will not probably be disputed by any one. But it was contended by the counsel for the respondent, that, although the people have vested in them, in the aggregate, the sovereign power, they have delegated portions of sovereignty to the various departments of government by the constitution, and as a portion of this sovereignty is vested in the governor, by that instrument he was beyond the reach of any other department of the government. We think this argument proceeds upon a mistaken view of the nature of sovereignty, and of the nature of the power delegated by the people to the governor in the constitution. As has been before stated, the people are sovereign, and it is proper to add that they alone are sovereign. In forming this government, they did not part with one jot or tittle of sovereignty; it resides in them and in them alone. Were it otherwise, had this government possession of sovereignty, it would have the power to perform its functions without consulting the people, and could change its form without their aid ; it could enlarge or diminish its power; it could, in short, do any act pertaining to the government, which unlimited power over it would enable it to perform. But the people, when they formed this government invested it with certain powers; they gave it such powers as they chose, and provided for the election or appointment of officers, agents and functionaries, to carry on its operations. They distributed these

powers among various departments, giving to one department executive power, to another legislative power, and to another judicial power. They delegated also certain powers which cannot perhaps be considered belonging to either of the above-named departments, and provided for the election of officers to execute the powers thus delegated ; but in all this they did not part with their sovereignty ; on the contrary, they now have the power to destroy the present organization of the government, and to form a new government with such powers as they shall please to confer upon it.

It must be apparent, from this view of the nature of the powers delegated to the various departments of the government, that none of them possess sovereignty ; but, that they all have power granted to them, the nature and extent of which, must be determined by the constitution which confers it.

We will now proceed to inquire whether the governor is strictly and properly an officer under our constitution, and thus to determine whether the writ of *quo warranto* can issue to inquire by what authority he holds and exercises his office. The constitution provides (*art.* 5, *sec.* 1, 2), that the executive power shall be vested in a governor, who shall hold his office for two years, and that no person except a citizen of the United States and a qualified elector of the state, shall be eligible to the office of governor, or lieutenant governor. Article seven, section first, provides that the House of Representatives shall have the power of impeaching all civil officers of this state, and that on the trial of an impeachment against the governor, the lieutenant governor shall not act as a member of the court. It will be seen that his station or position is called an office in the fifth article of the constitution, and that he is designated as a civil officer in the seventh article of the same instrument.

Indeed, it appears, that unless he is a civil officer, as that term is used in the constitution, he is not liable to impeachment, as the only power given to the House of Representatives to impeach him, is conferred by the clause of the constitution above cited ; yet, it appears, by the strongest implication, that he is liable to impeachment, for it is provided, that on the trial of an impeachment against him, the lieutenant governor shall not act as a member of the court. We have shown that no sovereignty is

conferred by the constitution upon the various departments of the government, but that power is given them in such measure as the people have chosen to confer it; and we are unable to discover any difference in the power so given. It is the same in kind, whether it is conferred upon the executive, the legislative or the judicial department. It is the power to perform the appropriate duties of the department; and we see no reason for the opinion, that while some of the persons who exercise this power, and perform those duties, are properly and strictly called officers, others, who exercise powers of the same kind, are not properly so designated.

It was contended by the counsel for the respondent, that the question arising in this case, is a political one, and not properly cognizable before a judicial tribunal. We cannot view the question in that light. As the case appears upon the record, it is the intrusion of a person into a civil office, without color of legal right; and, although the office is of high dignity and importance, it is still an office created by the constitution, and it seems clear to us, that this court has the same power to remove from it a person who has unlawfully intruded into it, that it has to remove an intruder from any other office, created by that instrument.

It follows from the views which we have been compelled to take of the question, that the motion must be denied.

JUSTICE SMITH expressed his concurrence with the opinion just read by the chief justice. There was no doubt but that this motion should be denied. The counsel for the respondent (Mr. Barstow), had chosen to put the motion on the supposition of a bald, naked successful usurpation of the office of governor. The counsel had claimed that the individual now exercising the functions of governor, although an usurper, by succeeding, had acquired such a position, that no other department of the government possessed the power or the right to inquire by what authority he held it. The basis of their argument was, that our government is divided into three departments, distinct, co-ordinate, co-equal and independent. Now the effect of the information and the motion made before the court was to place the respondent in the attitude of an usurper, with no constitutional right whatever to the office into which he had intruded. If so

was he co-ordinate with the other departments? Co-ordination is that which is equal, which derived authority from a common source. Could one usurping power, claim to be co-ordinate? The constitution admitted of no usurper. It seemed to him that until the respondent placed himself within the pale of the constitution, he could not claim the protection of that instrument, in exercising the functions of an office which, as had been the supposition on which this motion had been argued, he had usurped and was exercising in defiance of the constitution, nor could he thus call in question the powers of the other departments. He must stand upon the constitution if he would invoke its protection. He would suppose a case, that the emperor of France or the queen of England, should send over one of their subjects, appoint him governor of Wisconsin, and that he should come to the capitol, and in some way get possession of the executive department—complete possession for a few days or hours—the time was immaterial—could he come before this court, or the legislative department above, and say that he was co-ordinate with them? He would not be co-ordinate. He was ordained by the emperor of France or the queen of England. The constitution ordains in this government. Therefore the admission of the usurpation was destructive of the claim of co-ordination. If an individual could usurp the executive office, and hold and exercise it in defiance of the constitution, he was not co-equal with the other departments; he was above the other departments, and above the constitution itself; and, if successful, he destroyed the constitution and all the departments it had ordained.

Unless the individual now exercising the office of governor, places himself within the pale of the constitution, he cannot claim from this court immunity or protection under the constitution.

On the 21st day of February, the time appointed for pleading to the information, the counsel for the respondent presented the following stipulation, signed by the attorney-general and all the counsel for the respective parties:

"The counsel for the respondent exhibited in court a certificate of the board of canvassers, on file in the office of the secretary of state, of the canvass of votes returned to said board as having been cast for governor at the last election, in and by which it appears that the said board of canvassers determined that Wil-

liam A. Barstow was elected governor for two years, from the first Monday in January, A. D. 1856; also, a certificate of election, made out by the secretary of state, and transmitted to the said Barstow, which said certificates are in proper form, and the oath of office taken and subscribed by the said Barstow on the seventh day of January, A. D. 1856.

"And the respective counsel and the attorney-general submit, to the court, whether said court have any jurisdiction to inquire, beyond said certificates and the said canvass, as to the number of votes actually given at said election for said Barstow for governor; the counsel for the relator offering to prove that said certificates were made and issued through mistake and fraud, and also that said Coles Bashford, at said election for said office of governor, did receive the greatest number of votes; all of which the said counsel offer to prove by competent evidence;" and asked the decision of the court upon the question raised thereby, viz: whether the court had any jurisdiction to go behind the statement of returns and certificates thereof, and the certificate of election issued to the respondent by the board of state canvassers and secretary of state.

: The court declined to entertain the stipulation, and to pass upon the questions suggested, as they were not presented in legal form, as no issue of law or of fact was made; and any opinion which the court might express thereon would be inconsequential, and the position of the case would be precisely the same on the record, whatever might be the decision, hence the usual and regular forms of pleading would be required until an issue was formed; and time was given to the respondent, until February 25th, to file a plea to the information; on which day last mentioned the respondent, by his counsel, filed and read the following plea:

[*Title, &c.*] "The aforesaid William A. Barstow, saving and reserving to himself all exceptions to the uncertainty and imperfections of the said information, herein, by Arnold, Orton and Carpenter, his attorneys, comes and defends, &c., and says that he to the said information ought not to be compelled to answer, because, he says, that by the laws of the state of Wisconsin, regulating the manner of conducting general elections and the canvass of the votes thereat, applicable to the election stated in

said information, it became and was the duty of the board of state canvassers, upon a statement of the whole number of votes given at said election, and for whom given for the said office of governor, to be by them made and certified to be correct and subscribed by their names, to determine what person was by the greatest number of votes duly elected to the said office, and to make and subscribe in such statement a certificate of such determination, and deliver the same to the secretary of state; and thereupon it became and was the duty of the said secretary of state, without delay, to make out and transmit to the person thereby declared to be elected to the said office of governor, a certificate of his election, certified by him under the seal of his office; that in fact, Alexander T. Gray, Secretary of State, Edward H. Janssen, State Treasurer, and George B. Smith, Attorney-General, who thus constituted the said board of state canvassers, met together at the office of the said secretary of state, in the capitol at Madison, on the 15th day of December, A. D. 1855, the day duly appointed pursuant to law for that purpose, and did proceed according to law to make a statement of the whole number of votes given at said election for the said office of governor, showing the names of the persons to whom such votes were given for said office, and the whole number given to each one, distinguishing the several counties in which they were given, and did certify such statement to be correct, and subscribe their names thereto; and that they did thereupon determine and certify, that, by the greatest number of votes polled at said election, William A. Barstow, the respondent, was duly elected to said office of governor, for the term of two years, commencing on the first Monday of January, A. D. 1856; and that they did, in pursuance of law, make and subscribe on such statement a certificate of such determination in due form of law, and did duly deliver the same to the said secretary of state; and that thereupon, in pursuance of law, the said secretary of state did make out and transmit to the said respondent a certificate of his election to the said office of governor of said state, for the term aforesaid, in due form of law, and duly certified by him under his seal of office, and that said certificate was duly received by the said respondent, who thereupon duly qualified himself by taking the customary and proper oath of office as such governor,

and entered into possession of said office as he lawfully might. All which the said respondent is ready to verify, and pray judgment whether this court will have further cognizance of this suit, and whether he, the said respondent to the said information, ought to be compelled to answer."

Annexed to the plea was a tabular statement of the votes polled for governor, lieut. governor, secretary of state, state treasurer, attorney-general, state superintendent, bank comptroller, and state prison commissioner, at a general election held in the several counties in the state of Wisconsin, on the Tuesday succeeding the first Monday, being the 6th day of November, 1855, from which statement it appeared that the votes cast were:

For governor, seventy-two thousand, five hundred and ninety-eight; of which number William A. Barstow received thirty-six thousand, three hundred and fifty-five (36,355), Coles Bashford received thirty-six thousand, one hundred and ninety-eight (36,198), scattering, forty-five (45).

Also, the proper certificates of the secretary of state, verifying these statements; also the certificate of election issued to the respondent in the following form—

"SECRETARY'S OFFICE, Madison, Dec. 17th, 1856.

" To Hon. William A. Barstow:

"I do hereby certify that after duly canvassing the votes cast at the general election, held on the 6th day of November, 1855, for state officers, it was determined by the board of canvassers, on the 17th inst., that you had received the highest number of votes cast for the office of governor, and you were therefore declared to be elected to that office for the term of two years, commencing on the first Monday of January, A. D. 1856.

[L. S.]    " Witness my hand and the Great Seal of the State of Wisconsin.

(Signed)    " ALEXANDER T. GRAY, Secretary of State."
together with the usual oath of office made and filed with the secretary of state.

To this plea a demurrer was interposed, assigning causes:

"And the said attorney-general saith that the said plea of the said defendant and the matters therein contained, in manner and form as the same are above pleaded and set forth, are not suffi-

cient in law to take from this court further cognizance of the said information of the said attorney-general, and that the said attorney-general is not bound by the law of the land to answer the same. And this the said attorney-general is ready to verify. Wherefore for want of a sufficient plea in this behalf, the said attorney-general prays judgment, and that the said defendant may answer further to the said information, &c.

" And the said attorney-general states and shows to the court here the following causes of demurrer to the said plea:

"1st. Because the matters stated to the said plea, as therein pleaded, are not a legal answer in bar or to the said information, and do not disclose a want of jurisdiction in this court further to proceed upon the said information.

" 2d. Because the defendant having by his motion to that effect, raised the question of the jurisdiction of this court and submitted the same to the adjudication of this court, and this court having thereupon by its order passed upon and adjudicated the question of its jurisdiction, the jurisdiction of this court to entertain, hear and determine this cause has become *res adjudicata*, and it is not competent for the defendant to plead the above plea to the jurisdiction.

" 3d. Because the said plea does not show that there is another court which can take cognizance of the said information.

" 4th. Because the said plea is not verified by affidavit.

"5th. Because the said plea is in other respects informal and insufficient."

On the 29th day of February, the argument of the demurrer came on.

*Mr. Ryan*, in support of the demurrer. It would have been desirable that the plea of the respondent should present only the single question which, I understand, the respondent's counsel designed to raise by it. But as it is, it contains objections independent of this question, which as a lawyer, I cannot overlook. Those objections are not trifling, but are based upon sound authorities.

A general demurrer to a plea of jurisdiction raises all questions of the time, form and method of the plea. The demurrer in this case is general. The first I take is, that any plea to the

jurisdiction of a superior court, must disclose another jurisdiction, where the right can be tried. There is one principle that the counsel in all their arguments of this question of jurisdiction have either disregarded or pushed aside. It is the general principle of law—to which there may be rare exceptions in minor cases, but they are the defects of the law—that there is no wrong without a remedy. And because there is no wrong without a remedy, the courts have said that a plea to the jurisdiction of a superior court is bad, unless it discloses another jurisdiction that can try the right. This is no mere technical rule of pleading. It is founded upon the supposition of the law, that every wrong can be remedied. It is the boast of the law that it redresses all' wrongs, and whenever a suit is instituted to redress a wrong, the rule is, that a plea to jurisdiction must disclose another jurisdiction where the wrong can be remedied.

"In all pleas to the jurisdiction of the *superior* courts, it must be shown that there is another court in which justice may be effectually administered, for if there be no other mode of trial, &c., that alone would give the superior court jurisdiction." 1 *Chitty*, 144.

"Every plea to the jurisdiction must state another jurisdiction." 1 *Bacon's Ab.*, 2.

Lord Ellenborough, C. J., in *The King vs. The Hon. Robert Johnson* (6 *East's Reports*, 600, 601), says: "The rule is insisted on, that whoever pleads to the jurisdiction of one of the king's superior courts of general jurisdiction, must show. *what other court has jurisdiction.* I am of that opinion; and that for the want thereof the plea is bad, and ought not to be allowed, if nothing more be in the case; as it is expressly laid down in 2 *H.* 7, 17, *A.*, and *Doctrina Placitanda*, 234, and is agreeable to the general rule of pleas of this sort; as in the pleas of abatement, wherein it must be shown that the plaintiff may have a better writ. The reason of this is, that in suing for his right, a person is not to be sent everywhere to look for a jurisdiction, but must be told *what other court has jurisdiction*, or what other writ is proper for him; and this is a mattter of which the court where the action is brought is to judge."

In *The Bishop of Lodor vs. The Earl of Derby* (2 *Ves.* 357), Lord Hardwicke, speaking of the plea to the jurisdiction in the

former case, and of the grounds on which he had overruled it, says: "I would not be understood when I overruled the plea of the Duke of Athol, to have overruled it on affirmance of the general jurisdiction of this court to try and determine the title to the Isle of Man, or any such feudatory dominion, but merely on this; the plea was to the jurisdiction, without averring to what court the jurisdiction belonged; and the rule of law is, that in a plea to jurisdiction, like a plea in abatement, where it is to a court of general jurisdiction, you must also show where the jurisdiction rests, as well as negatively that it is not there; but if it be an inferior court, you need only plead thereto, and not show where it is, &c."

Mr. Ryan next cited the case of *Mostyn vs. Fabrigas* (1 *Cowper*). This was an action of trespass, brought in the Court of Common Pleas, by Anthony Fabrigas against John Mostyn, governor of the island of Minorca, for an assault and false imprisonment. The case was carried up to the Court of King's Bench. The jurisdiction of the court was called in question. It was claimed that:

"If an action would lie against any other person, yet it cannot be maintained against the governor of Minorca, acting as such, within the Arraval of St. Phillips."

"The governor of Minorca, at least within the district of St. Phillips, is absolute; both the civil and criminal jurisdiction vest in him as the supreme power, and as such he is accountable to none but God."

Lord Mansfield, in delivering the opinion of the court, said:

"The first point, then, upon this ground, is the sacredness of the defendant's person as governor. If it were true that the law makes him that sacred character, he must plead it and set forth his commission as special matter of qualification; because *prima facia* the court has jurisdiction. But I will not rest the answer upon that only. It has been asserted by way of distinction, that supposing an action will lie for an injury of this kind, committed by one individual against another, in a country beyond the seas, but within the dominion of the crown of England, yet it shall not emphatically lie against the governor. In answer to which I say, that for many reasons, if it did not lie against any other man, it shall most emphatically lie against the governor."

" In every plea to the jurisdiction, you must state another jurisdiction; therefore, if an action is brought here for a matter arising in Wales, to bar the remedy sought in this court, you must show the jurisdiction of the court of Wales; and in every case to repel the jurisdiction of the king's court, you must show a more proper and a more sufficient jurisdiction; for if there is no other mode of trial, that alone will give the king's court a jurisdiction."

On the same point see *Durnford & East*, 224; 3 *Man*. 26; 5 *Man*. 362; 6 *N. H. Rep.* 497; 3 *Harris & McHenry*, 151; 6 *Leigh*, 47.

It is often said that nature has so far exhausted herself, as to be incapable of producing anything original; that all great men are patterns of some other great men who have lived before. If Gov. Barstow has a pattern it must be Gov. Mostyn. In the government of St. Phillips he did a high handed act, for which he was sued in the Court of the King's Bench. If they got their idea of Gov. Barstow's sovereignty from anywhere, they got it from Gov. Mostyn's plea. He claimed that the Court of the King's Bench had no jurisdiction over him, not merely that the act was committed in St. Phillips, but for the sacredness and sanctity of his person as governor. If there was any sacredness or sanctity of person inherent in the person filling the office of governor, it should be set forth in the plea.

We boast, we brag, we throw our caps to the moon, and compare the independence enjoyed by the people in this country with the other nations of the world, and especially with Great Britain. I want no better doctrine than that contained in those words of Lord Mansfield. He was chief justice for the Court of the King's Bench by appointment of the king, an hereditary member of the upper house of Parliament, and was throughout wholly identified with the whole reign and represented the interests of class and privilege in the British nation. We shall see if in free Wisconsin, in the middle of the 19th century, Gov. Barstow will succeed better before this court than did Gov. Mostyn before the King's Bench in the last century.

2. The plea is bad unless verified by oath. The matters of fact which it contains must be sworn to specifically.

" In support of a plea to the jurisdiction there must in general be an affidavit of the truth of its contents." 1 *Chitty*, 445.

"By the statute of 4 and 5 Ann, c. 16 for the amendment of the law, no dilatory plea is to be received unless on oath, or probable cause shown the court." 1 *Bacon's Abridgment*, 27.

"In all pleas that oust a court of jurisdiction, whether superior or inferior, there must be oath in that very court of the truth of the plea." *Sparks* v. *Wood*, 6 *Mod. Rep.*

I suppose it will be contended by the counsel who filed the plea, that there is other satisfactory evidence equivalent to an affidavit.

*Mr. Ryan*, alluding to the several certificates of the secretary of state, annexed to the plea, said: " I suppose these will be urged by the opposing counsel as equivalent to affidavits. They are not. We cannot indict the great seal for perjury. That is one objection. Again, the great seal does not pretend to verify what is stated in the plea. First, there is attached to the plea a tabular statement, purporting to be a copy of what purports to be the canvass of the votes of the last election, in witness whereof, there is an impression of the seal of state. The *plea* asserts that there was a canvass; the *seal* asserts nothing of the kind, but only that this is a copy of a certain paper on file in the secretary of state's office. The second accompanying document is a copy of the oath of office that was *not* taken before the chief justice, bearing also the impress of the seal of state; and next comes the queerest use of the great seal that has yet come under my notice. It is a certificate addressed to Gov. Barstow, by Mr. Gray, the late Secretary, informing him under the great seal of the state, that he was declared elected by the late board of canvassers, and this is impressed with the great seal of the state. Of what validity is the great seal to show the correctness of a paper not on file in the secretary's office? None whatever. There is, then, as I conceive, no evidence in support of the plea, which the court could receive in lieu of an affidavit. We may have an impression that the facts are so—but I have come to the conclusion that I do not know what exists in any office in this capitol. It is not safe to think that we know. Recent developments have demonstrated this, and stranger things have happened in this capitol than would be the discovery that these are not facts.

*Justice Smith*—If I understand you, then, Mr. Ryan, however it may be intended, the certificate of the canvassers, and their statement of the votes, though set out in the plea, are not set out in proper form, unless verified by affidavit.

*Mr. Ryan*—Yes, sir; unless the oath, or other satisfactory evidence, accompanies them.

3. As a matter of practice the plea comes too late, after the expiration of the time fixed to plead to the information, an imparlance or dilatory plea cannot be allowed. Upon the records of the court, and by the filings of the clerk, there appears what amounts to two imparlances. The defendant was twice subject to default and had time extended to him to plead, amounting to two general imparlances. 1 *Chitty*, 435, *and* 1 *Tidd*, 637, 638.

4. My next objection to this plea is, that the question raised by it is *res adjudicata* in this suit. The question of jurisdiction has already been virtually decided, though then a decision upon a motion, while this is raised by a plea. The same question cannot be twice raised in the progress of the same suit.

" After a judgment of *respondeas ouster*, it is said, there can be no plea in abatement; for if it were allowed, there would be no end to such pleas." 1 *Tidd's Practice*, 641 ; *See also* 1 *Bacon's Abridgment*, 27 ; 2 *Saunders' Rep.* 40.

The universal rule is, that there cannot be two dilatory pleas in the same degree in the same cause. If such were not the rule this matter of dilatory pleas might go on *ad infinitum.* There may be two pleas in abatement based on different grounds, but you cannot plead two disabilities of the plaintiff in abatement in the same degree. So there cannot be two pleas to jurisdiction in a cause, and what cannot be done in substance cannot be done by a mere change of form. The opposing counsel saw fit to raise the question of jurisdiction by motion. That motion was spread upon the record. It was overruled. The court has adjudicated the matter. The court did not merely dismiss the motion, but spread upon the records of the court the reasons why the motion to dismiss for want of jurisdiction, was overruled. Though not in the form of an interlocutory judgment, its decision, in this case, should have precisely the same effect. The adjudication of the question, to be sure, is in the form of a mo-

tion, but with precisely the same effect as if it had been raised by a plea and a demurrer, and had been sustained. The counsel have said again and again that they do not desire to delay this cause. Are they dealing sincerely, candidly with the court and with this cause, to come here and make a motion with another string to their bow? Would the court have heard that motion, had the counsel informed them that they would subsequently plead to the jurisdiction, and ask them to hear twice over the same question? The plea presents a different aspect of the question of jurisdiction, it is true, but the effect is the same as the motion; and it is the business of the court to find defects in all dilatory pleas, where defects exist. It is unfair to the counsel in the cause, and to the court, driving them to argue and decide the same question twice over. Look at your records, and how will they appear?—a dilatory plea twice argued and twice decided; burdening the counsel and the court; burdening the counsel for the prosecution, if twice decided in their favor; burdening the court, if once decided in their favor and once against them.

What is the idea of a dilatory plea? It is this : A man charged with the commission of wrong comes into court and says, the wrong may exist, but for this or that reason, you have no power to correct that wrong. Such dilatory pleas should be scrutinized closely, for they are interposed as a shield between the correcting arm of the law and the offender. For this reason, as he had read, " courts lean against them, and seek to restrain them."

Many of these objections to the plea may appear technical. I have argued them technically. Interlocutory questions for delay, dilatory pleas to defeat the present administration of justice must be treated technically. This in the strictest sense, in its conception and gestation, is a dilatory plea, and it should be held to the rigid rule which commands courts to frown upon dilatory pleas. It certainly is not a plea in bar. It has no attribute of such a plea. And yet the subject of the plea is good, if good at all, as a plea in bar, not in abatement.

The court has already, by its former decision, taken jurisdiction as against a mere intruder into the executive office. Now he comes, not denying that he is an intruder, but asserting that

he is not a *mere* intruder. He says the canvassers canvassed him into a majority. The plea does not deny the fact set forth in the information, that Coles Bashford was legally elected governor of Wisconsin on the 6th of November last, but only asserts that the state canvassers, on the 15th of December, gave the certificate of election to William A. Barstow. The defendant comes in and says, that although Coles Bashford was duly elected by a majority of legal votes, on the 15th of December, the state canvassers canvassed me into a majority, and gave me the certificate of election—a plea in bar and not in abatement. The main question is as to the finality of this certificate. The record before this court admits the election of Coles Bashford, but sets up that the state canvassers canvassed the defendant into office—and here I would invoke a new use of the word "canvass," in the English language hereafter. When feats of legerdemain are to be performed, let it not be said "*presto, pass, change,*" but "*canvass,* pass, change!" to express ready, accomplished sleight-of-hand. It is admitted, that the secretary of state delivered the certificate to Barstow. It is admitted as a corollary, that Bashford, the stranger, the outsider—*the outside Shanghai*—is out of an office to which he is entitled by the will of the people; that Barstow is in an office to which he is entitled, by the will of the canvassers; and now it is claimed that the law is powerless to change that result— that the will of the people is not sovereign, but that of the state canvassers is. It will not do to say that there was but a small majority for Bashford. It stands precisely as if Coles Bashford had received the unanimous vote of the state, and his opponent had received none. If the canvassers have the power to withhold the certificate from the man who received a small majority, they can withhold it from one who had a unanimous vote. They might give the certificate to some emissary from England or France, appointed by the sovereigns of those countries to come here and demand it. Those nations have sent governors here in former times, and, if in the conflicts of the world, the case should occur, put by one of the judges the other day, as it may occur, if England should dispatch such an emissary hither, she would need to send no army to back him up, conceding to the canvassers the powers here claimed. All he would need, would be what Lord Bacon calls a "pretty purse," enough to buy the

state canvassers. Such is the result of this doctrine—nothing more or less. In the former argument, it was contended, that the usurpation of the governor's office, placed the usurper beyond the reach of law. A similar immunity is now claimed for him who can get a certificate of election from the state canvassers. There is angry talk just now between our government and England. We are a frontier country. Suppose that war should follow—a near possibility. Suppose a British fleet upon Lake Michigan, something less than two years hence, about the time of the state canvass, the 15th of December, a day that we ought to put in our calendars, with the gunpowder plot, and other memorable conspiracies—a British army lands on our coast—they march hither—and by the outside pressure of British bayonets, or the inside pressure of British gold, they buy or force from the canvassers a certificate that the present governor-general of Canada is the duly elected governor of Wisconsin. He takes possession of the office. As the war progresses, the British troops are forced to retreat, but the British governor remains. He has possession of the office and the certificate of the canvassers. The legally elected governor files an information in the nature of a *quo warranto* to oust him. Then, if the doctrine attempted to be maintained here were to prevail, the British governor would plead this as a precedent, and properly plead it. Remember that they plead no election, they do not deny but that Coles Bashford was legally elected, *mark this*. It is not denied but that the certificate was awarded upon a fraudulent canvass. The question is: Have the state canvassers the power to give the people of Wisconsin, by fraud, mistake, or corruption, a governor in opposition to their will as expressed at the ballot box?

In many of the books it is said that the sovereignty of the Union resides in the people. We are in the habit of using words without attaching any precise significance to them. Now the word sovereignty is not the father of sovereign; sovereign is the father of sovereignty. A sovereign is a supreme ruler.

In a theocracy, God is the sovereign. In politics the sovereign is the absolute ruler of the country. The moment we take the word sovereign from its absolute use, we run into a confusion of ideas. I deny that any monarch of a constitutional government

is sovereign. I deny that there can be a limited sovereignty. No monarch not exercising supreme power is a sovereign. Limited sovereignty is a bull—a contradiction of terms. There is no sovereignty out of an absolute monarchy. We confound the idea of sovereignty with that of independent power. In international law, nations are called powers but not sovereignties. The sovereign, where he does exist, is supreme, exercising supreme rule, being the law in and of himself, administering the law in and of himself, executing the law in and of himself. Where, in any state of this Union is such sovereignty? By some it is said to be divided, shattered—divided among the different departments of the government. By some it is said to be in the people. I deny that in the Union, there is anything beyond the idea of sovereignty. We are powers independent of powers. Until we have a sovereign there is no sovereignty. There is an idea of sovereignty—an inactive, latent, inscrutable, dormant idea existing—an idea of sovereignty—sovereignty so to speak, in solution. But till active, it never can be said to exist. Wisconsin is a power among the other states of the nation, it may be a sovereign power, so far as by that is understood an independent power, and except when it has parted with power by treaty or confederation. But in its internal organization there is no sovereignty—it is a mere idea, a dream which at some future period may be invoked and invested in a sovereign. The sovereign is the absolute power of law, of justice and of administration. I deny that in the people of this state is vested any such power.

In our government, there is no source from which such power can be derived. In constitutional representative government, there can be no such thing as sovereignty. God gave us no sovereignty in a state of nature. The aggregate people of this state have no sovereignty, no absolute power of tyranny over the humblest person in its limits. Tyrant and ruler are the same. Power abused is tyranny. There is no such tyranny here. The idea is a sort of political pantheism. The pantheist says that there is a God—but it is only all that we see, that every tree and stone and sod, is God. I never could comprehend it. It is a subtile name for atheism. I never could understand popular sovereignty. I deny it as a democrat of thirty years standing, and as one who intends to be a democrat for forty years

Attorney-General ex rel. vs. Barstow.

longer—or if not for forty years, to the end of life. I can no more understand the doctrine of popular sovereignty than I can the new Boston pantheism—a subtile species of atheism that would not shock the religious sense of community as much as when presented in a grosser form—and which escapes from a belief in God by saying that everything is God.

The idea of popular sovereignty is the idea of man running wild and savage through the woods, and over the prairies, having no law but his own will. To be sure, there are various powers of sovereignty in a constitutional government, and the elector, in voting, exercises one of those powers. This court is clothed with the armor of sovereignty, and when it makes a decision, or does any judicial act, it exercises one power that a sovereign might exercise. So also does the humblest justice of the peace. It is less in quantity but the same in degree. But I deny that all put together represent the sovereign power of justice. So of the officers who exercise executive and legislative power—the state canvassers, when they certify to the number of votes cast—the governor when he calls out the military to suppress an insurrection, or to create one—the legislature, when it passes or refuses to pass a bill—exercise a sovereign power. Any act of discretion or power is a sovereign act. But the aggregate falls far short of the *sic volo, sic jubeo*. There is no such absolute power as sovereignty. It may exist, but as an idea—a dream. It is like a dormant fee waiting for an owner. There can be no sovereignty in active existence till our whole system is broken, destroyed and confounded. Then a sovereign may arise, and the dormant fee find an owner.

It has been urged herein, that the governor is a part of the sovereignty, and therefore not under the jurisdiction of this court, which is another part of the sovereignty. At the same time it is admitted that the state treasurer is under the jurisdiction of this court.

In England, the right to political offices cannot be tested by *quo warranto*, because they hold the right to office from the crown. There is, then, a sort of *quasi* sovereignty which does not exist in this country. Here any public officer might make the same plea as the tenant of the office of governor makes, with equal propriety.

If the state canvass is a finality, so is the county canvass and the town canvass. The finality of the state canvass involves the finality of every other canvass. If the state canvass is final as to state officers, the county canvass is final as to county officers, and the town canvass final as to town officers. These canvasses are in the main ministerial. There is hardly an act of government so purely ministerial as this. The canvassers are merely arithmeticians. And I say this, that if this canvass is final, and there is no power of law to inquire into it, to impeach it, to interfere with it, the town and county canvasses come up here as finalities. I do not think this is the doctrine of the defendant's counsel—that the town is final to the county, and the county final to the state.

The state canvassers did not deem them so. They went behind them, and if reports are true, went to some very queer places behind them. Into what absurdities does the finality of this canvass bring us! The town canvassers, for instance, in every town of the state, might canvass a majority for A.; the county canvassers not liking finality A., canvass a majority for finality B.; the state canvassers, preferring C., set aside finality B., and give the certificate to C. Each one of these canvasses might be a lie, neither A., B. or C. having a majority, and the last lie is final only because it is the last; or I suppose the town canvass might be called "positively" final, the county canvass "comparatively" final, and the state canvass "superlatively" final. It is absurd—absolutely absurd. Inasmuch as every elective officer holds from some canvass, whose decision is final, you cannot go behind that canvass to correct error or fraud! Or the canvassers are invested with a portion of the sovereignty, and cannot be called into the court! The doctrine goes to that length.

I answer the whole argument by the general proposition, that the law alone gives us an idea of sovereignty. The law alone is above all things. I deny to you upon the bench, to the governor sitting in state in the next room, to the legislature in session in the rooms above—I say I deny to all, any attribute of sovereignty—sovereignty is in the law. Its will is execution. Its will is justice. It is above us all—it rules, controls us all. In the political sense of the word, that it wills, and its will is law,

it is not sovereign. But in the popular sense it is above us all, it is up in the sunlight of sovereignty, it is alone sovereign. The law is above the court, it is above the governor—or it should be —that is the theory—it is above the legislature. The latter can change it in the future, but is bound by it in the past.

-The law then is above all, and the reason why all other powers of the government are subordinate to the judiciary is that they are under the law, and the judiciary is the expounder, the mouthpiece of the law. Except power in the nature of judicial power—power of discretion, vested by law in certain offices—all the powers of the government are exercised under the judiciary and triable by the judiciary. The moment that this is otherwise, we have ceased to be independent and free. For the theory of freedom and independence is that we are all under the law. The governor may veto an act of the legislature. The judiciary cannot interpose; but it can determine whether he vetoed it according to law, within the constitutional time, &c. The moment this is otherwise, the moment you put the acts of any officer above the reach of the courts, you put the officer above the law. This subject has been discussed in the courts of Massachusetts as early as 1810, and definitively settled.

Upon the main question involved in the demurrer, I have proceeded, in a somewhat discursive manner, to present two views : 1st. That the finality of a state canvass, applies as well to all canvasses, and that the different canvasses resting upon the same statute, the same defence might be set up by any person holding any office, and claiming his right to it by the finality of the canvass. I had shown as a corollary to that proposition, the utter absurdity of the finality of the various canvasses, as shown by the contradiction of facts, each canvass rising above the other, and allowing no finality to the previous canvass, but claiming it for itself. 2d. That the same idea of exercising a function of sovereignty, or of being a co-ordinate branch of the government, would apply to every officer in the state, as well as to the governor.

I shall now go the direct question of the finality of any canvass, as a matter of law. I understand that an argument of this kind (in the case of Carpenter and Ely, contesting the district attorneyship of Rock county) has already been submitted to this

court at its present term. If the authorities on this subject have been already read to the court, I will not go over them now.

On an intimation from the court, Mr. R. cited and read from 4 *Cow. R.* 297, 322, in support of *Cook vs. Welch*, 4 *Seld.*

" If the votes of a town are improperly excluded, by which a majority of votes are canvassed and allowed to a candidate for the office of sheriff, who receives a certificate, takes the oath of office, &c., and acts as sheriff, judgment of ouster will be given against him, on an information in the nature of a *quo warranto* being filed *ex relatione*, the one who had the actual majority of votes."

" It is, perhaps, difficult to determine whether an information lies to try the title of the governor and state officers. The governor is the representative of the state ; and an appeal from the state canvassers may not exist. It is a case, perhaps, to which neither the common or statute law extends. But it by no means, follows, that the court have not power in this instance. Because a case may be put a little puzzling, it does not deprive the court of jurisdiction."

Woodworth, J., in his opinion says :

" It was contended in the argument, that the decision of the board of canvassers was conclusive until reversed; and could only be reviewed by *certiorari.* This objection cannot prevail. The duties of the canvassers are ministerial. They are required by the act to attend at the clerk's office, and calculate and ascertain the whole number of votes given at the election; and certify the same to be a true canvass. This is not a judicial act, but merely ministerial. They have no power to controvert the votes of the electors. If they deviate from the directions of the statute, and certify in favor of a sheriff not duly elected, he is liable to be ousted by information. The trial is had upon the right of the party holding the office. The certificate is not conclusive. The court will decide upon an examination of all the facts."

I also quote from 8 *Cowen*, 106. This case was to try whether one Henry F. Yates was elected to the office of county clerk, a certain number of votes having been cast for H. F. Yates. The court said :

" When we permitted an information to be filed in this case, it was represented to us that the ballots containing the designation

H. F. Yates, were intended for the relator. The canvassers had acted upon the idea that they designated some other person. They had no means of examining witnesses or of receiving any evidence beside what was upon the ballot itself. Courts and juries are not so restricted. They possess more ample means to determine any fact which is left in uncertainty." *Also The People ex rel. Benton vs. Vail,* 20 *Wendell,* 14.

" In those legislative bodies which have the power to judge of their own members, it is the settled practice, when the right of the sitting member is called in question, to look beyond the certificate of the returning officer; and I think a court and jury, with better means of arriving at the truth, may pursue the same course."

" Conceding that the county canvassers decided correctly on the facts before them, I think we are bound in this proceeding to go back to the canvass, and rectify the error in the statement of the inspectors."

In the case of *The People vs. Seaman* (5 *Denio,* 409), the court held: " This proceeding is instituted to try the right of office. It is an appropriate proceeding for that purpose. And in it, we can look beyond evidences of title to office which are conclusive for every other purpose, and determine who has really the abstract right. We can look behind the certificate to see whether the canvass of the presiding officer was correct—whether they allowed the proper votes—whether they determined correctly or otherwise, that two of the candidates had an equal number of votes, &c."

" The returns of election inspectors are ministerial, not judicial acts. Their character is shown by the freedom with which they are scrutinized in proceedings by mandamus, or information in nature of a *quo warranto."* 3 *Hill R.* 47.

Again : " The Montgomerie charter certainly does declare that the common council shall have the sole power of determining and deciding all elections of all corporate officers, and the amended charter of 1830, that each board shall be judge of the qualifications of its own members. It is quite doubtful whether the word *qualifications* can, by the most liberal construction, be made to comprehend *elections.* Admitting the clause, however, to mean that each house shall be judges whether its members have

been duly elected, it would still be difficult to show that the enactment amounts to anything more than the bestowment of a power concurrent with our own."

In the case of the *Attorney-General vs. Blossom* (1 *Wis.*), *Justice Smith*, of this court, held the following language respecting its jurisdiction:

" Contingencies might arise wherein the prerogatives and franchises of the state, in its sovereign character, might require the interposition of the highest judicial arm to preserve them. Other departments might need its intervention to protect them from usurpation ; indeed, various emergencies may have been conceived, in which this branch of the government, and this arm of the judiciary alone, might be adequate to preserve the balance of powers, to arrest usurped powers, franchises and prerogatives, to quell resistance to constitutional authority, to preserve the liberty of the individual citizen, and shield the sovereignty of the state itself from violation. Hence, we see that in the very sentence which constitutes the restriction to appellate jurisdiction, is inserted the exception, which is as broad as the constitution itself. * * * * * *

" This writ (*quo warranto*) may go to a person who has usurped the office of circuit or county judge, or that of justice of the peace, or, indeed, any other office, requiring him to appear and show by what authority he exercises the power of the office. But this direction is to the person, not to the officer; to the individual, not to the court."

In the plea of the defendant no election is pleaded. A reference to the plea in the case of Welch, in 14 *Barbour*, will show the court the difference between a proper plea and the one filed by the defendant. This case is a recent one, and its leading points are familiar. The action was in the nature of a *quo warranto*, brought by Benjamin Welch for the purpose of testing the right of James M. Cook to the office of treasurer of the state of New York. Cook was adjudged guilty of usurping and intruding into the office by the court, and was ousted, and Welch installed.

Our law and that of New York are the same upon this subject. The attention of the court was called the other day to the case of Jay and Clinton, in the state of New York. That case was

never judicially acted upon. It arose soon after the institution of our government, before the operation of government was familiar, and when that government found a judiciary already organized. When lawyers, learned gentlemen, are driven to state politics, to the discussions of wild politicians and their wild speculations and hypotheses, to learn what government ought to be, it seems to me they are driven into a hard place. But we all know the difference between the arguments outside the court, harangues in the street and upon the stump, and the grave' argument of law in court. Outside of the court those fossil remains of stale political theories may be of some account. But I answer them all, that we produce as our authorities the adjudication of years, since the present laws were adopted, and all the way through, the principle for which we contend has been universally recognized. Instead of commenting, myself, upon the great principles that lie at the foundation of all these cases, I prefer to take the language of this court in its opinion in the case of the *Attorney-General vs. Blossom*, already quoted. Was the spirit of prophecy upon the learned judge of this court, when he wrote that opinion? In that case it was urged that the Supreme Court had only appellate jurisdiction of *quo warranto*, that it must work its weary and almost interminable way through inferior tribunals up to this. The court, seeing the necessity of an immediate determination, seeing that justice depended upon that, took jurisdiction. Now it is contended that sovereign power is vested in mere ministerial officers, a board whose functions are merely arithmetical, a mere calculating board. Let us see where this argument goes. The respondent pleads here the tabular statement of the state canvassers. The footing up of columns of figures, as grave as this canvass, have been incorrectly made in this capitol heretofore. Even a secretary of state may commit errors in adding up a column of figures. We know this from past experience. But if you find that these columns, in this tabular statement, are not correctly footed, if errors are discovered here, intentional or otherwise, changing the whole result, showing that the men declared elected were not elected, the doctrine promulgated by the defendant's counsel here, is that this court is so crippled, so impotent, so deformed, so absolutely powerless that it cannot correct those

errors. You may have the evidence of wrong before you, and you who have declared that you are " armed with the sovereignty of the state," who control those powerful writs, more potent than sword or cannon, have no power to reach out your arm and correct the wrong. There was no gross usurpation ever successful that did not lead to still greater outrages, more audacious wrongs. When courts refuse to exercise the power of correction with which they are invested, usurpation, fraud and villainy gather strength and courage. If this court were to fail in its duty in this cause, we might easily imagine what would follow. Let this usurpation succeed. Say that your arm is paralyzed. Say that you wear that " armor of sovereignty " on paralyzed limbs and paralyzed bodies. Let fraud and villainy triumph. Let them prosper. Let them feel that they are strong. Let them grow insolent in the confidence of immunity. Let yet greater wrongs be perpetrated than have been, and you will have established the precedent, that they are beyond the reach of justice. Suppose this done. Two years hence Mr. Barstow gets no votes at all; but again he receives the certificate from the state canvassers. You would have no power, however, to correct the wrong according to the doctrine. The proposition is monstrous—it is monstrous.

Now, our whole conception of sovereignty is in the law. Of the sovereignty of the law this court is the mouthpiece. Who says that the court has no power to punish outrages against the law, and that whoever sets himself up as a usurper, against the law, is above the law ? The law has no vitality, it is but a theory, written or unwritten, except as vitality is breathed into it through the judgment, action and process of this court. Whosoever says he is independent of your judgment, action and process, says that he is independent of the law, and above the law. Why, they claim for their canvass more than for a judgment at law. The errrors of judgments at law may be inquired into and corrected. The judgment may be reversed. But they claim for this canvass that there is no power to inquire into, correct or reverse it.

I understood one of the counsel in the previous argument to concede that the decision of the board of canvassers might be reviewed as to the other state officers, but not as to the governor.

Now, all judgments at law are reviewable in equity. The counsel claim for this canvass what they will not claim for a judgment at law. They claim that one item of the canvass is inexorable, final. In all other respects it may be reviewed, but the single item that relates to governor, is immutable, absolute. And Governor Barstow comes into this court and says he was elected, not by the people, but by the state canvassers; he asserts, not that he has a right to the office under the constitution and laws, but that he has the certificate of election and that is enough for you to know. If the secretary or treasurer cannot say that, how can the governor? In the first place he said to the court: You have no jurisdiction over me because I have got possession of the governor's office. The court overrules that position. He comes now and throws the state canvass at the court. It is very evident that the governor *de facto* has considerable of an idea of his political position in the world. He is certainly exceedingly scrupulous, lest that sovereignty of the state, which he pretends to represent, may be sullied in his person by this court. As I said yesterday, I think Gov. Barstow has borrowed his ideas from Gov. Mostyn. Gov. M. held that he was supreme-ruler of the island of St. Phillips and accountable only to God for his acts. Gov. Barstow mounts the ladder a little higher and announces that he is only accountable to himself? Mostyn did consider that he was accountable to God; Barstow acknowledges no such limitation of his powers.

In early times this idea of a wonderful power residing in the office of governor was promulgated in Massachusetts. It was considered in the *Commonwealth vs. Samuel Fowler* (10 *Mass.*), where an information was filed "to know by what authority the Hon. Samuel Fowler exercises the office of judge of probate of wills, etc., in the county of Hampden, and also chief justice of the court of sessions in said county." It was an office filled by appointment of the governor. Mr. Ashman, counsel for the respondent, in the course of his argument, took this position:

" The respondent further issists that under the constitution of this commonwealth, no such process lies against an officer holding an appointment from the executive, which is a co-ordinate and independent branch of the sovereignty of the state. It seems an absurdity for one portion of the government to call on

a citizen to show by what authority he exercises an office, to which he has been appointed by another portion of the same government, equally deriving its powers from the constitution, and accountable for the exercise of them only to the people who conferred them."

This is the same principle for which the counsel on the part of the defence contend, in the present case. Chief Justice Parsons in delivering the opinion of the court, said:

" Two objections have been pressed upon our consideration, which have received the attention on our part, to which, as well from their own nature, as from the zeal and seriousness with which they were urged by the respondent's counsel, they were entitled:

" The first is a want of jurisdiction in this court in a case of this kind. If this court has not jurisdiction in the case, it must follow that there is no remedy; and a very important branch of the law is left without any means of execution. But we are well satisfied that our jurisdiction extends to the case. As the supreme judicial court, we must have authority, whenever a wrong takes place to redress it, either by appeal or by process originating here.

" The other objection is, that an information of the nature of that before us in this case, does not lie against an officer appointed by the supreme executive authority of the commonwealth. And it is said, that as the executive has the exclusive right of appointing, so it must have exclusively the right to determine when a vacancy in office exists, the filling of which appertains to that branch of the government; the executive being a branch of the sovereignty of the commonwealth, equally independent with the judiciary.

" Our government is founded on principles not known to the laws of any other country. The sovereignty of the commonwealth remains in the people. The several departments of the government, the legislative, the executive and the judicial, are the agents of the people in their respective spheres. When the legislature enacts a law, not authorized by the constitution, it is the part and the duty of the judiciary to pronounce such an act or appointment null and void. Where one is charged with usurping an office in the commonwealth, there must be authority in

this court to inquire into the truth of the charge. The party charged has a right to require that this inquiry be made by a jury of the country, so far as it shall involve facts."

The court, acting upon this principle, and finding the appointment to be unconstitutional, declared it void. Mr. Orton said here the other day, that had this case arisen in Massachusetts, the court would have given months to the consideration of the question of jurisdiction. He complained that this court had not sufficiently considered this point. The gentleman's reference was peculiarly unfortunate. Here we have a parallel case in Massachusetts. The interference in that case with the executive was more direct than in the present one. Here we do not propose to interfere with the executive at all; only to ascertain who is the executive. There the court inquired into the acts of the executive. The political objection applies to the one with far greater force than to the other. And Chief Justice Parsons took no time at all. The opinion followed immediately upon the conclusion of the argument. It was argued, moreover, at length by the ablest counsel that state at the time afforded. So much for the gentleman's insinuation that the court had been remiss in attention to the questions brought before it.

The constitution (art. 5, § 3) provides " the governor and lieutenant governor shall be elected by the qualified electors of the state, at the times and places of choosing members of the legislature. The persons respectively having the highest number of votes for governor and lieutenant governor shall be elected."

I argued yesterday, what seemed to me the correct view of sovereign and sovereignty. There is no present, active sovereignty anywhere. It is latent, intangible, dormant, vested somewhere, but active nowhere. The idea of a republican government is inconsistent with sovereignty. The idea, then, attempted to be represented by "popular sovereignty," is that the people are the source of all power. The people make a compact as an absolute, independent people, but not as sovereigns. They say we will form a government, we will adopt a constitution, we will distribute the powers of government among such officers as may be necessary to a safe and prosperous society. It is therefore said that the people are the source of all power. They are, but not the source of sovereignty. They do not make a contract as

sovereigns. They invest sovereignty nowhere. They form a republican government, which is inconsistent with the idea of sovereignty. Popular sovereignty then is just no sovereignty at all. The people are the source of all power. They grant all power. They say that certain powers of government shall be exercised in a certain way. Now, how is the governor constituted? He is elected by a majority of all the votes cast.

The people have framed a constitution prescribing that condition. Under it no man can be governor *de jure* except that he received the " highest number of votes cast" for that office. The State canvassers cannot control that. Suppose they give William A. Barstow, or William I, as some of the newspapers dubbed him, or William the conqueror, as he might be called, if the doctrines of his counsel were sound—a certificate of election for ten years instead of two, or for life. If they can violate with impunity the constitutional provision as to the highest number of votes, they may equally violate the other provision respecting the length of his term. The sheriff of this court adjourns it every day. Can he do so now? and why not? Because he is merely your mouthpiece; the thought fixing the adjournment must come from you. So the canvassers are the mere mouthpiece of the people. They give the majority, and the canvassers can only declare that majority. If they add figures wrongly, or corruptly, and declare a wrong result, their declaration confers no right. They can convey no right; they can merely declare one that exists independent of their action. Their certificate cannot create a right; it must be created under the constitutional provision, by a majority of the popular vote.

In this world there has never been but two kinds of government —a government of force without law, and a government of law without force. In the main, the governments of the world, have been governments of force without or above law. We attempted the experiment of a government of law without force. We complain of, and criticise, and grumble at our system of government. The truth is, it is far above us. We are not educated up to it, within a century. Here the law is a mere letter. There are no embattled armies to enforce it. It is a mere word, acting by its own vitality. How shall this system be preserved? Only by the universal submission of all men, high and low, strong

and weak, the highest official as well as the humblest member of community, to that simple letter, as paramount and supreme.

And whenever a usurpation of power—be it great or little—be it the sublime office of governor—and from what has been said of its nigh omnipotent tenant, I suppose if they should make profert of their client in court he would come with ermine on his shoulders and some kind of a tinsel crown on his head—or a justice of the peace—whenever a usurpation of power is success-ful, and the courts are powerless to correct it, when they have not the power, or will not exercise it, that very moment the reign of law without force has declined. Possession becomes stronger than right, usurpation has become stronger than law; the people cease to be the source of power—the state canvassers become the source of power; the law has ceased to enforce itself; then is the beginning of the end. And a government of law without force needs but one other process to make it a govern-ment of force without law. When the law cannot reign without force, when usurpation upon usurpation, and wrong upon wrong, have succeeded, you will call in force, to sustain the law. Force and law cannot exist together.. The force you have invoked to sustain the law becomes stronger than the law. It is true this court, sitting here in this simple way, with no executive power of hundreds of thousands of armed and embattled soldiery to enforce your judgments, you have not that apparent force which the courts of some of the monarchical countries display. But to the eye of reason, to one who loves, honors and respects his species, you are a far sublimer spectacle. Your honors have sat there for years; your predecessors have sat there for years; and no act of force has yet been called for to execute your judg-ments. So it has been, and so it will be, if you are true to the trust that has been reposed in you. True, we have heard threats of resistance, outside talk, a barking about a recourse to arms, in case you take jurisdiction of this case.—And so long as you sit there, asserting the power with which you have been clothed, declaring as you have done, that there shall be a remedy for all wrongs, you will sit a sublime spectacle to all mankind of law without force. But once say that the law is no longer supreme —that great and terrible wrongs are without redress—that you are powerless to reach them—that your arm is withered—and

force will then be invoked. Force will be resorted to to redress wrongs; force to confirm wrongs; force to perpetrate new wrongs;. Am I speaking of a remote contingency? Has it not been growled about this capitol? Have there not been threatenings in the presence of this court? Have not the newspapers echoed those threats, that if this court shall attempt to go back of the canvass and correct the errors and frauds it may find there, there will be armed resistance to its judgment? We know how cheap are those threats. But if the usurpation of this board of canvassers be successful this time, in a twelve month those threatenings may be realized. And unless you are true to the law, and true to yourselves, the spectacle you present, the peaceful reign of law without force, will cease upon the earth, and the reign of force without law will commence.

If this record is true, the canvass is a falsehood. The information declares the election of Bashford by a majority of the people of the state. The plea does not deny it. As it stands, then, Bashford was rightfully elected, and Barstow was canvassed into office. The record then shows that the act of the canvassers was a usurpation—it was a violation of the constitution—an exercise of power, if not strictly of force, yet without law. The intrusion of Barstow into the executive office was a usurpation over the law—an exercise of force above the law. Will you redress it? I say as a lawyer and a man of common sense, the doctrine that you cannot redress it, that you have not the power to redress it, is monstrous—it is shocking. I well know the exigencies of counsel. I know the necessities of desperate cases—how lawyers are compelled to advance strange propositions, and how sometimes they study over them till they almost believe them. But this proposition is monstrous, and when the court overrules the plea, as I believe they will, they should do it with reprobation. It should not be done with any timid opinion, but with as much zeal and earnestness as it was ever done in any case. The court should put on its judicial armor and strike down the usurper's ideas of his own power. If ever the " spear of Goliah " was a proper weapon, it is in this case, and against the doctrines of this plea. The proposition is so monstrous, that if it were not for the peculiar history of this case, we should submit it without a word of comment.

*Mr. Knowlton* submitted the following points in writing, not being present at the argument :

1st. The plea should be sufficient in law to abate the suit, or bar the right claimed for the relator in the information. It does neither and is therefore bad.

2d. The court has already decided that it has jurisdiction in this case. That question is *res adjudicata* and is the law of this case, and this adjudication is not in the proceedings subsequent thereto, to be questioned by plea or otherwise.

3d. The court has further decided that it has the same authority to proceed to final judgment in this case that it has in any other case between party and party—not to create rights, but to ascertain and enforce them, as to either party. This ruling includes the exercise of power to investigate the case upon its merits and pronounce judgment thereon. Hence, too, we have the law of this case.

4th. This court, on information in the nature of *quo warranto* at the last December term, in the cases that came from Columbia county as to sheriff and clerk of the Circuit Court, decided that it had the power to, and that it would go behind the certificate of election and the decision of the canvassing board, for the purpose of ascertaining the real facts and thus sustain the statute law, and mete out to each party his substantial legal rights. To give effect to a plurality vote of the electors, certainly the court should do as much under a positive provision of the constitution. More, is by no one sought.

5th. If the last-mentioned ruling was correct (and of this there can be no well grounded doubt), it follows that the matter relied on in the respondent's plea goes not to the jurisdiction of the court, or in abatement of the proceedings; but it is, so far as it goes, evidence in bar. Not good in bar, because the election of the relator as stated in the information is not denied or confessed and avoided. The plea stopping short of a full and complete answer to the case made by the information, is upon familiar principles bad.

6th. In all judicial proceedings to ascertain and enforce rights when, to defeat the party plaintiff, the defendant relies on extrinsic facts, he must plead those facts at the proper time and in

the proper manner. He must plead facts, and not the mere evidence of the facts, if he wishes to establish in himself a right, equal or superior to that claimed by the plaintiff.

7th. In this case the right to hold and exercise the office of governor is the real question in controversy, between the state, relator and defendant. This right under the constitution, has its entire basis on an election to the office. Such election does not exist, as to the relator or respondent, unless one or the other received the greatest number of votes given for that office, at an election in due manner held. If either has received such greatest number, in such person is vested the right by the constitution.

8th. The canvassing of votes polled, stating, determining and certifying the result thereof, and the certificate of election required to be given, is merely a mode provided by law to obtain *prima facia* evidence as the expressed will of the electors. And the pleading of these things is simply pleading some of the evidence of the fact on which the right alone rests : namely, who received the greatest number of votes for the office.

9th. The fact of the election to the office of governor is not therefore pleaded, which is the only warrant by which a man can hold that office. Instead of this, that is pleaded which would be *prima facia* evidence of the fact, had the pleader gone so far as to also state that the respondent was by the greatest number of votes given for that office elected thereto, at an election for that purpose duly held. The plea is for this cause fatally defective in substance. It amounts to no more than pleading some evidence of a defective title—not equal in any degree to a good title defectively set out.

10th. The demurrer to the plea at most no more than admits that the certain matters pleaded would in law be evidence if the fact existed, which thereby, or otherwise might be proved; but it by no means admits that that fact exists. In other words it does not admit that a fact exists, which is not stated in the pleading. It is simply an admission of a legal proposition and of course cannot injure the demurrant, nor aid the other party.

11th. The court judicially knows what day by the law an election is to be held, but it cannot in like manner know whether an election was in fact on that day held. Facts which the court

·does not judicially know should be set forth by pleading. The respondent has not conformed to this rule.

12th. The response of the defendant lacks so many of the essential qualities of any plea known to the law, whether dilatory or in bar, that it is not so much as a skeleton in the anatomy of. pleading. The commencement is bad, the conclusion worse, and the balance a mere void. In this last particular it is emphatically unlike nature—instead of abhorring, it admires a vacuum. What kind of plea it shall be christened, must be, of course, left to the respondent, his counsel, or to the curious in wild fowl.

*Mr. Orton,* in support of the plea.

The mind of the court is presumed to be closed against any impressions or knowledge, beyond the legal points of the plea and demurrer. I do not presume this court will be influenced by any other considerations. But it is the nature of the human mind to receive impressions from views repeatedly insisted upon —not enough perhaps to create an established bias, but to prevent that perfect freedom and impartiality of opinion which are just and necessary. We have been fed with what are claimed to be the facts in this case. They have been served up in the morning paper, with our breakfasts; are continually before us in some form, or other. And it requires great independence of mind to resist the impression so sedulously sought to be created. I regret that counsel have gone out of the record—that they have gone beyond the pure, naked question of law involved. Everything else is entirely foreign to the consideration in which we are engaged.

In the first place, I deny the whole ground of the argument— · that the plea admits the facts in the information, and I demand their authority. A plea in abatement, a dilatory plea, does not admit the facts, but a plea in bar is compelled to admit or deny. But in a dilatory plea the facts are neither admitted or denied— they are kept in entire abeyance.

It might be that a motion would admit them, for a motion is in the nature of a demurrer, but a plea is not. We are not compelled to deny the facts, in a plea in abatement. The argument based upon the statement that we are, is misapplied.

The facts in the information are not admitted. On the other hand, the demurrer does admit the facts pleaded, if they are well pleaded. So, we come into court, with the facts in the plea admitted, and those in the information neither admitted nor denied.

The first objection of the counsel to the plea, is that "it discloses no other jurisdiction where the right can be tried." This objection, if to a plea in a court of general jurisdiction and in a transitory action, would be well founded. But here are neither of these requisites. This is not a court of general jurisdiction, and if there is a local action in the world, a *quo warranto* is one. Neither is this an *action*. It is a high prerogative proceeding of the government, against one of its members. If this was a plea of privilege, would it require another jurisdiction to be disclosed? If a member of the legislature, brought up here, during the session, should plead his privilege, and deny the jurisdiction, would he be obliged to disclose another jurisdiction, when no court has jurisdiction?

The gentlemen wish us to name our plea. I suppose that it is just as good without a name. If it is a good plea, no particular name is necessary. I will, however, for the information of the counsel, give the authority for the plea. It is in the same form as that for Senator Blount, who was a member of the United States Senate from Tennessee, and was impeached by the House of Representatives of the United States, for high crimes and misdemeanors. *See Wharton's State Trials of the United States*, 260. The following was the plea:

"*In the Senate of the United States:* The aforesaid William Blount, saving and reserving to himself all exceptions to the uncertainty and imperfections of the articles of impeachment, by Jared Ingersoll and Alexander James Dallas, his attorneys, comes and defends the force and injury, and says that he, to the articles of impeachment preferred against him by the House of Representatives of the United States, ought not to be compelled to answer because, he says, that the eighth article of certain amendments to the constitution of the United States, having been ratified by nine states, after the same was, in a constitutional manner, proposed to the consideration of the several states in the Union, is of equal obligation with the original constitution, and now

forms a part thereof, and that by the same eighth article it is declared and provided, 'that in all criminal prosecutions the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation, to be confronted with the witnesses against him, to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defence.' That proceedings by impeachment are provided and permitted by the constitution of the United States, only on charges of treason, bribery, or other high crimes and misdemeanors, alleged to have been committed by the president, vice-president, or any civil officer of the United States, in the execution of their offices held under the United States, as appears by the fourth section of the second article, and the seventh clause of the third section of the first article, and other articles and clauses contained in the constitution of the United States. That, although true it is, that he, the said William Blount, was a senator of the United States from the state of Tennessee, at the several periods in the said articles of impeachment referred to, yet that he, the said William Blount, is not now a senator, and is not, nor was at the several periods so as aforesaid referred to, a civil officer of the United States, nor is he, the said William, in and by the said articles, charged with having committed any crime or misdemeanor in the execution of any civil office held under the United States, nor with any mal-conduct in a civil office, or abuse of any public trust in the execution thereof.

"That the courts of common law, of the criminal jurisdiction of the states wherein the offences recited in the said articles, are said to have been committed, as well as those of the United States, are competent to the cognizance, prosecution and punishment of the said crimes and misdemeanors, if the same have been perpetrated, as has been suggested and charged by the said articles, which, however, he strictly denies. All which the said William is ready to verify, and prays judgment whether this high court will have further cognizance of this suit, and of the said impeachment, and whether he, the said William, to the said articles of impeachment, so as aforesaid preferred by the House

of Representatives of the United States, ought to be compelled to answer."

This was the plea of Senator Blount. It was simply a plea to the jurisdiction. They had no trouble in naming it. And the plea was sustained as a good one by the Senate, by the rejection of a resolution declaring him a civil officer of the United States, and liable to impeachment, and by the adoption of an opinion as follows:

"The court is of opinion that the matter alleged in the plea of the defendant, is sufficient in law to show that this court ought not to hold jurisdiction of the said impeachment, and that the said impeachment is dismissed."

Our own plea is in exact conformity to that of Blount, it is simply a plea to the jurisdiction of the court.

Much has been said of the case of Mostyn. Now what is that case? The very authority read, Lord Mansfield's opinion, was that if it was a suit against Mostyn as governor, to remove him from office, to control his acts in office, the court would have no jurisdiction. But what was the case? Governor Mostyn had committed a high handed act in Minorca, an outrageous trespass upon a citizen. When the governor returned to England he was sued for trespass, in the Court of the King's Bench. The governor pleaded his office and the sacredness of his person. Why did Mansfield say that if the suit "lie against no other man, it must emphatically lie against the governor." This is why. I read from the opinion of the court:

"For it is truly said, that a governor is in the nature of a viceroy; and therefore locally, during his government, no civil or criminal action will lie against him. But here the injury is said to have happened in the Arraval of St. Phillips, where, without his leave, no jurisdiction can exist. If that be so, there can be no remedy whatsoever, if it is not in the king's courts, because when he is out of the government, and is returned with his property into this country, there are not even his effects left in the island, to be attached."

It will be seen that the very reason given why the Court of the King's Bench should have jurisdiction, and why " though the suit lie against no other man, it must lie against the governor," was, that in Minorca, where the offence was committed, and

where Mostyn was governor, no court could try him. As the government of that district, he was above his own courts. Had he been sued there, his plea would be a good one. And for this reason it was that in the Court of King's Bench, in England, he must be tried, or nowhere. If we had a court of king's bench under his Royal Excellency Franklin Pierce, Governor Barstow might be tried there, but not by any courts under his own government of Wisconsin.

The same opinion says, that if the trial were for his acts as governor, or his removal from office, it must be before the king in council.

The same opinion says:

" Complaints made to the king in council, tend to remove the governor, or to take from him any commission," &c.

It would not be very difficult to prove that Governor Barstow is as much a governor as the holder of letters patent in Minorca, and is as little subject to the courts of his government.

It is again objected that the plea is not verified by affidavit. The great seal of the state verifies the plea, and no affidavit is necessary. And the very facts of the plea are within the judicial knowledge of the court. It is conceded that the court has judicial knowledge of the election. Is it not a necessary deduction that they must know that the officers of the law sat in canvass and declared and published in the official papers of the state the result of the election ? Greenleaf says :

" They (courts) will also judicially recognize the political constitution or frame of government; its essential political agents, or public officers, sharing in its regular administration, and its essential and regular political operation and action. Thus notice is taken by all tribunals of the accession of the chief executive of the nation or state under whose authority they act, the genuineness of his signature, etc."

The court must judicially know what is the proper and constitutional legislature of the state, who is governor, and by what authority he acts. This is the authority. It is just as clear that they must know the action of the state canvassers, a body appointed by the constitution and laws under it. They must know all the essential allegations of the plea, and if they know it, there

is no need of an affidavit. The exhibits are a part of the plea, and prove the facts.

It is again said that we are too late with the plea. I never heard before that a plea in abatement was not a sufficient plea at any time. I don't care what the English rule is about imparlances. We have no such cut throat practice here. Nor is the plea to be technically scanned. It is to be as liberally examined as any other plea. And especially a plea to the jurisdiction of the court, which is always the first question to be considered and decided, is entitled to fair candid treatment.

"The question raised in the plea has already been adjudicated." This objection is sufficiently refuted by their authorities. Two dilatory pleas cannot be introduced in the same degree, but we may introduce two dilatory pleas in different degrees. This is in a different degree. Before, it was a motion to dismiss. Now it is a plea to the information. If it were not so, it would not be demurrable. It might be a good cause for striking off, but not a cause of demurrer.

It is again repeated that we come acknowledging our wrong. I have before denounced it as a fallacious proposition. With no such admission do we come into court. No such form does our argument assume on this plea. No facts have been before the court except those admitted in the demurrer. But we have been treated from first to last, as if it was a clear and confessed case of guilt. It has been assumed here and elsewhere, now and before, that there was not a question, but that the respondent here was a bold and outrageous usurper, without, or in defiance of law and by the grossest frauds. That is another of the peculiarities of this case. All the human and Christian principles of law must be ignored. The cry of the populace is echoed here to swerve or blind the course of justice. Though Pontius Pilate say "there is no fault in the man," the rabble cry "away with him, crucify him! crucify him!" Such is the treatment we receive. We do not stand here as men who must be convicted of crime before they are condemned for crime. Against this we do solemnly protest. We protest against being assumed guilty before we are proved so. We claim the merciful doubts of the law, and protest against the violent and unlawful presumptions of guilt. The plea does not admit a fact in the information. We do not argue

the case as if fraud, perjury and forgery were admitted by us. We argue it upon legal questions involved in the facts of the plea which the demurrer admits.

Their next position is, that the plea is not a finality. In the argument of this proposition, the counsel (Mr. Ryan) supposes that a British fleet lands in Madison, though whether the fleet came over the railroad, or how it is to "land" here, is not explained. It is a terrible case—it is, to use the language of the gentleman, monstrous, that a British fleet should do any such thing. But we will admit that they do it, and that they induce the canvassers to make a British officer governor. We are asked, if the rightfully elected governor cannot come into this court, and ask the British officer by what authority he holds that office. Suppose a little farther. Suppose they bribe the canvassers, after driving you from those seats, to canvass three British judges into your places. What is going to be done then? Suppose a little farther, that they canvass in a legislature. What remedy then? Oh, "the law is above us all"—"no wrong without a remedy." The law may be above us all, except the lawgivers. They make and repeal the laws, and are above it. Now what are we going to do? Why we have either got to resist, or submit. There is no judicial remedy for any such wrong.

We now come to the criticism, or definition, or emasculation of our term sovereignty. I agree most perfectly with his definition of the term. It was our position in the previous argument. And I am proud, that as a politician as well as a lawyer, the gentleman can be so independent of party, and so sound in his views. I do not agree with him that sovereignty is nowhere, but do agree with him that it is not in the people. Squatter sovereignty is only another word for border ruffianism. There is no such sovereignty in the people of this government. Where is popular sovereignty in the people of Wisconsin? Where is it as against this department of the government? Popular sovereignty would allow any fellow citizen present in this court, to walk up and tweak the noses of your honors. The court would probably order the sheriff to take his popular sovereigntyship off to jail for the commission of a contempt on one of the departments of the government of the state. The definition of such a word as sovereign can be easily settled. The

common law of England has settled the definition of sovereign there, to be the person that wears the crown. The decisions of the Supreme Court of the United States and of this state, have settled the definition of sovereign, by applying it to the states. The different states are called sovereign states. The sovereignty of the state is in the government of the state, it is in the organized departments of the state government.

It is all nonsense to talk of our liberty slumbering in popular sovereignty. How do the people go to work to form a state? They elect their delegates, who come to Madison. They here form the government—if I may use a figure—they build a capitol—erect its pillars and its massive walls—they crown it with a dome; surround it with bulwarks; establish its constitutional limits and balances. It is complete—they disperse and leave it here. They have established the government, divided it into its several departments, provided for a governor in one, a legislature in another, a judiciary in another. The people then send its occupants—they elect the officers of the departments. They, when elected, come up here, they hang the walls' of the temple with frescoes and ornaments, fill it with articles of beauty and necessity. Now what do the people do—this sovereign people? The work of their hands is complete. The building is here. They send up yearly, or every two years, its occupants, and that is all the sovereignty possessed by the people. They have established the sovereignty. They have placed it in the departments of the government. They have only to say who shall administer the departments.

If the people are sovereign they are above the law—they are above the constitution. But can any one man—any ten men— a majority of the people, defy the law, violate the law. Suppose they all went on a certain day, and voted to destroy the constitution—is it destroyed? The waves of popular tumult may dash against it in vain. The constitution cannot be changed except constitutionally. It provides in itself just how it may be amended, and it can be amended in no other way.

Can the people meet to-morrow, and vote to strike out article 5? They can't do it. It can only be done by the course provided in the constitution itself. And if the people cannot amend it, they certainly cannot abrogate it.

Laws must originate in the supreme power. Where do ours originate? In the·people, as is often popularly said? No. They send men here to make the laws. After they are here, members of the law making body, the people have no further control over them. They can vote, act and pass just such laws as they please.

But, says the gentleman, the sheriff exercises a share of the supreme power; a justice of the peace exercises a share of it. So they do. But they exercise and hold it as subordinate to the highest department of the state government.

The gentleman joins issue with pantheism. In his haste to escape pantheism, he has run into another heresy quite as objectionable to orthodox views. He has gone to unitarianism to escape from pantheism. In our government there is a trinity of powers. We have three departments of government, and these three are one; each supreme, independent, co-equal, and all together forming the government. And if one intrenches upon the other, if one invades the duties of the other, controls the other, disposes of the other, the integrity, harmony and stability of the government are quite as effectually destroyed, as if the gentleman's British fleet already covered Lake Mendota.

The gentleman says, that the law is supreme, and that the court being the mouthpiece of the law, must be supreme. In what is it supreme? It is not supreme over the acts of the other departments of the government. You are the supreme judges of the law, of the rights of man and man, but because the law is over the court, the legislature and the governor, you are not also over the court, the legislature, and the governor. There has been given you no such God-like unity, no such supremacy over all the other powers and departments of the government.

The gentleman complains that we go into "stale politics." If the court pleases, this is a fast age. This is a wise age, a remarkably wise age. It is an age of great wisdom, of magnificent discovery, so much so, that we stand on our conspicuous eminence, we look back at the honored graves of our fathers and call their wisdom stale, and abjure their pious precepts. The patriotism of the founders and statesmen of the republic—their wisdom, their foresight is "stale, flat and unprofitable!" Why, where shall we go for light, but to the age and the minds which formed our government—where but to those sources of knowledge coeval

with its formation?   We go for authority to the common law of England, whose foundations were laid in an age of barbarism and ignorance—go back hundreds of years to the turbid streams of barbaric law and justice; but if we stand at the graves where moulder the bones of the fathers of the republic, and drink in wisdom as it fell from their lips, and urge it in a modern court of justice, it is hooted out of courts as "the stale politics of the past," fit only for the street or the stump.   Where shall we go for authorities upon the constitution and the laws, but to those who framed the constitution and the laws?

It is strange that in all the history of close and fraudulent elec-tions in the United States a *quo warranto* never has been thought of to oust a closely or fraudulently elected governor from office. The court is familiar with the case of the election in Pennsylva-nia some years since.

*Justice Smith.*—You refer to the period known as the time of the "Buckshot War?"

*Mr. Orton.*—I believe the events are better known by that ap-pellation.   Here it was alleged that 5,000 fraudulent votes were cast.   Violence took place in the legislature.   The entire state was on the verge of civil war.   The laws of Pennsylvania on the subject of canvassing were similar to our own, except that the votes were canvassed by the two houses of the legislature.   The law of *quo warranto* is also similar to our own.   But no one ever thought of contesting the possession of executive power by an appeal to the Supreme Court of Pennsylvania.

Take also, the case of Governor Morton, in Massachusetts, who was elected by a majority of *one*.   Could there not have been in all Massachusetts, one fraudulent vote found to impeach the elec-tion?   But they never thought of trying it in the Supreme Court.

*Mr. Orton* here read from the statute upon the subject of the canvass:

" They (the state canvassers) shall certify such statements to be correct, &c., and they shall thereupon determine what persons have been elected."

" Sec. 76. The secretary of state shall record,   *   *   *   such

certified statement and determination so made by the board of state canvassers."

Now what is the language of the constitution, giving this court jurisdiction of writs of *certiorari, quo warranto*, &c ? *See Const. art.* 7, *sec.* 3.

"The Supreme Court. * * shall have power to issue writs of *habeas corpus, mandamus, injunction, quo warranto, certiorari* and other original and remedial writs, and to hear and determine the same."

It will be seen that the same judicial power, by the same language is given to the board of canvassers, that is given to this court. They are to "determine." Does "determine" mean one thing when a grant of power is made to this court, and another when a grant of power is made to the state canvassers? The canvassers are to "declare and determine," the Supreme Court to "hear and determine." Is this precisely similar to the New York law? See also, another section of the Rev. Stat. on the powers of the state canvassers. *Chap.* 6, *sec.* 95.

"Whenever it shall satisfactorily-appear that any person has received a plurality of legal votes cast at any election, for any office, the canvassers shall give to such person a certificate of election, notwithstanding the provisions of the law may not have been fully complied with, in noticing or conducting the election, or canvassing or returning the votes, so that the real will of the plurality may not be defeated by any informality."

Is this "precisely similar to the New York law?" What power more ample, more discretionary, more final, could be given to any tribunal? They are not only to "determine," they are to set aside all forms, to disregard all laws, to hear, consider and determine all facts to show what the real plurality of the votes may be. Is this "mere ministerial power," as the gentleman has urged? Are the canvassers "mere arithmeticians?" Is this "merely adding up a column of figures?" Is not the power full, judicial, ample and conclusive?

*Justice Smith.*—Mr. Orton, do you hold that that applies as well to town and county canvassers—renders them final?

*Mr. Orton.*—No, sir. By no means. It expressly says "in

canvassing or returning the votes." The votes are "canvassed and returned" by the town and county canvassers. It is their informalities and illegalities which the state canvassers are empowered to disregard. It can only apply to the state canvassers.

But it is said that this forms an unsafe tribunal, from whose action there may be no remedy. Why unsafe? Is it to be presumed that we never shall have honest and safe officers of the state? Is it urged here, to annul the law, that officers of honesty and integrity never can be had to execute it? If so, we had better leave the state. It is the presumption of law that all public officers will do their duty. This board consists of the attorney-general, the legal officer of the state into whose hands is confided this very high prerogative proceeding of the court—the treasurer, the custodian of the treasure of the state—and the secretary of state, to whose honesty is confided the financial accounts of the state—or in the absence of one of them, the clerk of this very court. They may be unsafe. They may be dishonest. If so, they are liable to impeachment. This court may be corrupt. The whole body politic may be diseased. The head may be sick and the heart faint—the extremities paralyzed and thrown off in a putrescent mass, sending a baneful thrill along every nerve and artery to the very seat of life—and where is our remedy? The whole government of the state may reek with partisan corruption and partisan malice, and yet there be no remedy. But the wise presumption of the law is, that public officers will be faithful, that they will be honest, that they will be true to the constitution. The same argument would be fatal to the delegation of power to any department of government, and would be equally conclusive that no power had been delegated to any.

Let us go to the constitution. It is there provided how it may be amended. An act to amend it must twice pass the legislature and be submitted to the people. Their vote is to be returned and canvassed in the same way as is that for state officers. How is this court ever to be satisfied that an amendment to the constitution has been adopted? It is by the certificate of the board of canvassers. Suppose twenty years hence a case arise under an amendment of this kind. Is the court to go back to the for-

gotten, obliterated and destroyed town and county canvasses, to poll lists and to voters, to ascertain if the amendment was adopted? Or is not the certificate of the state canvass final evidence that it was?

Take the banking law. Suppose a *quo warranto* sued out to inquire by what authority Alexander Mitchell, or the State Bank, issues bills and exercises the franchise of banking. Will the court seek evidence behind the certificate of the state canvassers, that the banking law, giving them their franchises, was adopted, and became a parasite, clinging to the constitution, if not almost a part of it, and unalterable as itself?

In all cases the certificate of the state canvassers, their declaration published in the official paper of the state, is final and conclusive. If not, we are all afloat. This Supreme Court itself does not know that its members are elected. The departments of state are held more loosely than by a rope of sand. We know not where we are. We are without rudder or compass. There is no finality anywhere.

*Justice Smith.*—Let me call your attention, Mr. Orton, to still another article of the constitution, providing for the submission of colored suffrage to the people. If you will recollect, it provides that a majority of *the votes cast* shall be required for its adoption. There was a plurality, but not a majority of all the votes cast at that election.

*Mr. Orton.*—I suppose that the statement of the canvassers is final, sir.

*Justice Smith.*—Their decision that it requires a majority of all the votes cast, or whether only a majority of the votes upon that subject, would be final, you think?

*Mr. Orton.*—Yes, sir. And finally upon the adoption of the constitution itself. Can I set up frauds in that election, for your inquiry, to test that question. Would a batch of *quo warrantos*, sued out against the first elected officers of the state, before the Supreme Court of the territory, alleging frauds in the constitution, be entertained? They certainly would not.

The board of state canvassers is a constitutional tribunal. *Const. art. —, sec. 4*—"The legislature shall have power * * to provide by law for the organization of a separate Supreme Court." The legislature has done so. This court is a constitutional court, the same as if it had been organized by the constitution itself. The law has a constitutional force and sanction, being specifically ordered by the constitution. Now see *sec. 3, art. 5, Const.* "The returns of election for governor and lieut. governor shall be made in such manner as shall be provided by law."

The board of state canvassers are formed under this constitutional grant of power to the legislature. When they are formed they are a constitutional tribunal. Constitutional power is vested in them, the moment they are formed, to the full extent that it is vested in this court.

The court having assembled, Mr. Orton resumed his argument.

I was commenting when I concluded, the previous day, upon those parts of the constitution which required a canvass of votes upon other questions than the election of state officers, and where their canvass and statement of the result would be final. I find in sections 82, 83 and 84, of chapter 6, Revised Statutes, the provisions for canvassing the votes on all amendments to the constitution. They are to make a statement of the votes and "*determine*" whether it is adopted or not. The same language is used as that directing their duties in canvassing the votes for state officers. It does not say that their certificate shall be final. But they shall determine the question. They shall make out and publish a statement of the votes. They shall "record such determination." Now when that determination is made, when the statement is published in the official paper of the state is it not final? is it not conclusive? is it not a public record of the state behind which no court can go, in its inquiries whether the amendment was adopted or not? It certainly is. And the language is essentially the same in defining the duties of the state canvassers in canvassing the vote for state officers. The process for canvassing is the same. The same rules apply to it. The canvass of the votes for governor is made a matter of the same prudent, cautious record. And when it is made, it becomes a part of the archives of the state, an indestructible record, and the conclusive evidence for all

time to come, of the result. If these determinations, and the same rule applies to all, are not good now, they never will be at any future time, however remote. Fifty years to come, there may be inquiry into the fact of the adoption of the constitution, and the state may be rummaged for town canvassers and poll lists and voters, to ascertain the fact when they are no longer in existence, as to whether it was adopted or not. But the law has wisely obviated any necessity for this labor. It has required the final, conclusive proof of its adoption to be placed in the books of the secretary of state, a perpetual, recorded proof of the fact.

The banking law was passed by a vote of the people. It was not a law when the governor signed it, not till a majority of the people had voted for it. Where is the proof that it ever passed, if the statement and certificate of the canvassers who canvassed the votes is not proof? Have you now, to go back of the canvass to every precinct in the state? It is nonsense to suppose such is the case.

*Justice Smith.*—Suppose, Mr. Orton, the vote on the adoption of the law had been very close, and frauds in the vote by which the majority in favor of its passage was obtained, were obvious; would not the court have a right to inquire into it, upon the question arising immediately after its passage?

*Mr. Orton.*—If you could then, you could now, you could at any time in the future. You would be obliged to when there were 300 banks established in the state, you would have it to do in every case, if suits were brought against them. If that canvass was not final, we are all unsettled, and must forever remain so.

*Justice Smith.*—Why, would not our adjudication settle it?

*Mr. Orton.*—Not if other cases arose, you would have to try the same question every time.

*Chief Justice.*—If the law is once settled, it is the law in all future cases of the same kind.

*Mr. Orton.*—Well that is what I claim for the state canvass.

I argue that it is a final and conclusive judicial determination that settles the fact, and ends the matter.

*Chief Justice.*—You do not differ from the position of the other counsel there, except in the change of form.

*Mr. Orton.*—Perhaps not. No, sir. I claim that the board of canvassers judicially settles the question.

*Justice Smith.*—But in the case I supposed, if there is specific fraud, in the election could it not be inquired into by this court, under a *quo warranto* proceeding, as that would be the proper proceeding against a bank, to inquire by what authority it exercises its franchises?

*Mr. Orton.*—Well, if the court will assume that there is fraud, will assume fraud, any way, whether it is proved or not, it puts a very hard case. But I imagine that fraud cannot be assumed till proved. The plea does not admit frauds averred in the information. No fraud is admitted, and never can be assumed till proved. The only facts that are admitted, or that can be assumed, are those of the plea, which are admitted by the demurrer, that there was an election, that its result was "*determined*" by the board of canvassers, and that their statement and certificate are conclusive of the fact.

*Chief Justice.*—But you have not pleaded an election.

*Mr. Orton.*—Does the court intimate that we have not pleaded an election? It is conceded by all that the fact of an election is in the judicial knowledge of the court.

*Chief Justice.*—We may have judicial knowledge of the election, but not of who is elected.

*Mr. Orton.*—We pleaded the certificate and statement of the canvassers, as evidence that Governor Barstow was elected—the public records of the state, of which the court must take judicial knowledge, whether they are pleaded or not. We show that he is governor, and the authority by which he is known to be governor, not only by the court, but throughout the state and throughout the country. We hold that the certificate of the can-

vassers is conclusive, that if it is not of this matter, it is of none, and that we are all unsettled, that there is no government, that no court sits on that bench any more than there is a governor sits in the next room. For if that certificate is nothing in his case, it is not in any case—if you can go behind it in one, you can in all.

But, it is urged—and, of course, that settles the case—that this is a government of law without force. Of course, if this be so, it ends the case. If all power is in the judiciary, if it is the law and the government, it is settled. But is it so? Is it true that this is a government of law without force? What is our executive for? What is our military for? Civil government cannot exist without force. Laws are nothing without force to execute them. Penalties enforce every law. Why not abolish the jails and penitentiaries? What does the sheriff stand there for day by day? Without force government has no strength—no tenacity. Force must stand behind the law to execute it. Without it, law is of no avail—our rights are without protection—the strong would trample upon the weak—there would be no security for property, liberty or life. What would be our government without force, with every despotism of the world ready to attack and enslave or destroy it. We would be like a sheep among wolves—all ready to rend and devour us. Our force only protects us. We should be in a poor condition indeed, if there were no more force in the government than there is in the gentleman's argument.

The constitution says, that "the executive power shall be vested in a governor." It is not vested in the department—not in that room yonder. It is in the man, the governor. Whether the governor is in that office, or in Milwaukee, he is the executive of the state, and in him is vested the executive power. How, then, can you dispose of him without reaching his office? If you bring the governor into court, do you not bring the executive into court? If you bring him into court, you bring in him in whom the constitution has invested "the executive power of the state." He has all the force of the state at his command. If the state is invaded to-morrow, he calls out the forces of the state to repel it. What could this court do? You would sit there declaring judgment and construing the law, while the invaders invested the

capitol and burned the town, and be powerless to command the force of the state to resist them. In our government we have to borrow supremacy from the idea of the head of a monarchy, and vest it somewhere. We have vested it in a governor. He is always present, and represents the state. He is the sole representative of the sovereignty of the state during the recess of the legislature and this court. He stands by the sovereignty of the state when you are asleep and we are asleep, guarding it, watching it, defending it from assault and destruction.

Again, the constitution gives him the power to remove every administrative officer in the state, except the heads of departments. He may remove them all—every civil officer in the state. There is power—there is force. And yet, it is said, the executive is nothing, it is "a government of law without force."

The main idea of my argument, the total distinction between an office, a mere subordinate position in the administration of government, and a department—a branch of the government itself, is so eloquently set forth in one of the opinions of this court that I will read it. *See* 1 *Wis. Rep.* 610, 611 *and* 612. The learned judge says :

"Constitutions and laws are made for the practical benefit of the people. The powers of the government are divided and distributed for the convenience and safety of the people."

"There is to be observed a wide difference between the fundamental law, by which a government is organized and its powers distributed, and those laws by which the government delegates subordinate powers and imposes duties upon inferior bodies or tribunals. While the one is regarded as the creation of the several indispensable departments through which the sovereign power of the state is to be exercised, the other is the mere delegation of authority, limited and special, by which the detail of administration is to be conducted. The failure or imperfection of the latter, may, at all times, be remedied by the existing government, while the failure of the former might operate the suspension or abrogation of the sovereignty, and become destructive of the government itself. The rule, therefore, here contended for (and which seems to have found favor with Justices Bronson and Jewett in their dissenting opinion in the case of *Oakley vs. Aspinwall*, 3 *Comst.* 564), ' that whenever a power is delegated

to several persons, without any provision that it may be exercised by a smaller number, they all must join;' does not apply to this case. The learned and venerable jurist, who delivered that dissenting opinion, seems to have lost sight of the distinction between the distribution of powers in the organization of a state or government, and the mere delegation of authority by the state to inferior tribunals or bodies. When the state, the primary repository of the sovereign power, delegates authority to a certain number of persons, it may well require that all of the persons thus intrusted shall be required to participate in the execution of the trust. In the latter case, authority is intrusted to the persons for a special and limited purpose. In the organization of the government, its powers are not distributed to or among persons or individuals of a certain number, but to and among certain departments. To each department its appropriate powers are assigned, not as new powers created for the occasion, but as part and parcel of those already existing as inherent in, and pertaining to the very nature, and inseparable from the complete idea of government. In no sense can it be said to be a delegation of authority to individuals, or a certain number of persons. The powers and functions attach to the departments, to be exercised from time to time, by the person or persons who may succeed to the offices."

How perfectly is this in point in support of our position that the governor is not a mere officer—that no department is a mere "office." He is "a power of the government." You are not dealing with a mere officer. You are dealing with a department of the state—a sovereign power of the government. You are dealing with sovereign power, and laying your hand upon one of the three pillars which sustain the sovereignty and uphold the power of the state.

I will proceed to read two authorities upon the point of the finality of a certificate of election. I read, first, from 1 Mc-Cord, 46. This is a case where the law provided that there should be eight managers of election who were to canvass the votes and award the certificate, and five of whom should form a quorum. The question was, whether a majority of the five, being but three out of the entire number, could grant a certificate of election. It was held by the court, that a majority of the quorum

was sufficient to decide the question. Justice Ray, at chambers, gave the relator leave to file an information. On this an appeal was taken to the full bench, on the ground that the certificate of the managers was final and conclusive. Upon this question the court held the same as was held in another case of the same nature, that as the legislature had constituted the managers a tribunal to "hear and determine" the question, their decision was final and conclusive, and the court had no control over them.

The next case that I will read is from 5 *Ohio Reports*, 359. This was a writ of *quo warranto* brought against Lemuel Moffit, associate judge of the Court of Common Pleas. On the journal of the House of Representatives it appeared that *Samuel* Moffit was elected to that office, while on the Senate journal it appeared as Lemuel Moffit. Depositions were introduced of several members and officers of the general assembly to prove that Lemuel, not Samuel, was the individual voted for and elected. Lemuel Moffit also took the oath of office and acted as judge, but had received no certificate of election, or commission from the governor. Judge Hitchcock, in delivering the opinion of the court, said:

"The evidence is such as to induce a belief that the defendant, Lemuel Moffit, was elected. * * * But whether this be the appropriate evidence to prove before a judicial tribunal the fact of an election by the two houses of the general assembly, is a more serious question. * * * The testimony of an individual member could not be received to contradict a statute, and, if not, why receive it to contradict an entry upon the journal? Besides, the principle that an election might be proved by parol would be fraught with danger. Where is the man, who has been for years a member of the legislature, possessed of a memory so tenacious that he can undertake to state the names of individuals for whom he has given votes for the office of associate judge, or for other offices. I presume he cannot be found."

Again: "Almost every officer of this state is elected by the legislature or the people. And the laws have made ample provision for the evidence with which the individual shall be furnished of his election. If these laws were to be disregarded, and the fact of the election should be left to be proved by the frail memory of the electors, it is not possible to conceive of the

confusion that would follow.    Still, this is substantially the principle we are urged to adopt, and which we must adopt in order to justify the course pursued by the defendant.    We cannot do it."

Learned, wise, prudent judge!    The law had declared that a certificate of election, and a commission of office, should be evidence of right to office.    He could not violate the law, and the plain dictates of reason and prudence, by deciding that other evidence should be presented against it.    The fugitive recollection of voters, scraps of hearsay and supposition, stuff, perhaps, trumped up for the very purpose of being produced as testimony, had no weight with him against the evidence of title which the law provided and prescribed.    Lemuel Moffit may have been elected, but he had no legal evidence of title to office, and the court could not declare one thing evidence, when the law had said another thing should be.    The case here is precisely similar. We have placed before the court the highest and only evidence of title to office known to our laws, and upon it asked the judgment of the court.    These two cases, both exactly in point, I put against the solitary authority in New York; for there was in fact but one, the others being based entirely upon it.

It is again said, that the canvassers are not a safe tribunal, because they are the administrative officers of the government. Suppose the law had given the same power to this court, that is given to the canvassers, by the same language.    Suppose, and I understand there is a proposition to so amend the law, the only change in it had been that, instead of the "secretary of state, treasurer and attorney," it should have read "the three judges of the Supreme Court," that you were to count and canvass, to "declare and determine" the result, to disregard all forms, and be guided only by "satisfactory evidence" in arriving at the "real will of a plurality," and that your clerk was to record your determination—it becoming a part of the perpetual records of this court—would it be judicial power then?    If it was mere ministerial, you need not accept the power granted to you.    But would you not accept it as judicial power?    And when your action was recorded, would it not be final?    No new power is added by conferring it on the court—it is the same in you as in the state canvassers.    Suppose, in the changes of politics, George

B. Smith and Alexander T. Gray should occupy the seats of your honors, to exercise the same power, would it be ministerial then? Is it more ministerial now than it would be then? There is no reason why they should not occupy your places. They are lawyers and members of your bar. And I will say, that however they may have been assailed, it has been unjustly and unwarrantably. As public officers, I know of nothing to impeach their honesty, their fidelity and integrity. And I will be affected by neither the calumnies of newspapers, falsehoods of the pen, or of the tongue, till such proof is brought as is conclusive.

Dark, indeed, would be the political history of this court, if this power was conferred upon it. Lampoons of political newspapers—complaints of defeated politicians—whole parties rising in rebellion to its judgments, if such was their duty. And such will be the case if this court have the power here claimed for it. It will be filled with defeated candidates at every election, and the excitement, the turbulence, the high political feeling of every canvass will invade it—money will be staked, and bets decided by its judgments. But leave the power where it is—it is final. It will preserve to this court, far removed from the political ring, its equanimity, its respect and its impartiality.

This decision is as conclusive as any other judgment. If it was objected that it was fraudulently obtained, they might impeach it. Fraud vitiates everything. But their information alleges no fraud.

There is a distinction in the duties between the different departments of government. Thus the court cannot do what the sheriff could do. They cannot go out into the street and serve their own processes. One justice has not jurisdiction over another. One cannot take jurisdiction of a case from another. No court can interfere with a case to which the jurisdiction of another court of concurrent jurisdiction has attached.

The judiciary is no greater, it is no less, than the other departments. It is their equal, it is independent of them, it is co-existent with them, but not above them. They are its equal, independent of it, co-existent with it, but not below it. When it usurps a superiority, it becomes not a sun, giving heat and light, shedding a healthful influence wherever it shines, warming,

blessing and protecting, but a baneful fire which withers and con-sumes.

I will not say how serious and important are the results of your action. It will not be a "finality" of action on this subject. Decide that you have all power, and your court will be thronged with political suitors from year to year. It is not the individu-als whose interest are concerned; it is the importance of the constitutional question involved. Bashford and Barstow are nothing, but your adjudication is for all time; its effects will be felt when they, and you, and I are in our graves. It is whether, when the governor of the state appears before you, and places upon your records his investment of the powers which he holds —the same title to office by which you hold the seats you occu-py—you must not dismiss the suit against him. You have no right to question his election beyond the legal evidence before you. He has no right to question yours. If either had, the harmony between the executive and the judiciary must cease at once, and if that ceases, it exists nowhere.

It is true, in the argument of the previous motion in this case, he may have appeared in the light of a usurper, with no legal evi-dence of right to his office. He does not stand so now. He has placed on your records the highest evidence of right to his office. He appears with the executive power of the state vested in him, which you can neither disturb, interfere with or control, without destroying the order and harmony of the government, and in the end producing conflicts of power and sovereignty, that must destroy the government itself.

*Mr. Howe* closed the argument for the demurrer. No time will be consumed in discussing the formal objections taken to the respondent's plea. My associate has stated these very clearly, and has sustained them conclusively. His argument upon these points in the demurrer has not been answered and cannot be an-swered. I will only recapitulate the points.

We object then, first, that the plea is to the jurisdiction, and it is put in without oath or affidavit of the truth of its contents. 4 *Allen, chap.* 16, *sec.* 11; 1 *Chit. Pl.* 445.

We object, secondly, that it is pleaded after a general impar-lance—after, indeed, several imparlances, and must thus be

overruled upon demurrer or be set aside upon motion. 1 *Chit. Pl.* 437.

We object, thirdly, that the respondent's plea, while it denies the jurisdiction of this court, yet shows no court which has jurisdiction. It does not deny the cause of action stated in the information—that can only be done by a traverse of its allegations. It does not deny that a cause of action is stated—that might be done by demurrer, and has been done by a motion to dismiss, and when this court denied that motion it conclusively decided that a cause of action was stated. If, then, a cause of action be stated in the information, some court must exist competent to try it. No judge can ignore this proposition—no lawyer will deny it, unless he be driven to denial by extreme stress of weather. No stronger language perhaps can be found in support of that proposition than was quoted by my associate from the opinion of Lord Mansfield in the case of Governor Mostyn. It has been said, indeed, that the respondent fills an office of much higher dignity than that occupied by Gov. Mostyn. I apprehend that opinion was advanced without due consideration. To be sure dignity is rather difficult to measure; but it may safely be asserted that the governor of this state represents the people only in a limited capacity. He is at the head of only one of the departments of this government—Gov. Mostyn, on the contrary, represented the king of England. Within his province he stood at the head of each department of the government, and could no more be impleaded in the courts of his own province, for any cause, than the queen of Great Britain can in the courts of her own realm.

But we need not rely upon the case of Governor Mostyn, nor upon the opinion of Lord Mansfield. We have higher authority nearer home. Our own bill of rights declares that " every person is entitled to a certain remedy in the laws, for all injuries or wrongs which he may receive in his person, property or character." *Const. art.* 1, *sec.* 9.

If then the relator has been injured as he avers, he is entitled to a remedy in the law. If the respondent will deny the authority of this court to afford that remedy, it behooves him to show what court can do so. But if some of these objections to

the form of the plea are not insuperable—there are objections to its substance which cannot be overcome.

The relator avers that he is entitled to the office of governor, and that the respondent has intruded into it. The plea does not deny this, but it sets up a certificate of election issued to the respondent by the state canvassers, and prays judgment if the court will have further cognizance of the action. Now, whether this plea be good or bad in substance as a defence to the action, it is beyond all question bad as a plea to the jurisdiction. We regret that this is so, and we hope the court will go beyond the mere technical question, and decide, what we all claim should be decided—the question intended to be raised by this plea—as to the conclusiveness of the state canvass. I repeat, if that canvass be conclusive, it offers no objection to the jurisdiction of this court.

If that certificate be conclusive evidence of title, it is a good answer to the averments of the information. Then the relator is not entitled to the office—then the respondent is not a usurper —then there has been no intrusion. But where, before, in the history of jurisprudence, has title been pleaded in abatement? If the respondent were sued in ejectment for a parcel of land, of which he had a patent from the government, he surely would not plead that patent in abatement.

The certificate of the state canvassers, is no more conclusive than a judgment of this court in an action of trespass or replevin.

But what lawyer would plead to either of those actions a former recovery in bar of the jurisdiction? If this mode of pleading was not condemned by all authority, and by the uniform practice of courts, it would be condemned by the very absurdity in which it would involve us. This court is asked to adjudge the respondent's certificate to be conclusive evidence of his title to the office, and if you so adjudge, then you are to decide that you cannot give judgment at all. You are called upon to determine this very question in the case, in order to ascertain whether you can determine the case or not. You are seriously urged to say, that you cannot try the allegation that the respondent is a usurper, because he exhibits a good title to the office, and consequently is not a usurper.

If the fact be as averred by the respondent, and the law is as assumed by his counsel—in other words, if in fact he have a certificate, and if, in law, that certificate have the effect claimed for it, then this court cannot dismiss the cause, but it must give judgment for the respondent, and award him his costs against the relator.

But we desire to meet the only proposition which can ever avail the respondent as a defence, and we deny that the certificate of the state canvassers is conclusive evidence of title to the office.

I have been a little troubled to ascertain the precise ground upon which counsel intended to rest that proposition. Sometimes they have urged the extraordinary dignity of the office as a reason why this court cannot inquire into the title of the tenant of it. Sometimes it is contended that the constitution and laws of our state contain provisions which deprive the court of jurisdiction. The two propositions are not quite consistent with each other. But, when driven from one, counsel have beat over to the other, and when beaten from that, they have just drifted back again.

I need not discuss the former position that was overthrown by the judgment of this court upon the motion to dismiss. We already understand that there is nothing in the executive chamber so sacred as to afford immunity to usurpation and intrusion. It only remains for me to consider what tribunal is charged by our laws with the duty of determining *finally* when that office is held lawfully and when unlawfully, when it is rightfully exercised, and when usurped.

Let me congratulate the court that we are already free from the difficulty, which was pressed upon our attention with great earnestness upon a former argument. It was then insisted that notwithstanding the respondent stood upon the record a confessed usurper, yet his usurpation was successful and complete. Moreover, it was of the office of governor, no less—an office to which belonged the right to grant pardons and to command the militia, by express grant of the constitution—and a salary of $1,250 per annum, by express grant of the legislature; that having succeeded in his usurpation he had proceeded to quiet his title by his own judgment, and upon examination had

pronounced it perfect—and that there remained to the judiciary of the state no authority to review that decision or to reverse that judgment; that if this court assumed so to do, it would result in a conflict of jurisdiction, in a conflict between the judicial and executive departments—departments which were said to be co-ordinate and co-equal, indeed, of such *exact equality* as would have induced us to believe that conflict must result in the annihilation of both, only it was hinted that the executive by dint of the militia, was likely to prove a little the strongest.

No such peril, I am happy to say, hangs on the decision of this question. The respondent no longer claims under his own decree. He pleads now the judgment of a very different tribunal, designated by his counsel as the "court of state canvassers," a court which, as it never had command of the militia and has long since ceased to exist, is not likely to offer any formidable opposition to the judgment of this court.

The respondent's counsel has advocated his cause with great ingenuity and marked ability, but he seemed to exhibit a strange sensitiveness touching the distinction which we claim to exist between the office and the tenant of the office—between the department and the person who occupies it. We have been told over and over again, that if you deal with the tenant you deal with the department. But surely this cannot be so. If the governor makes a contract no one doubts but he may be sued upon it. If he commit a crime he may be punished for it. If he commit murder, and the penalty by law was capital, he might be hung. It is absurd to say that the executive department would swing. If the governor commit an assault and battery, he may be arraigned before a justice of the peace. Would the executive department appear there? The consequences might be sad, indeed, if this doctrine were true. We may have a governor at some future time who will not observe the precepts of the Maine law, and the executive department may be seen hanging about the St. Julien calling dubiously and incoherently for one more brandy smash. To my mind there is a clear and broad distinction between determining the right of an individual to an office, and determining how he shall exercise the office while in it.

Before I proceed to state the grounds upon which I maintain

the jurisdiction of the court over this cause I wish to notice briefly the historical cases to which we have been referred by the other side, and from which an argument has been raised against that jurisdiction. The counsel first referred us to the controversy which arose in the state of New York between Judge Jay and Governor Clinton.

The latter received the certificate; it was alleged there, and is assumed here, that he received it wrongfully—and it has been triumphantly demanded why, if the judiciary are so powerful, was not the judiciary appealed to?

The answer is obvious—Governor Clinton received his certificate from the legislature. We have no sufficient evidence that it was not rightfully issued to him. But, right or wrong, that decision was undoubtedly beyond the review of any of the courts of the state—and for this reason, the constitution of New York had given no power whatever to the courts—it had created no courts—it had made no disposition of judicial power—that was left to the disposal of the legislature. The legislature created what courts it pleased, and gave to them such authority as it pleased. The courts were the creatures of the legislature—whatever the creator had done, therefore, it is evident the creature could not undo. The legislature, which gave to Clinton the office of governor, might have tried and determined an action of replevin, or exercised any other judicial power.

We were next cited to the case of Ritner and Porter, which arose in the state of Pensylvania. That was more a contest between the two branches of the legislature, than between the two claimants for the office. I was gratified to notice that my friend upon the other side, when bringing in a file of old newspapers, and even reading the address of the central committee of a political party as legal authority before this court, exhibited a sensitiveness which clearly indicated that he appreciated the novel nature of his authority.

We were next referred to the case of Governor Morton, who was declared by the legislature of Massachusetts to be elected by a majority of one vote. Is it not possible, asks the counsel, that if the courts had been appealed to, that one illegal vote could have been shown to have been cast for Governor Morton?

I answer, that such an event is quite probable. But it was

never denied, as I remember, but the decision of the legislature upon the evidence before them, was entirely just. And although it is quite probable that a judicial inquiry would have ascertained more than one illegal vote cast for Governor M., it is quite as probable that as many illegal votes would have been proved to have been cast for his opponent. But I do not claim that either of the courts of Massachusetts, or of Pennsylvania, had authority to institute any such inquiry, or to determine any such inquiry. I do not think they had any such authority, and for the same reason that the courts of this state have not power to try an impeachment—because the constitution of each of those states expressly delegated that power upon their legislatures. It was so much judicial power abstracted from the courts, and conferred on the legislatures.

But the constitution of this state makes no such or similar provision. It declares that the person receiving the highest number of votes for governor "shall be elected." It provides that the "*returns* of election for governor and lieutenant governor shall be made in such manner as shall be provided by law."

But the constitution does not declare who shall return finally the result of an election for governor. Where, then, shall such determination be had? We assert that it is not the exercise of executive power, because it is the duty of the executive to execute the laws and not to make them, or to interpret them, or to define rights under them. It is not the exercise of legislative power, because it is the province of the legislature to make laws and not to expound them or to execute them. If then, this duty has not been delegated to either the executive or legislative departments, it must of necessity belong to the judicial department, because these three make up the sum of the government.

Indeed counsel seemed to concede that such declaration is the exercise of judicial power, and to qualify them for that duty he has created the state canvassers into a court, and has called them the "court of state canvassers."

My answer to this assumption is two-fold. 1st, the legislature has no power to create any such court, and 2d, it has never attempted or intended to do so. The legislature cannot create any such court, because with the exception of the power to try im-

peachments, the constitution has vested the whole "judicial power of the state, both as to matters of law and equity" in "a supreme court, circuit courts, courts of probate, and in justices of the peace." *Const. art.* 7. *sec.* 2.

It is true that by the same section, power is given to the legislature to establish other courts, but only upon two conditions. They must be established "within the several counties," and they must be "inferior." It will not be contended that the court of state canvassers complies with either of these conditions, but if it complied with both, this court would clearly have the right to review its decisions, because to this court is given, not only general "appellate jurisdiction" but also a superintending control over inferior courts. *See Const. art.* 7, *sec.* 3.

If the legislature, then, may, in defiance of these constitutional provisions, create one new court, and vest in it final jurisdiction in any class of cases, it may create as many as it pleases, and so may strip this court and every other nominated in the constitution, of all jurisdiction whatever.

But I say, secondly, that the legislature never attempted or intended to create a court of the state canvassers, never intended they should possess the functions of a court, or exercise any judicial power whatever; it was only intended they should act ministerially, collect the returns from the different counties, to foot them up and to furnish to the several persons whom they judged to be elected, a certificate of such election, which certificate doubtless gives as good title to office as the governor or the president's patent does to land. Neither the certificate or the patent constitute title, but only evidence of title; if they are issued in conformity to the laws neither can be controlled, but if not, either can be. It is the duty of the canvassers not to establish rights like a court, but to furnish evidence of rights like a court commissioner. It is true the act defining the duties of the state canvassers, declares that upon examining the returns of votes, they shall "determine" who has been, by the greatest number of votes, elected governor. The respondent's counsel has laid great stress upon the use of that word "determine," and he insists that of itself, it gives final and conclusive jurisdiction over the subject. But certainly he is mistaken in this opinion. The word can have no such controlling force. In the very same

clause (*R. S. chap.* 6, *sec.* 74), the same tribunal is authorized to "determine" who has been elected treasurer, secretary of state and attorney-general. It was conceded by one of the counsel who argued the motion to dismiss, and not denied by any one, that such determinations were not final. The learned counsel who has argued this demurrer, now insists that the determinations of the canvassers are final upon each of those offices. But in the same clause the canvassers are authorized to "determine" who have been elected as representatives of the state in Congress. Surely no one will contend that such determination is final. By section 66 of the same chapter, the district canvassers are authorized to "determine" who have been elected members of the legislature, but each house can and does review such determinations. By sec. 53 of the same chapter, the same power is given to the county canvassers in reference to county officers, but such determinations have frequently been reviewed and revised both in this court and in many of the circuits of the state. I cannot conceive why an effect should be given to that word in one clause which it clearly does not have in others, nor even in all cases in the same clause.

But by the 73d section of the same chapter, the canvassers, when assembled, are directed "to make a statement" of the whole number of votes given for each of the state officers, from the governor to the state superintendent; "each of which statements shall show the names of the persons to whom such votes shall have been given, for either of the said offices, and the whole number of votes given to each; distinguishing the several districts and counties in which they were given." By the 74th section, they are required, upon such statement, to determine who have been elected to the several offices; and by the 76th section, the secretary of state is directed to certify such statement and determination, and to publish the same in a newspaper. To what end is the publication made if no fraud or error, which may be exposed in the statement, can be corrected? The opinions of this court are required to be published, and why? Because they are a part of the law of the land, and prescribe a rule of action for its citizens and a rule of decision for its courts in like cases.

These published "statements" can subserve no such purpose.

The people, to be sure, are interested to know which of the candidates for governor has received a majority of votes in the state, but they have no interest in knowing how many votes each candidate may have received in each of the counties of the state, except for the purpose of correcting errors in the statement. Suppose it to appear from such published statement, that the canvassers have made a mistake in footing up the returns, whereby A. has received the certificate to which B. was entitled. Will it be any satisfaction to the people of the state to see that error exposed when it cannot be corrected? Suppose the clerk of Grant returns that the whole vote of the county was given to one candidate, when it is known in every town of the county that the whole vote of that town was given to another. Suppose the true return from that county is lost, or purloined from the mails and a forged and false return is substituted and reaches the capitol, but which changes the result of the election in the state. Is it not worse than idle to inform the people of Grant of the fraud that has been committed upon them, and at the same time tell them they are without redress? The deliberations of the canvassers are *ex parte*, they act upon *ex parte* testimony, they have no means of distinguishing between genuine and false returns, and if, under such circumstances their determinations are to be held final, it is not easy to enumerate the frauds and impositions that might be practiced upon the people and the elective franchise. It would be hard enough to expose the people to such wrongs, but it would be cruel to require a statement of such wrongs to be published, taunting thus the people with their helplessness.

I have always thought that one of the most striking illustrations of fiendish malice I had ever witnessed, was that of Cruikshank, which pictures the ugliest of mortals, Daniel Quilp, sprawling upon the ground just out of the reach of a chained mastiff, kicking his heels, snapping his fingers, and taunting the enraged but helpless animal to bite him. But if the people of this state are to be bound down by the iron decision of the state canvassers, and are then to be told circumstantially by them—we have made the man of *our* choice governor, not the man of your choice, and this is the way we did it—we discriminated liberally in favor of our favorite, in all cases where different persons, each

claiming to be clerk of the same county, made returns of votes from different portions of the same county. We greatly improved upon the returns of some counties, upon the strength of private letters received by us—and better than all, only the day before we "finally determined" who was governor, we received a refreshing shower of returns from precincts not known to us, to the people or to the law, but which we presume to be genuine, because they are absolutely necessary to the result we had predicted weeks before they arrived, and because they are made upon paper exceedingly common about the capitol wherein we inhabit, which we know to be genuine paper; and because if they are not genuine, there is not a man living in the wilderness from which they purport to come, to impeach them: we have done it, and you cannot help yourselves. If such deeds can be done, and such language used by the doers, under sanction of law, then I think Cruikshank may improve his picture, by borrowing an idea from the legislature of Wisconsin.

But I conclude, that the law will sanction no such transactions. I believe the decisions of the state canvassers are not final, and were never intended to be; and that they were never intended to be clothed with any judicial authority. Their proceedings are not after the form of judicial proceedings—they meet whenever they please before the 15th of December succeeding a general election—they meet without notice to parties interested—they act upon such evidence as they have before them—the evidence is *ex parte*—in three days from the time they assemble, the board is dissolved, and its authority terminated. If they are dishonest, they have every opportunity to impose upon the people; if they are ever so honest, they cannot protect themselves from imposition.

An argument in support of the finality of the canvassers' certificate has been framed upon the 95th section of the 6th chapter. It has been claimed that that section confers upon the state canvassers a discretion not confided to any other canvassing board, and which, like all discretionary power, cannot be controlled by any other tribunal. My answer to that extraordinary position is, first, that the section gives no discretion, but only imposes a plain and imperative duty to the end "that the real will of the plurality may not be defeated"—that if discretion cannot be con-

trolled, duty can be enforced. And second, that if discretionary power is conferred by that section, it is conferred upon every canvassing board alike. That section is the last of eleven, under the head of miscellaneous provisions, which close the chapter. Each of the first nine sections refer expressly either to county or town officers, or canvassers. The last section is in these terms: "Whenever it shall satisfactorily appear that *any* person has received a plurality of the legal votes cast at *any* election, for *any* office, the canvassers shall give to such person a certificate of election," etc. If that is intended only for the guidance of the state canvassers, it was most unfortunately drawn, for the state canvassers never see the votes for county or town officers, and yet it is not so easy to believe that the legislature was more anxious to have the real will of the plurality observed in the choice of state officers, than of town and county officers. If, therefore, the state canvassers have a discretion under that clause, by reason of which their decisions are conclusive, both upon parties and people, then the decisions of county and town canvassers are equally conclusive; but that the latter *are* conclusive, has probably never been asserted by a single lawyer in the state, and is denied by the uniform practice of our courts.

I hardly need to enforce these views by reference to the office of the *quo warranto*, or to the motive of the proceeding by information. I will simply remark, that by our statute this proceeding is given to remove a person who shall "usurp, intrude into, or unlawfully hold or exercise *any* public office, civil or military, within this state." It is difficult to deny that the governor fills an office—it is so termed in the very first section of that article of our constitution, which treats of the executive power—it is so termed throughout that instrument, and throughout the body of our laws. The use of the information is not restricted to any particular grade of offices; it may be employed to remove an intruder into any office.

How unrestrictedly it has been employed for that purpose we may see by looking into any book of practice—judges, treasurers and secretaries of state, and almost every denomination of town and county officers have been removed by information, and no case has been found in the long catalogue in which the court has expressed the opinion advanced here by the respondent's

counsel, that the determination of a board of canvassers was a bar to the information.

I go further; I not only insist that such determination is no bar, but I assert that there is not a rational man in the state who has not a deeper interest in the event of this suit than he has in good government, who would have it so. I do not doubt that there are many men in the state who would rather have the respondent continued in office than to see the relator installed in it, but very few I think, who, to have him continued in office, would consent to establish as a rule of law the doctrine here contended for. Let us look for a moment at the consequences which must ensue from a rule holding the certificate of our canvassers final and conclusive. I concede that judges may be as corrupt as canvassers—I concede that canvassers may be as intelligent as courts; but even if judges were invariably corrupt, and canvassers were invariably honest, still these controversies had better be determined finally in courts than by canvassers, and for these reasons I have already indicated the course of procedure before the state canvassers. Suppose them to be perfectly honest, how are they to distinguish between true and false certificates, between forged and genuine returns. No witnesses are sworn before them, no parties are cited by them, no opportunity is given for a contest. The county clerks may be dishonest and send up false returns—genuine returns may be purloined from the mails or from the post-offices—returns may be forged and forwarded in their stead—clerks may be honest also, and yet err in footing up the vote of their counties (and they are only required to return the aggregate vote of their county for each candidate), returns may be sent up which the county canvassers never saw. How, I ask, is even honesty in the state board to guard against all these opportunities for deception, imposition and mistake? And yet, within three days after they first assemble, they are required to determine the right to all the most important offices in the state—after three days have expired their powers are terminated; they cannot correct their own decision, no matter how glaring an error may have been committed, or how gross a fraud may have been perpetrated, they themselves can afford no help. It must be acknowledged that if only in the state canvassers we have hope, we are of all states the most miserable.

But on the other hand suppose judges are corrupt—yet there are lengths to which even corruption cannot go in the open day, and courts must work constantly in the open light and exposed to the public gaze. Moreover they are governed by established and well known forms of procedure. All parties in interest are cited before them and may if they choose, have counsel to assist them. The highest court in the state cannot determine the title to an old kettle, without the claimants having an opportunity to be heard—all the evidence upon either side is exposed to the criticism of the opposite side—time is given to dispute every allegation of fact. Counsel are heard upon every question of law, and if the facts are controverted, the judges cannot settle them, but they are referred to the determination of twelve impartial, disinterested, unbiased men. Let any sensible man say for himself which of these tribunals is the more likely to elicit the truth of a case or to mete out justice to contending parties! If, however, the judges and the canvassers are equally honest or equally corrupt, the odds in favor of the former are greatly increased; and if again the judges should happen to be honest and the canvassers dishonest, as is possible they may be—the chances for justice with the latter would bear no comparison with the former.

May it please the court: I have professed to believe that the questions stated during the progress of this case have been of a light and trivial nature, not at all difficult to solve. I have been sincere in such professions. I do not now doubt of the decision of this court. But I am conscious I have pressed the argument with something more of earnestness than I have exhibited on any former occasion.

That has not happened, because I consider the fate of this demurrer more doubtful than I did the motion argued upon another occasion; but I have been incited perhaps to a little more show of zeal by the manifestation from the other side. Still, I have not seen fit to point the court to the possible consequences of its judgment. Still, I say, it may or may not be executed. The only judgment to be pronounced is the one which law and justice dictate, not that which the executive arm can most easily execute.

I have somewhere read the story of a boy whose sublime heroism filled me with admiration. I cannot tell it; but at the com-

mencement of a naval engagement, his father, who commanded the ship on which the boy served, placed him at the helm, with directions not to leave his post until ordered by himself. During the battle the father fell, unseen by his son, and the ship took fire. As the flames spread over the vessel, and spar and yard went hissing into the sea, the mariners fled from it, but the hero helmsman stood at his post; the order for his release had not been received. Unbeknown to him, the voice that should have issued that order was hushed forever, and the last that was seen of that ship as she plunged beneath the wave was the form of that hero boy going to his death as promptly as he would go to his manual exercise, at the word of command. The command of the constitution to the judiciary is, to stand fast at the post prescribed to it. No matter what confusion prevails elsewhere, the tribunals of justice must stand at the helm. I am a lawyer. I have an honest pride in the great names which have adorned the bar, and almost glorified the bench; and if the time shall ever come—which may God forbid—when discontent, violence and anarchy shall succeed to law and order—when the people and public officers shall depart from the constitution and desert the ship of state, I have a hope that the last glimpse that will be caught of organized government will be the judiciary—that courts may be seen as long as any vestige of a state shall remain, still ready to direct—still speaking the law with an even mind, and dispensing justice with an even hand, sitting serene and unmoved, above the influence of fear and of faction, still abiding by that motto so peculiarly their own—*fiat justitia, ruat cœlum.*

*By the Court,* WHITON, C. J. The information in this case is in the usual form. It avers that there was an intrusion into, and a usurpation of the office of governor; that the respondent exercises the duties of the office without right, and also sets up the right of the relator to hold the office. In point of form, this information is presumed to be unobjectionable, as no objections have been raised before the expiration of the time fixed for the respondent to plead. A motion was made to dismiss the proceedings, because the court had no jurisdiction to consider the matter. The court decided that it had jurisdiction, because the governor is an officer, although of a high character, still undoubt-

edly an officer. It was stated, in the opinion of the court, that by the filing of the motion, the facts in the information were admitted. Although it was stated in the opinion as true, still the court did not consider it necessary in order that they should have jurisdiction. When the motion was overruled, the defendant was required to answer, and has put in his plea.

There is no doubt of the character of this plea. The counsel on both sides agree that this is a plea to the jurisdiction of the court. It is designed to oust the court of jurisdiction. The plea sets up the fact that at a canvass on the 15th of December, the state canvassers declared that the respondent was elected governor. The argument is, that although the court might have jurisdiction in the case of a mere intruder, it would not have in the case made by the plea.

We have stated before, and we repeat, that we shall decide questions no farther than they are raised by pleas, or in the proper manner to put upon record. The question of the finality of the canvass, the validity of the title of the respondent under the certificate which is presented by the plea, we shall not decide. We have all come to the conclusion, that though the matter of the plea might be good as a plea in bar, it is not good as a plea to the jurisdiction. The case is likened to a case of privilege, and therefore the governor should not be held to answer in this shape. We know that a legislator, during the session, and for some specified time previous and after, cannot be arrested for debt. This does not seem analogous. We have already decided that we have jurisdiction of the case. If the governor should plead his certificate of election in bar, and maintain that plea, he could not be ousted; but the court must have jurisdiction to pass upon that plea.

For these reasons the demurrer is sustained, and the respondent is required to answer over.

JUSTICE SMITH.—It seems to me very clear, that the matter here pleaded does not go to the jurisdiction of the court. The facts stated in the plea are, that a canvass was had, and that a certificate of election was awarded to the respondent. Suppose a judge of the Supreme or Circuit Court should be impeached, and thereby disqualified for holding any office in the state; the people,

notwithstanding this, elect him governor; the canvassers canvass the votes; they having no power to try and determine his qualifications, but finding he has a plurality of the votes cast, declare him elected, and the usual certificate is awarded. The constitution declares that he, and such as he, shall not be governor. Is this certificate to override the mandates of the constitution, and preclude any inquiry into these constitutional disabilities? Is he to hold the office by virtue of the certificate, notwithstanding, and in defiance of, the inhibitions of the constitution? That instrument has provided the means for its own preservation. It is vain to say, that any person can hold the office of governor if he is declared elected, and that the constitution has provided no means by which its inhibitory provisions shall be executed—that it contains no sustaining, self-preserving vitality. The question of the right to hold office must often become a judicial question, and the constitution provides for this.

The provisions relative to the writ of *quo warranto* unequivocally show that the framers of the constitution conceived that such questions might occur in such manner and form as to require a judicial investigation by means of that writ, and that whenever they did so arise they should be judicially determined.

It has been said that there are three departments of the government. This may be true. But there are not three governments, nor three parts of the government deriving power from separate sources. They all derive power from the same source. When the executive department acts, the whole government, and not a part of it, operates through that department—the state with all its sovereign power is in motion. Just so with the legislative and judicial departments. Though the executive power is vested in a governor, it is not vested in any individual who may by accident, mistake or fraud obtain possession of the office. The constitution declares that the governor shall have certain qualifications. These are a *sine qua non* to his being governor. It is idle to say that any person, if elected, may hold the office, whether or not he has these qualifications; that if he gets a certificate of election that is conclusive, and that there is no power to correct any wrong, accident, mistake or fraud, but the power of the sword. If this be so, then these prescriptions and requi-

sitions of the constitution are a mere idle collection of words, the annunciation of which is *vox et prœterea nihil.*

It is said that we are exercising a dangerous and delicate power in taking jurisdiction of this question. Delicate I admit and feel it to be, but not dangerous. It is delicate, because it is a delicate duty to ascertain the extent of one's own power. I dare not exercise this or any other judicial power unless it is clearly granted by the constitution, nor do I dare refuse to exercise any of the powers and duties assigned me by the constitution and the laws, when properly called upon so to do.

The matter of the plea may be proper in bar, but in form it is to the jurisdiction, and must hence be overruled.

The respondent was then ruled to plead over within four days.

*Mr. Carpenter*, on the day fixed by the rule for the respondent to plead, addressed the court after referring to the case, as follows:

"Mr. Arnold, Mr. Orton and myself appeared at your bar at the commencement of these proceedings, as the counsel for Governor Barstow, to object to your jurisdiction. We have presented the objection in all the forms known to the law, and the court have asserted and re-asserted its determination to proceed with the cause and hold and exercise full and final jurisdiction over it. We can take no further step without conceding the jurisdiction of the court, and we have so informed the governor; and in reply he has directed me to withdraw from the cause and to present to the court a communication from him as governor of the state which I now present to the court.

" For Mr. Arnold, Mr. Orton and myself, I now formally withdraw from the cause, as counsel, and terminate all connection with it. We leave this cause without regrets for the past—without fears for the future."

On retiring Mr. C. handed up to the court the following communication from the respondent:

" MADISON, *March 8th,* 1856.

" *To the Honorable, the Supreme Court of the State of Wisconsin:*

" It is of course known to you, that on the 17th day of January last, I was summoned by a writ issued out of your honor-

able court, to appear in said court and show by what warrant I hold and exercise the office of governor of the state of Wisconsin. ·

"At that time, I was firmly of opinion that the court had no jurisdiction, whatever, to entertain such a proceeding against the person in whom the constitution had vested the executive power of the state, and then discharging the duties of that department of the government, which, by the nature and necessity of the government itself, is co-ordinate, co-equal, and independent with your own. But that no seeming disrespect to your department might be chargeable to the executive, I at once employed able legal counsel to examine the question of your jurisdiction in the premises, and to take such steps as they might deem advisable to fully present the question, and urge the legal and constitutional reasons why the court should dismiss the proceedings.

"This has been done in all forms known to the law, without consenting to a jurisdiction, which, if exercised by the court, it must be obvious to any impartial mind, would at once destroy the harmony and balance of the three sovereign departments of the state government, and concentrate into the judiciary, an imperial power which would be the end of republican government in any form. The canvass and determination of the vote of the state for governor, at the last general election, by the board of state canvassers, the tribunal in which the legislature have vested the fullest judicial power and discretion in the matter, their decision and the certificate declaring me duly elected as the governor of the state, together with my oath of office, have been twice presented and spread upon the records of the court, first, by stipulation and consent, and afterwards by plea, to inform the court of my official character as governor, by the same evidence by which the Supreme Court itself is known to the other departments to be in legal existence, and the present incumbents of the bench to be the judges.

"It has been properly urged to the court, that these public records, and the action of the constituted authorities of the state, are within the judicial knowledge of the court, without plea or proof; but to leave no doubt upon the subject, they have thus been twice submitted to the court, authenticated by the great seal of the state.

"This was all I could do without compromising the integrity and independence of the executive department, and submitting to a transfer of the sovereign powers of that department to whomsoever the judiciary might deem the proper or the favorite person to administer it.

"Whatever my political opponents may have charged as to the frauds in the township and county returns of the vote of the state, to meet the emergencies, and accomplish the ends of a defeated party, the law at least presumes, and the court ought to presume, that all the officers of the state have done their duty, until the contrary appears. How far the court have been governed by this obvious principle of law in these proceedings, or yielded to political exigencies, I shall leave those to judge who have had personal cognizance of their peculiar decisions and rulings in the progress of the case.

"It is enough for me to know, and say, that I have no knowledge of any unfairness, much less of any frauds in the vote or canvass by which I have been declared the elected governor of the state; and I am clearly satisfied that I was elected by an unquestionable majority. If I believed the constitution had created any tribunal to revise the proceedings of the state canvassers, I should cheerfully meet any issues of law or fact which might arise in the fullest investigation of the election, from the decision of the state canvassers to the real vote and will of every elector in the state.

"But believing as I do, that no such tribunal does, or, without doing violence to the government, could exist, I most respectfully decline submitting my official rights and powers to the determination of a co-ordinate department, usurping a jurisdiction unprecedented in the history of our country, without legal or constitutional warrant, and fraught with the greatest danger to our institutions. I therefore respectfully, but peremptorily, and officially, protest against any further interference with the department under my charge as the governor of the state, on the part of the court, either by attempting to transfer its powers to another, or direct the course of executive action.

"Deeply impressed with the responsibilities under which I act, and of the solemnity of the oath which I have taken to support the constitution of the state, to no infraction of which can I sub-

mit or consent, and believing that the Supreme Court will best subserve the interest of the people of the state, and answer the constitutional purpose of its creation, by discharging its legitimate functions without arrogating to itself the high prerogative of transferring the sovereign powers of the government to partisan claimants, I hereby take my leave of the court and of these unwarrantable proceedings, in which the court seem but too willing to receive my full and unreserved submission; and I shall deem it my imperative duty to repel, with all of the force vested in this department, any infringement upon the rights and powers which 1 exercise under the constitution.

.(Signed)    " WILLIAM A. BARSTOW,
*Governor of the State of Wisconsin.*"

Whereupon the counsel for the relator moved for judgment upon the default of the respondent.

The attorney-general desired some time to consider what should be done on the part of the people, and the further hearing was postponed until March 18th, on which day he appeared, and said; he "wished to call attention to the motion made by the counsel of Bashford, in the case of the *Attorney-General ex rel. Bashford vs. Barstow,* for a final judgment in favor of the relator. That motion was submitted without any consultation with the attorney-general, and I will now present the court with a paper which I desire should be regarded as a motion in the case. The paper is as follows :"

" *The State of Wisconsin, on the relation of Coles Bashford, vs. William A. Barstow. In Supreme Court. Information in nature of a quo warranto.*—The attorney-general, in behalf of the people of the state of Wisconsin, has heretofore submitted to the court his views in regard to the position which he occupies in this case. He has respectfully stated, that as between the relator and defendant, a question has been raised on the claim of Coles Bashford to the office of governor of the state of Wisconsin, against William A. Barstow, who is alleged to have usurped the said office; yet the whole people of the state having an abiding interest in the case, and in such question, the attorney-general considered that his official duty could not be correctly discharged without having all the facts in the case legally spread before the court, in order that the claim of the relator should be legally

established, the usurpation of office of the defendant made manifest, and the great question of right as between the two claimants of the office of governor of the state, be fully examined into, and the result of such examination be legally ascertained and determined.

"The proceedings which have thus far been had in this case, have not yet produced as matter of record any proof of usurpation of office on the the part of the defendant, other than such inference as may be drawn from the absence of any plea on his part which has been submitted to the court, to the information filed against him; nor has the relator as yet produced as matter of record any proof of claim on his part to the office in question, other than the allegations contained in the information. The great, and to the people of the state, the all important question of, "Who is the rightful governor of the state?" has not yet in such manner been inquired into, as the only one by which the attorney-general considers that the rights of the people of the state may be protected, and their just expectations satisfied.

"The court having asserted its jurisdiction over this case, may, according to legal practice, in the absence of a plea on the part of the defendant, enter against him a judgment of default; although the judgment might properly be entered at first as interlocutory, yet by the ruling of the court it may become final; such final judgment may be that of ouster as against the defendant, who has refused to plead; but the attorney-general submits to the court that such judgment can extend no farther; it cannot be rendered to an extent to place the relator in the office which he merely claims, when there is a total absence of any proof whatsoever to substantiate his claim, beyond the averment set forth by himself in the information filed in this case.

"In case such a result should flow from the judgment which may be rendered in this information, the attorney-general considers that the rights of the people of the state of Wisconsin would receive an outrage, to the perpetration of which he cannot, even by implication, consent, and against which he respectfully, yet most earnestly, in the name of the people of the state of Wisconsin, whom he here represents, enters his solemn protest, and by virtue of his authority as attorney-general, does hereby dismiss this information, and says to the court here, that

he will no more prosecute the same in the name of the state of Wisconsin.

"In taking this course of action, the attorney-general has no hesitation, no reluctance; up to this period in the progress of this case, all motions, pleadings and rulings of the court, have been made, entered and decided on, as between the relator and respondent, while the interests of the people of the state in the important questions involved in the information, have never in any manner or degree, been considered or inquired into; the name of the state of Wisconsin has been used for the relator, in the information, as by all legal forms in cases of *quo warranto*, is known to the practice of courts and the laws of the land; beyond this, the attorney-general has taken no part in the pleadings; he has been, openly before the court, denied by the relator to be of his counsel, and in the very first stage of these proceedings an effort was made by the counsel of the relator to exclude the attorney-general from having any participation whatsoever in conducting this case, but such effort was unsuccessful.

"The attorney-general respectfully asks the court that this written dismissal may be filed among the records of this information. "WILLIAM R. SMITH,

"*Attorney-General of the State of Wisconsin.*
"*Madison, March 15th, 1856.*"

DECEMBER TERM, 1855—IN SUPREME COURT.

"*State of Wisconsin, on the relation of Coles Bashford vs. William A. Barstow, on information in the nature of a quo warranto.*—And now, to wit: this 10th day of March, 1856, William R. Smith, attorney-general of the state of Wisconsin, comes into court and gives the court here to understand that he will no farther prosecute this suit, in the name of the state of Wisconsin, against William A. Barstow, and the above case is hereby discontinued and dismissed, so far as the state of Wisconsin is concerned.

"WILLIAM R. SMITH,
"*Attorney-General of State of Wisconsin.*
"To LAFAYETTE KELLOGG, Esq.,
"*Clerk of Supreme Court of State of Wisconsin.*"

I ask that this document be placed upon the records of the court.

The counsel for the relator protested against the right or power of the attorney-general to dismiss or discontinue the case to the prejudice of the rights of the relator; that whatever might be his power or discretion to dismiss the proceeding so far as the people were concerned, he should not be permitted to turn the relator out of court without his consent.

*March* 19. The court proceeded to the decision of the motion of the relator's counsel for judgment of ouster against the respondent and in favor of the relator, as well as upon the motion of the attorney-general to dismiss the suit.

*By the Court*, COLE, J. Before passing upon the motion which has been made for a judgment of ouster against the respondent and establishing the right of the relator to the office mentioned in the information filed in the cause; and also upon the motion of the attorney-general, made yesterday, to dismiss all further proceedings herein; before, I say, passing upon these motions, I deem it proper to review the proceedings thus far had, and with as much brevity as possible, place upon record my reasons for thinking that the court has properly entertained jurisdiction of the cause, and has the power to give a final judgment. I do not propose entering upon an extended discussion of many of the questions raised before us, and shall refrain from elaborating any view taken by the court in the decisions already given. Some repetition may unavoidably occur, but no more, I hope, than necessary to make my observations clear and intelligible.

On the 15th day of January, 1856, the attorney-general, the law officer of the state, filed in this court an information in the nature of a writ of *quo warranto* upon the relation of Coles Bashford, giving the court to understand and be informed that the respondent for the space of one day and upwards then last past, had held, used and exercised, and still did hold, use and exercise the office of governor of the state of Wisconsin without any legal election, appointment, warrant or authority therefor; and that at a general election of state officers of said state in the several counties thereof, on the 6th day of November, 1855, the relator was duly elected and chosen governor of the state aforesaid, and that the said relator hath ever since the 7th day of January, 1856, and still is, rightfully entitled to hold, use and exer-

.cise the said office; which said office of governor aforesaid the respondent. on the said 7th day of January, usurped, intruded into and unlawfully held and exercised, and still doth usurp, intrude into and unlawfully hold and exercise, in contempt of the people of this state, and to their great damage and prejudice; and prayed for due process of law against the respondent in this behalf to be made, to answer the said people by what warrant he claims to hold, use, exercise and enjoy the office of governor of this state.

In compliance with the prayer of this information, a summons in due form was issued, returnable on the 5th day of February, 1856, which summons was returned served according to law.

On the 22d of January, the relator, by his counsel, filed a motion to discontinue the information filed by the attorney-general, and for leave to file in lieu thereof, an information in the nature of a *quo warranto* upon his own relation, different from the one already filed, and for liberty to prosecute and control the same, by himself or counsel as he should be advised; and for such other or further order as the court should deem proper in the premises.

This application was based upon two grounds: 1st. That the attorney general having refused to file a special information prepared by the relator, but filing a different one, the relator's right to file one on his own relation and prosecute it to final judgment became perfect under the act of 1855, chap. —; and 2d. An alleged hostility or unfriendliness upon the part of the attorney-general to the interests, rights and success of the relator. The motion was resisted on argument by the attorney-general on behalf of the state, and by the counsel for the respondent, who that day entered his appearance in the cause. The motion was overruled; the court holding upon the first point that the attorney-general had substantially complied with the act of 1855, in filing an information adequate to all the purposes of the suit; and upon the second point, that the attorney-general might control the proceeding so long as he prosecuted with fidelity; but if he should act in bad faith towards the relator, or attempt to fritter away his rights, the court would interfere for the protection of them.

On the 25th a rule was entered by the attorney-general, re-- quiring the respondent to plead to the information in such time as the court should direct. The court required the respondent to plead on or before the 5th of February ensuing.

On the 2d of February, the counsel for the respondent filed their motion to quash the summons issued herein, and to dismiss the same, and all proceedings, for the reason that the court had no jurisdiction in the premises. By order of the court, the argument of this latter motion came on for argument on the 11th of February, and the counsel for the respondent then endeavored, with great zeal and earnestness, to sustain their motion, by insisting upon and establishing the position, that even where there is an usurpation of the office of governor of this state, by a person not lawfully entitled to exercise its duties, this court has no constitutional power to entertain a proceeding for his removal, but that the person thus intruding could only be reached and removed by revolutionary force. This doctrine appeared to me bold and startling when advanced, and does still, for the reason, probably, that I had supposed we were living under a constitutional government, and that there was, or should be, under such a government, a peaceable redress for a political evil of this nature. The court thought the position an unsound one, and overruled the motion, deciding the principle, that where there was an intrusion without color of right, even into the office of governor of this state, it had the power of entertaining a proceeding to inquire into the right of the person thus holding the office, and to remove the intruder.

On the 25th of February, the respondent filed a plea in abatement to the jurisdiction of the court, setting forth in said plea, that by the laws of the state of Wisconsin, regulating the manner of conducting general elections, and the canvass of votes thereat; applicable to the election stated in said information, it became and was the duty of the board of state canvassers, upon a statement of the whole number of the votes given at said election, and for whom given for the said office of governor to be by them made, and certified to be correct, and subscribed by their names, to determine what person was, by the greatest number of votes, duly elected to said office, and to make and subscribe on such statement, a certificate of such determination, and deliver the same

to the secretary of state, and thereupon, it became and was the duty of the said secretary of state, without delay, to make out and transmit to the person thereby declared to be elected to the office of governor, a certificate of his election, certified by him under his seal of office; that in fact Alexander T. Gray, Secretary of State, Edward H. Jansen, State Treasurer, and George B. Smith, Attorney-General, who then constituted the said board of state canvassers, met together at the office of the secretary of state in the capitol, at Madison, on the 15th day of December, A. D. 1855, the day duly appointed pursuant to law for that purpose, and did proceed according to law to make a statement of the whole number of votes given at said election for the said office of governor, showing the names-of the persons to whom such votes were given for said office, and the whole number given to each one, distinguishing the several counties in which they were given, and did certify such statement to be correct, and subscribe their names thereto, and that they did thereupon determine and certify that by the greatest number of votes polled at said election, the respondent was duly elected to said office of governor for the term of two years commencing on the first Monday in January, 1856, and that they did, in pursuance of law, make and subscribe on such statement, a certificate of such determination in due form of law, and did duly deliver the same to the secretary of state; and that thereupon, in pursuance of law, the said secretary of state did make out and transmit to said respondent, a certificate of his election to the said office of governor, of said state for the term aforesaid, in due form of law, and duly certified by him under his seal of office. And that said certificate was duly received by said respondent, who thereupon duly qualified himself, by taking the customary and proper oath of office as such governor, and entered into possession of said office as he lawfully might; duly certified copies of which said statement and certificates authenticated under the great seal of the state, the said respondent here in court produces and shows to the court. Certified copies (under the seal of the secretary of state) of the statement made by the board of state canvassers, of the official oath of the respondent, and of the certificate of election, accompanied this plea as exhibits. The plea was demurred to, several causes of demurrer being assigned. The demurrer

was sustained upon the ground that the matters, contained in the plea, if good at all, should be pleaded in bar to the action, and did not go to the jurisdiction of the court. Consequently judgment of *respondeas ouster* was given on the demurrer, and the respondent had four days, until the 8th instant, to file his plea in bar. He has purposely made default. On the 11th, the counsel for the relator moved for final judgment. While this motion for judgment was under advisement, the attorney-general, on the 8th instant, filed a motion to discontinue the proceeding, and this motion is resisted by the relator. I have been thus minute in giving a full history of the cause; have stated the motions made therein as it progressed, and given the rulings of the court, in order that we might have the whole case fairly before us. We now see *what has been done*, and we now naturally arrive at the important question involved in the case, that is, whether the court in entertaining this proceeding has usurped a power not given to it by the constitution and laws of the state? If it has, the path of duty is plain. It should go no further, but retrace its steps, and cease to make encroachment upon the other powers of the government. But, if in all this matter it has exercised a function delegated to it by the constitution; if it has proceeded in this, as in all other causes which come before it, merely in the discharge of its appropriate duty of *determining and settling* the rights of parties, and not *creating* these rights, then it must go forward to judgment, however unpleasant and delicate a duty that may be, and regardless of any, and all consequences, that may result from its constitutional action. All that we can know is our duty. We cannot look beyond that. Here we must firmly stand to our posts of public trust, until the constitution fall about us in ruins. And it may not be altogether inappropriate, after what has fallen from counsel in court, and imputations made *elsewhere*, for me to say that I enter upon this discussion with all the candor and impartiality I am able to exercise, and with the directness that the gravity of the subject demands. I am deeply sensible of all my responsibility at this moment. I am unconscious of any partisan bias or personal prejudice that could warp my judgment, or cloud my understanding, and least of all, have I any desire to extend

Attorney-General ex rel. vs. Barstow.

the jurisdiction of this court one hair beyond its constitutional limits.

It could not, of course, be expected, that in the examination of a question of constitutional law, we should shut out of view entirely the nature and origin of our government. I propose to make but one remark upon it, in passing, for it seems to me that if our conceptions of our government be erroneous, our whole reasonings upon it cannot fail to be confused and unsound. I suppose we are living under a popular government, one which originated with the people—the rightful source of all political power. In the exercise of a natural right, the people established our present constitution, delegating to it just so much power, and distributing it among the departments in just such a manner as they thought necessary to insure domestic tranquillity and promote the general welfare. And as the people established the constitution, so they can alter, amend or destroy it, and frame a new one whenever they may deem it necessary and proper. A particular mode of effecting such alterations has been agreed upon in the constitution, and it would likely be found most convenient to adhere to it. And the power which the people have not delegated to this government, or to the Federal government, they have reserved to themselves. Whether it is philosophically correct to say, that in this country the people are sovereign, I will not stop to inquire, because it is not very material to the purpose. Some of the most accurate, eminent and discriminating writers upon our political institutions, say that sovereignty resides with the people. And I think, if it is to be found at all in our country, it will truly be found to be in the people. But I do not think that sovereignty is to be found in the departments of the government, as contended upon this argument. That is perfectly incomprehensible to my mind. A department of this government is nothing but a division of the powers of the government, nothing more, as I understand it. But sovereignty is not in one of these departments, nor in all of them.

There is another feature of our government, and that a striking and distinguishing one, which must not be overlooked. This is not only a popular government, but it is a representative government—one where the officers are but the *agents*, and not the *rulers*, of the people; one where no man is so high as to be above

.the constitution,. and no one so low as to be beneath its pro-
tection.

Such,. briefly, is my view of this government; its nature, origin
and character.   And such I had supposed, until this discussion,.
was the general and almost universal view of it;. and that a man
who should argue upon these propositions, would argue without
an opponent, for the reason, that here they are considered as
political axioms.   But to the point before the court.

It will be borne in mind, that this court decided in the case of
the *Attorney-General vs. Levi Blossom* (1 *Wis. R.* 317), that it had
original jurisdiction of the writ of *quo warranto*, by virtue of
section 3, article 7, of the constitution of this state.   The correct-
ness of this decision stands unquestioned.   It is also apparent
that the legislature, in chapter 126, R. S., have substituted an
information in the nature of a writ of *quo warranto*, for the former
practice, and that this proceeding is under that statute.   It will
not be denied that it was perfectly competent for the legislature
to prescribe a practice more prompt and comprehensive than
the old one, if they deemed that the objects of the writ of *quo
warranto* would be best attained thereby.   Section 1 of this
statute provides that " an information in the nature of *quo war-
ranto* may be filed in the Supreme Court, either in term time or
vacation, by the attorney-general, against individuals,. upon his
own relation, or upon the relation of any private party, and
without applying to such court for leave,. in either of the follow-
ing cases :

" 1st. When any person shall usurp, intrude into, or unlaw-
fully hold or exercise any public office, civil or military, or any
franchise within this state, or any office in any corporation cre-
ated by the authority of the state."   The subsequent sections of
the statute make ample provisions by. which the proceeding can
be prosecuted to judgment, and authorize the court to pass as
well upon the right of the respondent to hold the office, as upon
the right of the person setting up his claim thereto.   The scope
and object of the statute evidently is, to provide a method by
which contestants to office could try their respective rights.
Then is the office of governor, which is now in controversy, a
public and civil office within the meaning of this statute?   We
have already decided that it was, and the chief justice has stated

the grounds of that opinion. The reasons for considering the office of governor a civil office, under the constitution and laws of the state, and nothing more than a civil office of high dignity and trust, appear to my mind perfectly irresistible and conclusive. But I do not deem it necessary to go over with them. I am willing to rest the question upon the argument contained in the opinion to which I have referred, and which is before the people of the state. The people are as capable of understanding the merits of the objection, that the office of governor is not a civil office under the constitution, and within the meaning of this statute, as professional men. I do not think that the word "office" is used either in the constitution or in this statute in a restricted sense; but in its most popular and general acceptance. It applies to any place which imposes upon him who occupies it the performance of duties of a public nature.

I anticipate an objection that will be made to this liberal construction of the statute. It will be said that the place of a member of the legislature is an "office," while confessedly the court has no right under this statute, to try the claims of contestants to a seat in the legislature. Obviously not; and for the reason that the constitution expressly declares (*sec. 7, art. 4*), that "each house shall be the judge of the elections, returns and qualifications of its own members." It is a familiar rule of construction, that a general grant of power, or a general statute, may be controlled in a particular case by a special grant. And this must be so, in order to give effect to the whole instrument, and render it consistent with itself. To my mind this is a full and satisfactory answer to the whole objection. And here, it seems to me, we might safely stop. For if an argument could not be drawn from any other source in favor of the jurisdiction of this court over this proceeding, it might be rested upon section 3, article 7 of the constitution, and chapter 126 of the Revised Statutes; and it would stand upon impregnable grounds. Concede that this court has original jurisdiction of the writ of *quo warranto* by the constitution—concede that chapter 126, under which this proceeding is had, is constitutional; and all the rest follows as irresistibly as the law of reason. There is no escape from it. But the argument in favor of the jurisdiction of this

court is not exhausted. And let us look at this matter in another light.

Section 2, article 7 of the constitution reads as follows: "The judicial power of this state, both as to matters of law and equity, shall be vested in a supreme court, circuit courts, courts of probate, and in justices of the peace. The legislature may also vest such jurisdiction as shall be deemed necessary in municipal courts, and shall have power to establish inferior courts, in the several counties, with limited civil and criminal jurisdiction, providing," &c.

Here, it will be observed, by words the most apt, in language most clear, comprehensive and explicit, that the judicial power of the state is vested in certain courts. Of course, this grant of power is to be taken in connection with the exceptions elsewhere contained in the constitution. The Senate is made the court for the trial of impeachments, *sec.* 1, *art.* 7. And there may be some other exceptions, though none such occur to my mind at this moment. But otherwise, this entire judicial power is vested in the courts, without limitation or restriction. Whether this was a wise grant of power, is not now open for controversy. Were we framing a constitution with new powers, instead of administering one of clearly defined powers, then the inquiry would be pertinent; but it is not now. We then might inquire whether such an extensive grant of judicial power should be given to the courts of the state. But as the people have seen proper to delegate it to the courts, they must exercise it when called upon or set in motion, or prove recreant to the duty imposed upon them by the constitution. I then ask, is the determination of the rights of persons claiming to hold and exercise the office of governor of this state, the proper and legitimate exercise of judicial power? Is such a matter a proper subject for judicial inquiry and investigation? If nay, why not? Is it because the controversy is about an office of high dignity and importance? But does the high character of the office render the right of him to hold it less valuable, or less an object of the protection of the law? Courts of justice inquire into and settle the conflicting claims of persons to the office of constable, or justice of the peace, a sheriff of the county, and other subordinate officers.

The rights of those officers are not considered beneath the pro-

tection of the court. And it would seem that the right to the high office of governor should not be. That is the personal aspect of the question. How is it upon the ground of public policy? The public interests are most deeply involved in the matter. For there does seem to me to be a greater political necessity for some constitutional power for removing an intruder from the office of governor than there is for removing an intruder from an office of inconsiderable importance. In the latter case the public welfare may not be seriously endangered. The existence and tranquillity of the state may not be imperiled. But if a man can usurp the executive chair, and there be no power to remove him, constitutional government is at an end. There is no use in trying to disguise the matter. For if a man can usurp the chair of the executive department for a day, and cannot be reached, he can continue his power at will. We all know that the office of governor is one of grave responsibility. The proper discharge of its duties requires no common degree of talents, of sagacity and moral integrity. The dignity, the peace, the honor of the state are often committed to the prudence of the governor. He is to see that the laws of the state shall be faithfully executed. So that it does not appear to me that, whether the controversy is regarded as involving a private right, which is, if possible, to be protected; or if it is regarded in a broader and more general aspect, as involving the interests of the state, a writ of *quo war-ranto* ought to lie to inquire by what *warrant* a person acted as governor.

The office was evidently regarded as one of great consideration by the framers of the constitution. Hence, we find that certain qualifications are necessary to entitle one to be eligible to it. He must be a citizen of the United States, and a qualified elector of this state, *sec*. 2, *art*. 5. But if the office is an inviolable one, and there is no power in the state competent to inquire into the right of a person to hold it, what is the value of these constitutional safeguards? Are they parchment guaranties without efficiency and without value? Suppose a person not possessing the qualifications, being neither a citizen of the United States, or an elector of this state, receives votes for the office of governor, claims to be elected, takes and subscribes the oath of office, gets possession of the records and papers belonging to it, is there

no redress? Is there no power competent to inquire into his right to hold the office, and protect the constitution from invasion?

Take another case. Suppose the governor should be impeached before the court of impeachment, for corrupt conduct in office and for crimes and misdemeanors, and should be found guilty by the court. The constitution says, that such a judgment shall not only be a disqualification forever after holding any office of honor, profit or trust, under the state, but shall be a sufficient cause of removal the instant the judgment is rendered. That is the spirit if not the exact letter of the provision. Still the person thus disqualified, insists upon acting as governor. Is there no way that his right so to act can be inquired into and a judgment of ouster given? It may be said that these are improbable cases, or very extreme ones. But are they so improbable, or so remote as never to happen? And if they should happen, where is the remedy? What power of the state can give relief? Are we remediless? Instances of this kind might be multiplied to any extent. I put them, because they were many of them stated during the progress of the argument, and they are cases, too, easily understood. And the question returns upon us, where is the protection of the people against them? Counsel seem to feel the necessity that there should be some remedy for them, and they significantly hinted where that remedy was to be found. It was to be found in a revolution. Ah! but that is not a constitutional remedy. It is one above the constitution. But we are now considering what means the constitution has provided for its own preservation. For if it has not those means, ample, adequate and equal to the political emergency of such, and other like cases, it is hardly worth spending any breath upon.

Again; section 3, article 5 of the constitution reads as follows: "The governor and lieutenant governor shall be elected by the qualified electors of the state, at the times and places of choosing members of the legislature. The persons respectively having the highest number of votes for governor and lieutenant governor shall be elected." A contest arises between two citizens of the state, who were candidates for the office, as to who has received the highest number of votes; for whoever it may be, who has received the highest number of votes, unless constitutionally ineligible, must be governor. So the constitution declares. It cannot be said that this is an imaginary or

improbable case. It has already happened, and in this popular government, is quite as likely to happen again. Now, in what forum is this to be settled? Where, and by whom is it to be determined, as to who received the highest number of votes? By the legislative, by the executive, or by the judicial department of the government? Perhaps it will be said that there is created by statute, a competent tribunal to settle and determine all such questions, to wit: the board of state canvassers. But can any one point to a provision in chap. 6 of the Rev. Stat., and that is the only law we have upon the subject of canvassing votes for state officers, which by the remotest implication, in case of a contest for a state office, authorizes the board of state canvassers to make up an issue, impannel a jury, summon witnesses, take proof as to alleged frauds, errors or mistakes on the part of the town and county board of canvassers, and judicially determine who, under the constitution, is entitled to the office? No such provision can be found. The legislature never gave them any such power, and it does not appertain to their office under the constitution. Whether it would have been competent for the legislature—under the constitution which delegates all of the judicial power of the state to the courts of the state—to give to the board of state canvassers judicial authority to settle and adjudicate rights of this nature, it is not necessary to inquire. They have not given them any such power. Their duties are strictly ministerial.

. They are to add up and ascertain, by calculation, the number of votes given for any office. They have no discretion to hear and take proof, as to frauds, even if morally certain that monstrous frauds have been perpetrated. The 95th section of this statute gives them no such power. And it is idle to look for it elsewhere, for they have not got it. So the question again recurs, what power of the government can give a specific and adequate remedy? What power of this government is to settle this controversy? I think that the conclusion is irresistible, that it is the judicial power. If the contest cannot be settled in the courts of the state, it cannot be settled at all. And if redress cannot come from that source, it can only come in a violent manner by revolution. And is this government thus powerless, impotent to correct an evil of this kind, impotent to shield its own

high offices from usurpation? I cannot believe it. Ordinarily the courts have been found entirely adequate to settle and determine contests for office. It has been done in almost numberless instances in England. In the state of New York, under a constitution which distributes the 'powers of the government, and where there is a statute for canvassing the votes substantially like our constitution and our statute upon that subject, this power to determine the rights of persons to office has been repeatedly settled by the courts. The leading cases are *The People vs. Clark*, 4 *Cowen*, 95; *The People vs. Richardson*, 4 *do.* 57; *The People vs. Ferguson*, 8 *do.* 102; *The People vs. Vail*, 20 *Wend.* 12; *Ex parte Heath et al.*, 3 *Hill*, 42; *The People vs. Seaman*, 5 *Denio*, 410; *Cook vs. Welch*, 4 *Selden*; same case, 14 *Bar. Sup. Ct. R.* 259, and the recent unreported case of *Davis vs. Cowles*. These offices were town, county and state offices. The court in Massachusetts have also had like suits before them, and I am not aware that in any of these cases, the jurisdiction of the courts was seriously questioned. This court has likewise adjudicated and settled the rights of contestants to office, in two instances at this term. *State ex rel. Carpenter vs. Ely*, and *State ex rel. Ege vs. Rust et al.* And one of the able counsel for the respondent (Mr. Arnold) admitted upon an argument in this cause, that the court could inquire into the right of a person holding any state office, other than that of governor. And he failed, I think, to show that the same power might not also settle and determine the right of persons claiming that office.

The objection to the exercise of the jurisdiction of this court to entertain a proceeding to determine the right of a person to hold and enjoy the office of governor, is, that it is dangerous to the independence of the executive department of the government. The executive power of the state is vested in the governor by the constitution, and hence it is said, you cannot interfere with the person acting as governor without disturbing the department. Who does not see the fallacy of this reasoning and the utter confusion of ideas in the very statement of the proposition? It assumes, in the first place, the very point in controversy—to wit: the right of the person acting as governor, to the office. This inquiry proceeds upon the hypothesis, that this right is disputed, contested; that the respondent is an usurper.

But whether he is or not is a question of fact to be established by proof alone. It is certainly very illogical to commence reasoning upon a proposition by begging the question. The question here is, who is entitled to hold the office of governor of this state? The answer given is, that the respondent is the governor, and there the argument ends. Concede it, and there is nothing to inquire into; no right to be ascertained, no subject for judicial investigation. But whether the respondent is the governor or not, is the issue. But a still greater error in the reasoning upon this case, consists in confounding the person who holds an office with the office itself. By the general theory and principle of our government, the legislative, executive and judicial departments are equal, co-ordinate and independent; each within the sphere of its powers. Admit it, and what follows? It is said that the person holding the office of governor, is the executive department, or to state the proposition more intelligibly, the department and person are one and indivisible. Here is the vice of most of the reasoning upon this subject. Gentlemen will not discriminate, or do not discriminate between the office and the officer, a department of the government and a person exercising and acting in that department. Yet, to my mind, there is no difficulty whatever in making a distinction. I can easily conceive how an intruder may be removed from a department without interfering with, or disturbing or impairing one jot or tittle of the powers of such department. Were it not for the conceded ability of the gentlemen who have advanced this argument, vitiated by this palpable fallacy, involved in it, I should not deem it worthy a moment's examination. As it is, it must be treated with sufficient respect to explode, if possible, the absurdity. And I therefore say that there is not, and from the nature of the case there cannot be, any resemblance, any similitude, any necessary connection, much less identity, between a department of the government, and the person exercising the duties of the department. A department is a division or classification of a certain kind, of the powers of the government. It is not necessary to define what a person is, only negatively, and say that a person is not a department. Consider that the agents, the officers of these departments have been successively changing since the adoption of the constitution. Yet the de-

partments remained unchanged. Some have died perhaps, and others removed from the state; but the departments whose duties they discharged, are still unimpaired. So that this court can sit, examine and decide upon the rights of contestants to the office of governor, and give judgment against one, and for another, without breaking down or disturbing the executive department of the government.

Another conclusion, more alarming, and more inconsequential than any yet noticed, is said to follow from the independence and co-equality of the departments of the government. It is the power of the person holding the office of governor to determine his own right to it. Whence does he derive this power? As observed by the chief justice, in the opinion delivered by him, you look in vain through the constitution and the laws for a provision giving him this power. If he has it at all it is underived, and inherent in the office. It is a high prerogative not claimed by royalty itself, unless in the person of a despot. I shall be slow to believe that it belongs to any officer of this government.

Much has been said about what this court must take judicial notice of; as that it must judicially know that the board of state canvassers canvassed the votes cast at the last election; determined upon such canvass that the respondent in this cause has received a majority of such votes; that they made the statement required by law, certified to it, and filed it in the office of the secretary of state, and that thereupon the secretary gave the respondent a certificate of election under the seal of the state, and that the respondent is the acting governor of the state : I suppose we do take judicial notice that the respondent is the acting governor in the same sense, and in no other, that we take judicial notice of who is the acting sheriff or circuit judge of this county. The right of persons to hold office cannot be inquired into collaterally. It can only be done by a direct proceeding of this nature. The determination of the board of state canvassers, and the certificate of election, we can only take notice of when it is set up in a proper plea before us. This has not been done, the counsel declining to plead them in bar to this proceeding. But this court cannot know, except by a laborious, long continued and systematic inquiry, all about the votes cast

at the last election—whether there were any frauds or mistake in the canvassing or return of votes that affected or destroyed the right of a person to an office. And I suppose this rule is one of general application. These observations might be extended, but I do not deem it necessary. I have given some of the reasons which have led me to the conclusion that, under our constitution and laws, this court has jurisdiction of this proceeding. That is really the great question in the case, and the only one of abiding interest which the court has been called upon to decide. I desire that this point should stand boldly out upon the record of the case, and I shall not attempt to divert the public attention from that point to minor issues. I am prepared to take my share in the responsibility of this decision. This court has not sought this discussion, this apparent conflict with the other powers of the government. The questions have been presented here in the regular order, and we have decided no more nor no faster than the record compelled us to decide. And after the angry passions of this hour shall have become stilled, and the inconsiderate heat of party feeling subsided, when men's minds shall have become calmer and reason again assert her supremacy over them, I cannot but believe that this decision will be generally approved by all the candid and thinking citizens of the country. But I take leave of this question, and come to the motions yet undecided.

In the first place, I am clearly of the opinion that the attorney-general cannot now dismiss this cause. If he could, I think all the objects of the statute of 1855 might be defeated. That statute gives any citizen, claiming an office which has been usurped, the right to file an information in the nature of a *quo warranto* upon his own relation, without the consent of the attorney-general, and prosecute the same to final judgment: provided, he shall first have presented the information to the attorney-general and he shall refuse to file the same. Now, as has been correctly said, this is an enabling statute, passed for the purpose of giving contestants a right to determine their respective claims to an office, when the attorney-general is unwilling to move in the matter, making the relator responsible for the costs of the proceeding. And when the attorney-general upon request, as in this case, files an information substantially com-

plying with this statute, and the cause progresses as this has done, I think the attorney-general cannot defeat the relator's rights by dismissing the proceeding against the relator's consent. The case of entering a *nolle prosequi* upon an indictment, is not analogous to the one before the court.

Now as to the motion for judgment. Without doubt, judgment of ouster can be given against the respondent, he having confessed all the allegations of the information to be true which are well pleaded. Such is the legal effect of this default. One of those allegations is, that he has usurped and intruded into the office of governor, and now holds it without any lawful authority. It cannot now be necessary to go on and take proof and establish this allegation; if it is, a party would obtain a great advantage over his adversary by refusing to plead and make up an issue. I believe the authorities generally say, that though in form this is a criminal proceeding, yet that in character it is a civil one; consequently the same effect is given to a default as in an ordinary civil action. This was the practice adopted in the recent contest about the office of supreme judge in the state of New York. Upon the default of Cowles, judgment of ouster was rendered against him.

But what is the effect of this default upon the rights of the relator? In the case just referred to—as I understand it—upon Cowles' making default, the court not only gave judgment of ouster against him, but a judgment establishing the right of Davies. And I am inclined to think that this is the general and perhaps correct practice. And in this case I regret that it is so. I wish that there was some way in which an issue could be made up and tried, and the relator's rights to the office could be affirmatively established by the most competent testimony. But I know of none. I have thought that on account of the importance of this office, and the very great interest which seems to be felt throughout the state in reference to the cause, and after the action of the attorney-general and the communication which he has made to the court, that we might require the relator to show at least a *prima facie* right to the office by exhibiting proofs before us. I do not say that it is necessary for him to do so in order to entitle him to a judgment upon the authorities. According to strict technical rules of practice, I believe that the

relator is now entitled to a judgment establishing his right; and though this is so, and notwithstanding the practice may be anomalous, yet for the reason above assigned, I do not think it an undue caution, an unreasonable exercise of the discretion of the court—if we have such discretion, and I think we have—to require of the relator some proof, which will show, that *prima facie*, he has a right to the office, before we give a final judgment in his favor.

SMITH, J. This case has now assumed an importance, and has arrived at a stage in the course of its procedure, that will justify, if not require, a careful review of the several steps of its progress, the decisions which have been made, the principles attempted to be established, and an examination of its present posture.

I have not felt called upon by any consciousness of duty heretofore, to reduce to writing the conclusions to which my mind has been impelled from time to time, as questions have been raised, argued and determined—questions in no respect or degree affecting the merits of the controversy; nor to enter into an elaborate exposition of the reasons which have led to such conclusions. I have rather been disposed to wait until the case should have approached some matter touching, if not involving, the merits, when it might be proper for the court, and for each of its members, to give written expressions of the opinion and judgment to which they might have arrived.

But the neglect or refusal of the respondent to plead to the merits of the information, and his default necessarily following, precludes the necessity of further consulting the precise order and time of expression, and justifies, if it does not demand, a full, careful and candid examination of the several propositions raised by the respondent, and the law on which it is claimed they rest.

It is a fundamental maxim with us, that the powers of government, whatsoever they may be, are derived from the people. The maxim is just and true. It is the basis of our political creed. Whatever power is exercised by any officer or department of the government is derived from the people who created the office or department. It is competent for the people to vest

all the powers of government in one individual officer, or to separate and distribute them among several officers or departments, in such proportions and degrees as they shall deem proper. It is competent for the people to create three departments, co-equal and independent, unequal and still independent, or, all equal, yet each dependent upon the other. The judicial may be dependent upon the legislative for the enactment of laws to administer, and the legislative upon the judicial for the administration of the laws, and both upon the executive for their due execution; while the latter, without the other two, would have nothing upon which it could operate—a naked sword beating the empty air.

At the time when the people of the territory of Wisconsin resolved to change the form of government under which they had theretofore lived, and to organize a state government, they were at liberty to form it as they chose, limited only in regard to its character—that it should be republican in form. By the ordinance under which they were invited to settle the wild lands of the territory, they were permitted to form such a state government, and were guarantied admission into the Union as a state, subject to only a few material restrictions or conditions, among which were two; viz: that there should be no slavery or involuntary servitude, except for the punishment of crime, whereof the person should be duly convicted, and that their government should be republican in form.

Acting upon the rights thus guarantied to the people of this territory, they resolved to form a state government. That government was required to be republican in form. The people did so form a government not only republican in form, but in compliance with the limitations and restrictions imposed upon them by the ordinance aforesaid.

Subject to such limitations and restrictions the people were at liberty to establish such a government as they saw fit. They did so. They ordered a convention of delegates of the people to form a constitution, which should be proposed to the people as the fundamental law of the state, not for the guide and government of the agents to be employed under the government only, but also for the guide and government of the people of the state, to abide and continue until they should amend or

alter the same according to the forms by them prescribed. The constitution thus adopted was submitted to the people, and was by them ratified and confirmed, as their primary and fundamental law, by which the people solemnly pledged themselves to abide, and to the provisions of which they exacted a strict conformity on the part of all the agents of the government that might be deemed necessary, by personal oath, in the administration of the affairs of the state.

Then, for the present, discarding theoretical disquisition, it seems obvious, that we should all turn our attention, not to the vague theories of political essayists, but to the provisions of that great fundamental law under which we have all most solemnly agreed to live, and which we are all most solemnly bound to support and sustain.

Nor, can we fail to be culpable in the judgment of our Creator, of our fellow men and of posterity, if we fail to adhere to that fundamental instrument under which we all hold and enjoy all the rights most dear to freemen, and to the support of which we are all bound by the most solemn obligations which can possibly be imposed upon members of a social or political organization.

In view of the obligations imposed upon me, or rather voluntarily assumed by me when I gave my assent to our present form of state government, and more especially, in my present position, I have felt bound to sustain that fundamental law, —the constitution of the state, according to its true intent and meaning. That is the great charter of our rights, to which the humblest may at all times appeal, and to which the highest *must* at all times submit.

Let us then look to that constitution, adopted by the people of Wisconsin, and endeavor to ascertain its true intent and meaning, the distribution of the powers of government which *it has in fact made*, and the agencies which it has provided, whereby those powers are to be executed. And here, let it be remarked that our conclusions must be guided and determined, not by theories of speculators upon the science of government, not by the opinion of jurists of other states reasoning upon philosophical abstractions or political postulates, but by the plain, simple, but authoritative and mandatory provisions of our own constitution. We made it ourselves. We are bound to abide by it,

until altered, amended or annulled, and we must construe it, and support it, not according to the vague, conjectural hypothesis of volunteer expounders, resident in other states, having no care or interest in the government, and having no knowledge of the constitution of our state, but according to its plain letter and meaning, as the oath-bond of our safety—as the palladium of our rights and liberties—as the vital principle of our social and political organism.

The people then made this constitution, and adopted it as their primary law. The people of other states made for themselves respectively, constitutions which are construed by their own appropriate functionaries. Let them construe theirs—let us construe, and stand by ours.

By our constitution were created certain offices. By it officers were not created. Provision was made by which the created offices should be filled. The persons constitutionally designated to fill the offices thus created became officers for the time being, and for the term which the constitution prescribed. The officers serve their term and retire; they die, resign or are removed, and thus they depart; but the offices remain. The latter are as permanent as the constitution which creates them; the persons who fill them are subject to all the changes of accident and time, and more especially are they subject to the peculiar prescriptions of that constitution which grants them admission and defines their tenure.

Nor should we be misled by terms. Whether the constitution defines the agencies by which its functions shall be performed, by the term " office," or " department," the same idea is in fact conveyed, and by the terms employed in the constitution, are the people to judge of it.

We are now prepared to examine that fundamental law by which we have all agreed to be governed, and to which we have all agreed to submit, and by the provisions of which we have all most solemnly pledged ourselves to abide.

This one truth must therefore be evident, that whatever power one " office," or " department," can rightfully exercise, must be, and is, derived from the constitution which the people have themselves adopted.

It may serve the purposes of reckless men, in and out of

power, to devise terms and phrases by which their own minds may be obscured if not deceived. But names do not alter substance; phrases, however adroitly constructed, can neither pervert ideas, nor strangle truth with intelligent minds. To talk of "sovereign departments" created by our constitution, is simply to talk, not to think, and much less to think rationally. We have no sovereign departments. We have no triple sovereignty. Much, indeed, was said in the course of the several arguments in this case, concerning sovereignty. But this whole matter has been settled by judicial construction, and were it not so, it would seem too plain to require argument for its elucidation. The theory of our government is, that all its powers are derived from the people. They are equal, and as equals have agreed that certain powers shall be exercised through agencies, and according to forms, by them prescribed, for the common good of the whole. The power thus created, is the constitutional sovereignty. The power to frame the government, and to prescribe its forms and limitations, is the *ultimate* sovereignty and rests in the people. When the people have created their government, and defined its powers, and designated the agencies by which such powers should be executed, there is then constituted what we call the *state*. Each one of the people is a component part of the state, but he is also a subject of the state. The state then becomes the organism through which, and in the name of which, all the functions of the government are to be performed. But no one department, or officer of the state, can claim to be the sovereign. There was a time in the history of the world, when one man intoxicated with despotic power, gave expression to tyranical pride, and exclaimed "*L'etat, c'est moi !*" "The state, I am the state." But that man was the tyrant of France. He was not the constitutionally elected executive of this free state. That was the language of the 17th, not of the 19th century.

Whenever the powers conferred by the constitution, of whatsoever character, are exercised, they are exercised by the state. It is the state acting through the agencies provided by the constitution. The writ of *quo warranto*, or rather the summons which issued upon the filing of the information, was not the writ of this court. It was not the writ of the justices, but was the mandate of the state. It was the state's writ, going in con-

formity with constitutional provision, to accomplish the purpose for which the constitution designed it, viz: to inquire whether one 'of the offices created by the constitution· had been usurped, or invaded without legal warrant or authority.

On the 17th day of January, 1856, the state of Wisconsin sent its writ of *quo warranto*, or rather its summons upon the information filed by its attorney-general, to a citizen of this state, requiring him to show by what warrant or authority he exercised the office of governor. The state did not send its summons to the governor of the state. But the attorney-general, the attorney for the people and the state, one authorized to speak for the state, informed this court that a certain individual had· intruded into one of the offices created by the constitution, without any legal warrant or lawful authority, and had usurped its powers, and asked of this court that the state's writ might issue, not to the governor, but to the person who, as it was alleged, had invaded unlawfully, one of the state's offices. He did not ask for any writ of the *court*, nor did the *court* issue its writ, but the court allowed the *state's* writ to go in the name of the state, and by the authority of the state to perform its appropriate functions, of which I shall speak hereafter.

The framers of the constitution took care to provide by what power or authority, and in whose name, the judicial writs of the state should run. *Sec.* 17 *of art.* 7 declares the will of the people in this respect. These writs do not run in the name of the Supreme Court, or of the legislature, or of the governor, but in the name and by the authority of the state of Wisconsin. It is not the court, therefore, calling upon the governor to answer, but it is the state calling upon Wm. A. Barstow to answer its, the state's summons. When this court, or a circuit.court, allows a writ of attachment; or any other process, to issue, such process is the process of the state, not of the court that issues it. The time has not yet come when any man is beyond the reach of state process. The officer, or department (if the term is more agreeable), has not yet become superior to the state. The authority of the state is yet superior to that of an office or department·of the state. Let it be distinctly understood that this proceeding is one in which the state calls upon one of its citizens to answer its process. This it is. No more, no less. The writ

issued, is issued in the name and by the authority of the state—a writ carefully preserved by the constitution itself, for the very purpose of protecting the offices or departments created by it, from unlawful intrusion; and yet, it is now said, that the person to whom the state has directed it, is superior to the authority of the state, and may, with impunity, defy the mandate of the very writ which the constitution has preserved to guard and defend itself from violation? Such is the doctrine advanced. It is no less than this. Let us meet it in all its baldness—in all its force—in view of all its direful consequences, and decide upon it as we shall answer to God at the great day.

It is known to all that the object of the writ of *quo warranto* is to guard and protect the constitutional offices of the state from usurpation and intrusion, to guard against such offices being filled by persons other than those who have the constitutional qualifications, and are legally elected or appointed. For such purpose and object did the framers of the constitution expressly preserve the writ of *quo warranto*, in order that there might be a legal, peaceful and constitutional mode of deciding the title to office, and to avoid the sanguinary strife which has marked and disgraced the history of our race, in other times and in other countries, but thanks be to God not yet in our own. But if the citizens or persons to whom this writ is directed in the name and by the authority of the state, can be permitted to defy the state's authority, and to claim exemption from the power of the state's writ, on the ground that he has already succeeded in his intrusion or usurpation, then indeed, was the work of the framers of the constitution a mere sound, an empty expression—and the constitution itself is utterly helpless—open to invasion, unguarded, undefended, stripped of its armor, a declaration of principles without sanction, an idle covenant without obligation—a pompous pretension to supreme and fundamental law, but in fact a supple instrument in the hands of ambition, to be moulded at convenience or defied at will, as the occasion may suggest.

Let us meet and answer these questions as it becomes men, having upon themselves the responsibility of maintaining a government of law. Nay, we must meet them. They meet us at the very threshold of our inquiry. Words and phrases can neither amuse nor divert us longer. The simple proposition is

before us, whether the constitutional writs of the state are to be preserved and obeyed, or whether the authority of the state is to be defied, and these state writs annulled and our state constitution stripped of its defensive or conservative armor? We may not deceive ourselves by speculations concerning the co-equality and independence of departments of the government—the question brought home to us is, not whether the departments are equal and independent, but whether the person who may chance to occupy them for the time, is superior to the law. Suppose this defendant were indicted in the Circuit Court of this county, for an offence against the law, would his arrest and trial be resisted on the ground of the co-equality of the executive department? Suppose he should be charged with assault and battery, or breach of the peace, would the magistrate who issued the warrant for his arrest, be chargeable with an attempt to usurp and control the executive department? No one for a moment would thus presume. And yet this defendant is charged by the attorney-general, in the usual and legal form, with intruding into and usurping one of the high offices of state created by the constitution, and the manner of filling which is prescribed by the same authority, and this high law officer of the state asks that this charge may be judicially investigated, according to the forms of the constitution and the law—and we are told by the person thus charged, that it is no matter by what, or whether by any authority he has entered into this office of the people, there is no power to examine the fact and no remedy for the offence which he is perpetrating against the constitution and the law, but that of force, of civil war—of revolution. We are told that this high office created by the constitution, may be usurped, and if the usurpation be successful there is no legal remedy ; that force, and force only, is to decide the issue. The constitution has prescribed certain qualifications for the office of governor, and yet we are told that the incumbent of that office is the sole and ultimate judge of his own qualification. The constitution provides that no person but a citizen of the United States, and a qualified elector of this state, shall be eligible to the office of governor ; yet we are told that whosoever can usurp or intrude into that office is the sole and ultimate judge of his own qualification, and that there is no power to inquire whether he be in fact a

citizen or a qualified elector of the state. Any man who can intrude into the office is to decide upon his own qualification, declare himself a citizen and an elector, or at least a successful intruder in defiance of the constitutional pre-requisites!

Again; the constitution provides that the person having the highest number of votes shall be governor; yet we are told that any man, who by force or fraud can get possession of the office, must be the sole and ultimate judge of his own election; that not the highest number of votes shall constitute him governor, but his own judgment must decide the matter, and his own will is the ultimate tribunal by which his election is to be determined!

Again; the constitution provides that "in case of the impeachment of the governor, or his removal from office, death, inability from mental or physical disease," &c., "the powers or duties of the office shall devolve upon the lieutenant governor," and yet he is the sole and ultimate judge of his own qualifications, of his own "impeachment," of his own removal from office, of his own "inability from mental or physical disease!" If the mental disease amounts to lunacy, yet he is the sole and ultimate judge of his own sanity! If he be removed from office, yet he is the sole and ultimate judge of that fact, and of the jurisdiction of the authority by which he is removed! These, and the like, are the doctrines which this court is called upon to declare as the law of the land. If the lieutenant shall chance to imagine the governor insane, and take upon himself the duties of the office, and get possession of the "department," the governor might not be satisfied with the decision of the lieutenant, and yet both would be the sole judges of their respective sanity, while the secretary of state might deem them both mad, and mentally disabled, and himself pronounce the "ultimate" decision in his own favor, and act the governor while he should think the disability continued!

To such confusion, not to use a term less mild, do the propositions assumed and insisted upon, lead us. While "the soil of England has been drenched by the best blood of her sons" in the process of determining the right of contestants to the chief magistracy of the realm, it is the boast of the states of this Union that they have provided peaceful and constitutional means by which pretensions to the executive magistracy shall be deter-

mined. To avoid the danger of usurpation, they have prescribed certain qualifications, without which no man can gain accession to the office. To secure fidelity to the trust, and responsibility for its due execution, they have prescribed short terms of office, at the close of which the incumbent retires from the place, to be filled again by himself or another, as the people shall elect. But if all these constitutional requirements can be overridden by any bold and temporarily successful aspirant, every one must perceive that all these constitutional safeguards are vain and useless, and our soil is liable to be drenched with the best blood of our people at every returning gubernatorial election, and instead of the protection of the constitution and the law, we are solely dependent for the peace of the state, and the supremacy of the law, upon the mere forbearance of the retiring incumbent, or the aspiring candidate.

It is made a subject of complaint that the court construed the motion to dismiss this information, into an admission of the facts contained therein. Yet every one knows, and the counsel for the defendant, from time to time, during the course of the argument admitted, that such was the effect of the motion ; that it was in the nature of a demurrer, admitting all the allegations in the information·; and still this court had no jurisdiction—still there was no remedy but force, there was no law to reach the evil, no court to pronounce the law. Time after time, the case was put, of a bald, palpable, avowed usurpation of the office of governor, and yet there was no legal remedy, as the counsel contended from the commencement to the close of the argument. At the very close of the argument, the last counsel who argued the motion, in answer to a question from the bench, declared that he preferred to put the case for that time, upon that ground, and upon no other. Such was, undoubtedly, the effect of the motion to dismiss the information. Such did the counsel admit its effect to be, when before the court. I will not ask, therefore, with what propriety, candor or justice, it is made a matter of complaint, that the court thus construed its effect. .

But, it is contended, that the "court is bound to take judicial notice of who is governor of the state ; when he was inaugurated ; the genuineness of his signature, &c." This is true to a certain extent. But counsel have mistaken its just limits. Let us ex-

amine the proposition. The court take judicial knowledge every day of, not only who is governor, but of who is circuit judge, who is secretary of state, who is treasurer, who is attorney-general, who is clerk of the Circuit Court of the various counties, who is district attorney, who is sheriff of the county.; but that judicial knowledge only extends to these officers *de facto*, or when their title to their office is undisputed. When, however, that title becomes a question *de jure*, this judicial knowledge ceases. While Mr. Ely was acting as district attorney for Rock county, the court took judicial knowledge of that fact, but that did not prevent the court from inquiring into his title to the office, or from ousting him when it was made to appear that another person had the legal and constitutional right to the office. The fact that the court took judicial knowledge of his official action and character, did not bar the question of his legal right from becoming the 'subject of judicial inquiry. The court took judicial knowledge of the official character of the clerk of the Circuit Court of Columbia county, but when his title to that office became the subject of judicial inquiry, such judicial knowledge became *ipso facto* suspended, until the question was determined, and then there followed a like judicial notice of the person who was ascertained to have the legal title. As I said before, the court takes knowledge of the fact who is circuit judge of the first circuit, recently appointed to fill the vacancy occasioned by the resignation of the late incumbent. But suppose, for the sake of the argument, that it should be ascertained that the appointee was actually holding an office of profit or trust under the United States, or was consul for some foreign power, which would disqualify him from holding any office under this state, will any sane man assert that the fact that the court took judicial knowledge of his appointment precluded this court from inquiring into his constitutional qualifications, or into the facts which the constitution declares shall preclude him from any office created by it? Illustrations without number crowd upon the mind, showing the mistaken view which counsel have taken of the scope and extent of judicial knowledge. Courts take judicial knowledge of a statute, yet they will inquire, when the question is raised, what is a statute. The Supreme Court and the Court of Appeals in New York, took judicial

knowledge of the election in that state of treasurer, yet those courts proceeded to inquire by *quo warranto* into the title of the respective claimants to that office, when that title was disputed.

Again; it is said that the government is divided into three departments, legislative, executive and judicial, each of which is co-equal, co-ordinate and independent of the other. By what authority is this proposition made, or attempted to be sustained? Not, certainly, by any reference to our constitution. It is true the constitution vests the legislative power in a Senate and Assembly, yet they are by no means independent, for the governor may veto any of their legislative acts. It vests the executive power in a governor, yet he may be impeached by the two houses, and hence it is not independent. The judicial power is vested in certain courts, yet the legislature enacts the law which they are bound to administer, and their judgments and decrees depend for their execution, in most cases, upon the executive and administrative branches of the organism. Political speculators may dream of "departments," of "co-ordination, co-equality and independence," but a practical common sense, guiding a practical and legal administration of public affairs, soon discovers such ideas to be the "stuff" which dreams are made of." The judicial power is vested in a supreme court, circuit courts, county courts, and justices of the peace. These constitute what is called in the argument the "judicial department, co-equal and co-ordinate," and yet the governor, in spite of its assumed independence, may remove the judges upon address of the two houses, and appoint incumbents to fill vacancies which may occur, and yet no alarm is felt, lest the executive should usurp the functions, or control the action of the judicial department.

Again; while the constitution provides, that the executive power shall be vested in a governor, it also provides in the same article, that sheriffs, coroners, registers of deeds, and district attorneys, shall be elected in the several counties. These offices are, some, if not all, intimately connected with, and are a part of the executive department. Yet sheriffs, coroners and district attorneys are officers of, and obey the mandates of the courts. It was indeed alleged with great apparent earnestness by one of

the counsel for the defendant, that the governor by one swoop may remove all these officers and appoint others in their places. This assertion must have been made without reflection. The governor has no such power. It is true he may remove these officers, but it must be upon charges preferred and after an opportunity given to be heard in their defence. A removal otherwise made would be unconstitutional and void, and an appointee to fill a vacancy thus created could be ousted by *quo warranto*. He would be as much an usurper of the office, as would be an alien, or one not a qualified elector of the state, who should attempt to exercise the functions of governor.

But it is useless to discuss this and similar propositions, touching the co-equality and co-ordination of the several departments in this stage of the proceedings. No such question is presented by the pleadings. The counsel for the defendant on the argument of the motion, preferred to place the question of jurisdiction upon the admitted, the avowed fact of successful usurpation of the office of governor, without any legal or constitutional warrant or authority, resting the whole question upon the fact that the defendant had possession of the office, and would hold that possession not of right, but because he had succeeded in getting there and that he chose to remain there.

Other departments or officers of the state government are ordained by the constitution, and unless the governor holds his office by a like warrant of the constitution, he cannot claim to be co-ordinate with those who do admit the supremacy of that instrument and bow to its authority.

But enough has been said to show that there is nothing in the office of governor that exempts the person holding it from obedience to the constitution and the law, any more than any other person holding any office under the same.

But it is contended, that if the person acting as governor is subject to the writ of *quo warranto*, or to any process or proceeding by which his right or title to the office can be be examined and tried, the independence of the department is destroyed, and placed at the control of another. This, if true, is no objection to the exercise of constitutional power, and is no reason for placing the acting executive above and beyond the provisions of the constitution. But it is not true. On the argument of the

motion to dismiss the information, it was conceded by the counsel for the defendant, that this court had jurisdiction to inquire by *quo warranto* into the title of the office of secretary of state, treasurer, attorney-general, &c., but who ever supposed that an examination of the title of contesting claimants to the office, was usurping a control over the office. The title of the contesting claimants to the office of district attorney, has been tried at this term, but is this court usurping that office? and are the duties of the person found rightfully entitled at all different? does the court control, modify or enlarge his powers? The persons holding the office of sheriff of Washington and Columbia counties have been ousted by judgment of this court, but no one claims or pretends that the court has usurped or controlled those offices, or that the persons declared entitled by the judgment are, or have been any the less independent in the discharge of their duties, than others, or that their duties are in the slightest degree modified. So, whichever of the present contesting claimants to the office of governor should succeed in establishing his title, would not the constitutional and legal duties of the office remain precisely the same? Could this court direct the approval or rejection of a bill? the pardon of a convict? the signing of a patent?

Nor is it true that the court takes upon itself to displace one man and install another. The proceeding is not, in any just sense, a removal of the officer. It is a proceeding to ascertain the person whom the people have elected. And to show how vain and fallacious are the assertions that the court by this process makes the governor, or appoints him, it is only necessary to look for a moment at the nature and character of the proceeding. In the first place, the attorney-general, a high law officer of the state, must file his information, charging the intrusion, and averring the title of the relator, before the court can take one step of progress; then a summons issues, and answer is put in, an issue is made up, if of fact, is sent to a jury to be tried, witnesses are sworn and examined, a verdict is rendered and judgment is pronounced, and all this is done in open day, in the full gaze of the public, and above all, every step of the proceedings is watched and contested by learned and zealous counsel—a singular mode of usurpation indeed! an admirable plan to control

the action and direct the policy of the executive department! It cannot be necessary to pursue such objections as these. So long as the constitution has prescribed certain qualifications for the executive office, and the people have hedged it about with inhibitory safeguards, I unhesitatingly affirm, that if the writ of quo warranto could reach an intruder into no other office, that writ, or some other adequate process, should reach the office of governor. Were it not so, of what avail these cautious constitutional provisions? What avail to declare that he shall hold his office but for two years if there is no power to remove him at the end of his term? Of what avail to provide for his impeachment, if he could barricade the halls of the capitol and bid defiance to all judicial authority, which alone can impeach, and which alone is competent to try the record of impeachment? Of what avail to declare that the person having the highest number of votes shall be the governor, if there be no power to determine in behalf of the people, and the person entitled, who has in fact the highest number of votes? The time may come when some bold bad man may obtain the office of governor, and from time to time refuse to submit to all legal forms to ascertain the results of the election, declare himself elected and re-elected from term to term, and thus plunge the people into civil strife, or leave them the only alternative, to submit to his usurpation and despotism so long as it might suit his interest or pleasure to ride rampant over the constitution and the law, to trample upon the rights and liberties of the people, and to riot upon their substance. Who does not perceive that such doctrines are utterly subversive of every principle of constitutional liberty—utterly destructive to every element of popular government, shocking to the moral sense, repugnant to every suggestion of right and justice, and terrible in their results.

This court has, on several occasions, and upon every occasion when it has been applied to, refused to interfere in any manner with the duties of the executive department. We have disclaimed all power to control its action. We still disclaim all such power, and do now and at all times repel, with earnestness and truth, the intimation that we desire to have or claim the power, of controlling the governor, or any other officer in the discharge of his duties. But the powers which the constitution

has conferred upon the court, we are compelled to exercise, when properly called upon to do so. We can no more refuse to do what is right, than we can do what is wrong. We shall be careful not to do wrong—we must do what we believe our duty demands of us.

But it is said, though the writ of *quo warranto* goes to other offices, it does not reach that of the governor. A few plain provisions of the statute and of the constitution settle this question.

Chapter 126 of the Revised Statutes, provides as follows:

" Sec. 1. An information, in the nature of *quo warranto*, may be filed in the Supreme Court, either in term time or vacation, by the attorney-general, against individuals, upon his own relation, or upon the relation of any private party, and without applying to such court for leave, in either of the following cases :

" 1. *When any person shall usurp, intrude into, or unlawfully hold or exercise any public office, civil or military, or any franchise within this state; or any office in any corporation, created by the authority of this state.*"

Here is the statute, the declared will of the people through their legislature. Has any person ever yet pronounced it to be unconstitutional? Never. Here, then, is one of the sources of the jurisdiction of this court. The attorney-general has informed the court that the defendant has, ever since the 7th day of January, usurped and intruded into the office of governor; that such office was one of high character and dignity in the state; that he had no legal or constitutional warrant or authority for exercising the functions of the same.

But in answer to the information, or rather in objection to the court's considering the information, the counsel come into court and contend that the office of governor is not a civil office, but a " department." Here again we are brought to the trial of the truth of allegations like this, by the test of the constitution. That is the basis on which all facts of this kind rest, which constitutes the organism of our government, and which is the source of all the powers of this state that can be lawfully exercised.

The statute provides that the attorney-general may file an information in the nature of a *quo warranto*, when any person shall

usurp, intrude into or unlawfully hold or exercise any public office, civil or military. Does the constitution then regard the office of governor as a civil office? Is this defendant a "person?" Let us look to the constitution and be governed by its provisions.

Sec. 1, of art. 5, of the constitution of this state, provides that "the executive power shall be vested in a governor who shall hold his *office* for two years." Is this office so denominated, civil or military? It certainly is one or the other, or a mixture of both, and hence within the purview of the statute before cited.

Sec. 7, of art. 5, provides that "in case of the impeachment of the governor, or his removal from office, death or inability from mental or physical disease, &c., the duties of the office shall devolve upon the lieutenant governor." Is the governor here deemed an officer or a "department?" The department is not impeached, is not removed, does not die, does not become insane, nor remove out of the state.

Again; section 8 of the same article, provides for a vacancy in the "office" of governor, on account of any casualty happening to the lieutenant governor, while acting as governor, when the secretary of state shall act as governor.

Again; section one, of article 7, declares that "the House of Representatives shall have the power-of impeaching all civil officers. On the trial of an impeachment against the governor, the lieutenant governor shall not preside." Here the governor is spoken of as a civil officer, not as an independent and co-ordinate department of the government, but as an agent of the government, rendered directly responsible to its tribunals. It is a confusion of all terms, of all ideas, to confound the departments of the government, or the offices of the government, with the persons who fill them for the time being. Even if the departments were sovereign, the citizens chosen to administer them are not sovereign. In our free, happy and constitutional government, every individual, whether in or out of office, is amenable to the law, to the process of the law, and to the tribunals erected by the constitution. Suppose one of the gentlemen who were candidates for seats upon this bench, or any other citizen, should apply for and obtain process against one of the justices

of this court, either to test his title to the office he holds, or for any other purpose, could he bid defiance to such process of the law, on the ground that he is a sovereign department of the government? On the contrary, every citizen, whether in office or out, is subject to the process of the courts of the state in all cases, but those which are specially excepted by the constitution or the statute.

It is clear, from the provisions of the constitution, and the law above cited, that the office of governor is a civil office, that the incumbent of the office is subject to the process of the law, and that proceedings by *quo warranto* are especially provided to protect all the civil offices of the state from usurpation and intrusion. We have seen that the sole and exclusive object of the writ of *quo warranto* is to guard and protect the offices and franchises of the state from unlawful usurpation. We have seen that the constitution has prescribed certain qualifications requisite to enable a person to occupy the offices created by it, and we have only now to look to the 3d section of the 7th article to ascertain in what department or branch of the government the constitution has deposited the control of this, the state's writ. "The Supreme Court shall have power to issue writs of *habeas corpus, mandamus, injunction,* QUO WARRANTO, and to hear and determine the same."

It is a sufficient answer to all objections which have been urged to this use of the writ of *quo warranto;* such as a pretended usurpation by the judiciary of executive functions; an attempt to control the executive and direct its action; to say that when this court attempts to direct the governor *what* to do, or what *not* to do, or *how* he shall perform any of the duties appertaining to his office, then it will be time to apprehend encroachment from that department; when it shall assume to appoint military or civil officers, or remove the same; when it shall assume to convene the members of the legislature, or send messages to them; when it shall attempt to transact business with the other officers of the government, civil or military; in short, when it shall attempt to perform any of the functions of the executive department, or direct how they shall be performed; then, and not till then, will gentlemen be justified in charging upon it, or its members, usurpation or dictation. There can be found no

instance of the kind, none has been alluded to, and, for the palpable reason that none exist. But, moreover, when it is recollected that this writ of *quo warranto* was especially and specifically preserved by the framers of our constitution in all its original vigor, and its well known character and scope, for the very purpose of enabling the government to protect the liberties of the people, and to enable the state to protect itself—and the constitution to execute through its own agencies, its own perscriptions and sanctions—and to that end, and to preserve, pure and unimpaired, the precise channels and agencies through which the power of the state should be exercised or administered —to the end that the people of the state might know whether or not the powers which they had delegated were exercised by constitutional agencies; no attorney or counselor of this court, nor any party to this constitutional writ, is authorized to attempt to impair its efficacy, or evade its exigencies by setting up a pretence of usurpation on the part of those to whom the constitution has intrusted its control. It is foreign to the objects and functions of the writ of *quo warranto* to direct any officer what to do. It is never directed to an *officer* as such, but always to the *person*—not to dictate to him what he shall do in his office, but to ascertain whether he is constitutionally and legally authorized to perform any act in, or exercise any functions of the office to which he lays claim.

Here is the full, perfect, express grant of jurisdiction, direct from the people, which this court can no more refuse to exercise, than it can do what it is not authorized to do.

It is idle to say that it does not reach the office of governor, for the constitution declares that to be a civil office, and the statute extends the scope of the writ to *all* civil offices.

But it is said that there is no precedent for a proceeding by *quo warranto* against a person claiming and exercising the office of governor. This is no objection. Cases frequently arise for which no precise precedent can be found. It is rare indeed that two cases precisely alike can be found in the books. But all are found to fall under some principle of legal or equitable jurisprudence. Never before was a cause defended, or the jurisdiction of a court denied, on the ground that the counsel had been unable to find any case exactly like it. On the contrary the

counsel and court search for analogies in the law, and apply the principles deduced from such analogies. So in this case; analogies innumerable are found in all the books, and positive provisions of the constitution and the statute not only recognize the jurisdiction, but demand its exercise.

But the reasons for the absence of precedents are obvious. First, when the governor has been elected by the people in the several states, the majorities have generally been so decisive as to render a contest hopeless. Secondly, in many of the states, the returns of the election for governor and lieutenant governor are made directly to the presiding officer of one or other branch of the legislature, opened and counted in the presence of both houses, and the result declared, and made definitive by express provisions. And thirdly, in many of the states provision is made by their respective constitutions for a special tribunal before which a contest for the office of governor can be tried. Those who assert that no tribunal can be created for the trial of a question of this kind without doing violence to the government and destroying the harmony and balance of the "sovereign departments," have read the constitutional law of these United States to little purpose. If my memory serves me correctly, there are no less than ten states, and perhaps more, whose constitutions specifically provide for contesting the election for governor. And yet the framers of these constitutions never dreamed that they were doing violence to the government by questioning the title of a person who might assume to be their governor. Some of these constitutions provide a specific tribunal for that purpose, some authorize the legislature to provide for one, while others, like our own, have classed the office of governor among other civil offices in the state, and guarded it from invasion and usurpation, by cautiously and specifically preserving the prerogative writs of the state, and endowing their judicial tribunals with the control of them.

Reference has been made to two, and only two, cases in which there has been any dispute, in the states of this Union, as to the person elected to the office of governor—one in New York, in 1792, and one in Pennsylvania, in 1838.

The counsel was quite unfortunate in the citation of the case in Pennsylvania. He said that was a state in which the common

law prevailed in peculiar force and purity, and he asked why, in the controversy in regard to the election in 1838, when Gov. Porter and Gov. Ritner were candidates, when the most stupendous frauds were charged, why was not the remedy by *quo warranto* invoked, instead of muskets and buck-shot? It is believed that if the counsel had examined the history of that case more closely, it would have become apparent to him, that probably one very adequate reason why a writ of *quo warranto* was not thought of or suggested, was, that when the controversy arose, the term of the incumbent of the office had not yet expired; that the votes for the candidates for the succession had not been counted; that Gov. Porter had not entered into the office; that there was no intrusion, therefore, to be inquired into. And a further examination would have discovered the fact, that the legislature had not yet organized; that the returns were by the constitution required to be made to the speaker of the Senate, who was to open and publish the same; that as yet there was no senate organized, and no recognized speaker chosen, and no returns opened and published. A still further examination would have discovered the fact, that after the Senate was organized, a speaker chosen, the returns opened and published, the results declared, the muskets and buck-shot were of no further use; and that no one chose to contest the election as its result was announced, although ample provision for that purpose existed, had any one chosen to do so, without "destroying the harmony of the government," or "the independence of the departments." *See vol. 54 Niles' Register, pp.* 237–273 *et seq.; Const. Penn., art.* 2, § 2, *Statutes of Penn.*

The case in New York was between George Clinton and John Jay. In that case the canvass of the votes was by a joint committee of the two houses, and their decision was declared by statute to be final and conclusive, and upon the result being so declared, Mr. Jay advised his friends to submit to the determination of the tribunal which the law made "final and conclusive." The case was never made the subject of judicial inquiry, nor, although the law of that state made the decision of the canvassing committee appointed by the legislature "final and conclusive," it was never intimated that the matter could not become a subject of judicial as well as of political inquiry. It is quite evident

that an inquiry by the legislative department into the title of the person holding the office of governor, is equally incompatible with the independence and co-equality of the executive department, as a judicial investigation would be.

Having now endeavored to dispose of the material objections urged to the jurisdiction of the court, which were urged upon the argument of the motion to dismiss the information, it may be proper to direct our attention for a time to the plea subsequently interposed.

After the motion to dismiss was overruled, the counsel for the defendant interposed a plea in abatement, going to the jurisdiction of the court. This plea set up the canvass of the returns of the late election by the board of state canvassers, the certificate of election issued to the defendant, and the oath of office taken by him—not in bar of the action, but as matters which necessarily ousted this court of jurisdiction—the substance of which was, that because a board of canvassers had decided the matter, therefore the supreme judicial tribunal of the state, by the action of such board, was ousted of all jurisdiction in the premises.

It is not denied that it was competent for the people in the organization of their government to have provided for a tribunal to whose determination alone should a question of this kind be submitted. But have they done so? To answer this question we must appeal again to the constitution and the law. For this purpose we will examine the various provisions on this subject.

But before proceeding to a review of these constitutional and statutory provisions, it may be well to recall to mind what is the precise subject matter under inquiry, of which it is claimed the facts stated in the plea, ousts this court of jurisdiction.

Two persons claim to be entitled by the constitution and the law, to hold and exercise the office of governor, to receive the salary pertaining thereto, and to enjoy the honor belonging to the station. The attorney-general, acting under his oath of office, has informed the court in the most solemn manner known to the law, that Coles Bashford, the relator, at the general election held on the 6th day of November last, received the highest number of votes cast by the electors of the state for the office of governor. The constitution declares that the person receiving the highest number of votes for such office *shall* be elected. The

defendant, by the plea says, not that he was elected, not that he received the highest number of votes cast for the office of governor, not that he possesses the requisite constitutional qualifications for the office, but that the *board of state canvassers* had "determined" that he was elected, and that he had received the certificate of his election, and taken the oath of office, and that, therefore, whether or not any other person had in fact received the highest number of votes, whether any other citizen was entitled to the honor and emoluments of the office, this court had no power to inquire, and that it was an attempt on the part of the court to remove the governor, by instituting an inquiry as to the fact, which one of all the free and equal citizens of the state, is in fact, and in law the governor ; that to ascertain who is the legally elected governor, is to remove a governor ; that to determine the right of the person elected by the people, is to appoint a governor ; and that to guard this high and important office of the people from unwarrantable intrusion, is to remove a governor ; and hence there was no power or jurisdiction in this court to do anything of the kind.    This is the simple translation of the plea, with this addition, viz: that though this court may have jurisdiction and power to oust a bold usurper of the office of governor, yet, if the state canvassers shall declare that he is not a usurper, the court has no power in the premises to inquire whether he is such or not ; that although the constitution declares that the Supreme Court shall have jurisdiction of the writ of *quo warranto* to protect the offices of the state from usurpation, the board of state canvassers think differently and "determine" otherwise.

To sustain these novel doctrines, it is contended that the legislature has created the board of state canvassers, consisting of the secretary of state, attorney-general and treasurer, a judicial tribunal, with power to determine who is elected to the office of governor, and whose decision is final and conclusive. Admitting for the sake of the argument (but by no means as a correct legal proposition), that this position is correct, it does not affect the jurisdiction of this court.    At most it can only be urged in bar of the information.    Had the defendant pleaded the canvass and the certificate of the board of canvassers in bar, and produced the same as evidence conclusive of his title, an-

other question would have been presented. But he has not done so. The purport of the plea is, that "because I aver that another tribunal has decided the subject matter of this investigation; therefore, this court must instantly cease all further cognizance of the case; that it cannot even inquire as to the genuineness of the record;" for be it remembered, the exhibits accompanying the plea are not presented as *evidence* of the truth of the facts alleged in the plea, but as matters which, *ipso facto*, deprive the court of a jurisdiction which it would otherwise possess, and be bound to exercise.

To a legal mind *profert* of a record is a novelty, and especially is such *profert* a novelty when made in a plea to the jurisdiction. As oyer cannot be craved of a record, so profert is not necessary, and when thus made, it is not evidence. What are called "exhibits" accompanying this plea, are no part of the plea itself. They neither strengthen the plea, nor enlarge its scope. If the allegations of the plea are good, for the purpose for which they are made, they require no proof until they are traversed. If they are not sufficient, evidence of their truth does not make them better, for they are admitted to be true for the purposes for which they are made. It was demurred to, as a plea to the jurisdiction, and was treated as such, and avowed to be such by the defendant's counsel.

But I prefer to lay aside all technical objections to the plea, and meet the arguments which have been presented to sustain it. And here it is proper to remark, that much of the argument upon the demurrer to the plea was substantially based upon the propositions assumed in support of the motion to dismiss the information, and need not be again referred to. So far as the argument was based upon the effect of the canvass and the certificate issued thereon, it is proper to discuss the positions assumed, and the provisions of the statute cited to sustain them. All of the counsel for the defendant admit that the canvass and certificate of the board of county canvassers is not final and conclusive, but that the court has jurisdiction to inquire behind the certificate in proceedings by *quo warranto*. One of the gentlemen distinctly admitted, in direct terms, that the court had jurisdiction to reach by *quo warranto* the secretary of state, state treasurer and other state officers, notwithstanding the can-

Attorney-General ex rel. vs. Barstow.

vass, but insisted that such was the nature of the executive office as to preclude the operation of the writ upon the person holding the same; while the gentleman who last argued in support of the plea, contended that the canvass of the board of state canvassers, and their certificate, was not only final and conclusive as to all state officers, but absolutely precluded any inquiry, by any power or tribunal, by any process or means whatsoever, from inquiring into the right to office, of the person holding the same. It is not for us to harmonize these different positions, but it is difficult to perceive how they can affect the question of jurisdiction. If the court has the power to oust a mere intruder without color of right or warrant, the necessary consequence follows, that the person in office may be called upon to show by what warrant he holds. If, being thus called upon, he exhibits his warrant, that is in-*bar to further action*, not in denial of the jurisdiction to make the inquiry.

But it is contended that the board of state canvassers is a judicial tribunal, whose determination is absolutely conclusive. If this be so, the court has jurisdiction to oust a person who has usurped an office, *without* any such determination in his favor. It must therefore be pleaded in bar of the action, not in denial of the power of the court to ascertain whether he has it or not. If a person is indicted a second time for an offence whereof he has been duly acquitted by the final judgment of a court of competent jurisdiction, he cannot plead such acquittal to the jurisdiction of the court in which he is last indicted, but in bar to the prosecution. A person is sued in trespass or replevin for unlawfully taking the property of another, and he defends the action by pleading in bar, that he was sheriff and took the property by due process of law, but he does not insist that the court has no power to inquire by what warrant or authority he thus acted. Numerous instances might be cited precisely analogous, and there is no person in so high authority in the state that he is not bound to answer the process of the state issued by the proper tribunal. Suppose this defendant was sued in an action of trespass for ordering property to be seized; could he defy the process of the law and refuse to answer? Could he say to the court, you have no right to inquire into this matter, because I am a sovereign department? Or would he not plead

in bar of the action, that the property seized was the property of the state, and that he as governor was rightfully entitled to the possession ? Suppose he should take from a warehouse or depot, property purchased and brought hither for the use of the state, and the carrier should attempt to replevy the property to enforce his lien thereon for freight, would he resist the process of the law upon the pretext that he was a department of the government, and was sovereign and independent ? And when the same person is asked by the state by what warrant he has taken possession of one of its high offices, can he reply that in his judgment he is governor, a sovereign and independent department, and therefore the state had no business to ask the question ? And when this is not satisfactory, shall he reply again that he has a certificate of election from the state's secretary, and had taken the oath of office, and therefore it is high-handed usurpation even to have put such a question to him ? It would be all very well to produce his certificate and oath of office in answer to the process, and these would be *prima facie*, if not conclusive evidence of his right to take possession of and hold the office, but they do not defeat the authority of the state to make the inquiry. This, however, the defendant has not done, and this he refuses to do, on the ground, as the counsel allege, that it would subject the executive department to the control of another department, co-equal with itself. Let it still be borne in mind, that this and the like process is the process of the STATE, not of the court—the mandate of the people, not of the judges; that it is directed to the *defendant*, not to the executive department; not to dictate or control the action of the department, but to ascertain by what warrant the defendant is in possession of it.

And here I may be permitted to repeat, that the higher and more sacred an office created by the constitution may be, the stronger the reason and the greater the necessity for guarding it against unwarrantable intrusion. The minor offices of the state, county or town might be intruded into and usurped for a time, without seriously affecting the public welfare ; but a successful usurpation of the highest office of the state, is in truth and in effect, the overthrow of the government itself. If the success continues, the constitution is destroyed, and irresponsible and self-constituted power reigns, riots and ruins.

But, although, from the fact that the defendant has refused to plead his election, the canvass, the determination of the board of canvassers, and the certificate of election, in bar of the claim set up by the attorney-general in behalf of the relator, the whole subject matter of the plea in abatement might here be dis-. missed ; yet·I should be unfaithful to the trust reposed in me, should I fail to notice some other positions here assumed, lest silence might be construed into acquiescence in their correctness.

It is said the legislature has erected the board of state canvassers into a judicial tribunal, supreme, final and unquestionable. This is indeed strange doctrine. The board of state canvassers consists, by the provision of the statute, of the attorney-general, secretary of state and state treasurer, two of whom shall constitute a quorum, and if only one of said officers shall attend on the day appointed for the canvass, the clerk of the Supreme Court shall be notified by the one attending on such day, and shall attend without delay, and with such officer shall form the board. *R. S. chap.* 6, *sec.* 69. And it is gravely contended that the attorney-general and the clerk of this court can be erected into a judicial tribunal by the legislature superior to the Supreme Court itself! And this, too, in the very teeth of the constitution, which declares that the judicial power of this state "shall be vested in a supreme court, circuit courts, courts of probate, and justices of the peace, and that the Supreme Court shall have a general superintending control over all inferior courts." Besides, can this board of canvassers be considered a judicial tribunal, when they have no power to issue a subpœna for, nor to compel the attendance of witnesses, to summon parties before them, to grant a trial by jury, nor to do any act but " upon the certified statements of elections, made by the board of county canvassers, to examine and make a statement of the whole number of votes given at any such election for the offices of governor, lieutenant governor, secretary of state," &c. (*chap.* 6, *sec.* 74), to certify such statements to be correct, and "thereupon" to determine the result. These are not judicial but purely ministerial acts. *Strong, petitioner, p.* 497.

In this case, Mr. Justice Morton, in deciding this very question, says: "It cannot be maintained that the decision of the

examiners (canvassers) was an act within their legal discretion. Whether their determination as to the reception or rejection of returns would be deemed a judicial decision, may well be doubted. But nothing can be clearer than that the counting the votes and ascertaining the majorities, and giving certificates of the result, are merely ministerial acts. They have no discretion in determining which of the candidates shall be elected. It must be the result of pure, inflexible mathematical calculation." The same doctrine was held in the case of the *People ex rel. Cook vs. Welch* (14 *Barb. S. C. Rep.*, 4 *Selden*), and more recently in the case of *Cowles vs. Davis*, upon *quo warranto*, relating to the title to the office of judge of the Supreme Court of the state of New York.

Indeed, the contrary doctrine has never been asserted until now, and its assertion stands without authority.

But it is said that, it is presumed that these officers have done their duty until the contrary appears. So it is presumed; but the position of the counsel for the defendant precludes the exercise of any possible jurisdiction or authority by which the contrary *can* be made to appear, whatever the facts might be. Most undoubtedly the courts and the people of the state presume that the officers have done their duty. Their certificate is *prima facie* evidence of the facts it asserts. But when it is asserted that the clerk of this court and the attorney-general, can be invested with judicial power above and beyond the supervisory control of the Supreme Court, created by the constitution, and this court is asked to sanction such doctrines, we should be faithless to the constitution, which has itself vested the judicial power of the state, if we did not assert the supremacy of the constitution, in terms at once unmistakable and definitive.

Again; much stress is put upon the word "determine," used in the 74th section of chap. 6 of the Revised Statutes. The statute has, however, most carefully restricted the meaning of that word. The canvassers cannot "determine" according to their discretion, who is elected, but they must certify the statements which they have made of the returns of the county canvassers, and certify such statements to be correct, and "thereupon," that is, upon a computation of such returns and statement thereof, determine. They must determine "*there*-upon," not

upon any other hypothesis or statement, but solely and exclusively upon the statements made from the footings of the returns of the county canvassers.

Suppose a public defaulter should be elected to the office of state treasurer, in defiance of the constitutional inhibition, the board of state canvassers are bound to examine the statements of the election made by the county canvassers, and " thereupon," to make a statement of the whole number of votes given for such person for the office of state treasurer, and to certify such statement to be correct, and, " thereupon," to determine him elected to the office of state treasurer, although the constitution expressly forbids his holding that or any other office; would the canvass and certificate absolutely preclude any court or power from inquiring into the fact whether the person to whom the certificate had been given was in fact a defaulter or not?

This question and the like answer themselves.

Again; it is said that the defendant's title to his office is evidenced in the same manner as that of any of the members of this bench. So is the fact; but if any of the persons who were candidates at the election for the incumbents of this bench, had chosen, or still choose, to file an information in the nature of a *quo warranto* against me, to inquire by what warrant or authority I exercise the duties of this office, could I resist the writ and its exigencies, on the ground that I am a "sovereign department" of the government, and therefore not amenable to the judicial process of the state? or that the "court of canvassers" had determined my right?

Again; it is said that the 95th section of chapter 6 of the Revised Statutes, gives to the state board of canvassers the broadest *judicial* discretion to examine the whole matter of the election, and empowers them to declare whomsoever they shall see fit, to be elected to any office.

It is a sufficient answer to this proposition to say that this section refers as well to the town and county canvassers as to the state canvassers, for its language is too explicit to be mistaken, referring to *any* person, to *any* election and to ANY office, and to the canvassers, without distinguishing the one board from another, but in terms comprehending them all. And all admit that the "determination" of the town and county canvassers can

never have the effect which is here sought to be given to that of the state canvassers.

It is apparent from an examination of the statute, that precisely the same powers are given to the county and district boards of canvassers, as are given to the state board. Each board is required to make the statement from returns received, and *thereupon* to "determine," that is, to foot up, and declare the result.

It is admitted on all sides, that the "determination" of the county board of canvassers for county officers cannot be conclusive—that the county board of canvassers are not a judicial tribunal—and yet the language of the statute conferring power upon the one and the other, is essentially the same. The sections of chapter 6 of the Revised Statutes which grant to the several boards of canvassers, for town, county, district and state officers, are couched in almost the same precise language, and can admit but of one—the same and uniform construction.

Sections 52 and 53 relate to the county canvass, and are as follows:

" Sec. 52. Each statement shall be certified as correct, and attested by the signatures of the said county board of canvassers, and filed in the office of the clerk of the board of supervisors, and the same shall be recorded by him in a suitable book to be provided and kept in his office.

" Sec. 53. They shall then determine the persons who have been by the greatest number of votes, elected to the several county offices, and members of the Senate and Assembly, when the county constitutes one or more senate or assembly districts; and such determination shall be reduced to writing, certified as correct, and attested by the signatures of the said clerk and justices, and be annexed to the statement of votes given for such officers respectively, and filed and recorded by said clerk with the same."

The powers and duties of the district canvassers, as to their " determination " of results, are expressed as follows:

" Sec. 61. The canvassers shall then determine the person or persons elected to office within the district, as shall appear by such statements, and shall certify such determination under their hands, and annex the same to their said statement, and deliver the same to the clerk of the board of supervisors of the county

in which their meeting shall be held, who shall file the same in his office."

The powers and duties of the state canvassers will be seen from the following provisions of the same chapter:

"Sec. 73. The board when thus formed, shall, upon the certified statements of elections made by the board of county canvassers, proceed to examine and make a statement of the whole number of votes given at any such election for the offices of governor and lieutenant governor, secretary of state, treasurer, attorney-general, and state superintendent, or either them; and another statement of the votes given for representative in Congress in each congressional district; each of which statements shall show the names of the persons to whom such votes shall have been given for either of the said offices, and the whole number of votes given to each; distinguishing the several districts and counties in which they were given.

"Sec. 74. They shall certify such statements to be correct, and subscribe their names thereto, and they shall *thereupon* determine what persons have been by the greatest number of votes duly elected to such offices or either of them, and shall make and subscribe on each statement a certificate of such determination, and deliver the same to the secretary of state."

"Sec. 16. The secretary of state shall record in his office, in a book to be kept by him for that purpose, each certified statement and determination so made by the board of state canvassers, and shall without delay, make out and transmit to each of the persons thereby declared to be elected, a certificate of his election, certified by him under his seal of office; he shall also forthwith cause a copy of such certified statements and determinations to be published in a newspaper printed at the seat of government."

Now after examining all these provisions of the statute carefully, it is impossible to find that any more force or effect, or any wider scope is given to the "determination" of the board of state canvassers than to that of the town, county and district canvassers. If the "determination" of the town and county canvassers can oust the judicial tribunals erected by the constitution of all supervisory jurisdiction, and can finally conclude, beyond appeal, all the right of the people involved in an elec-

tion, then may the "determination" of the state canvassers do the same, for their power is the same.

But it is contended that the 95th section of the act in question confers a broader discretion upon the state canvassers. It is found among the miscellaneous provisions of the chapter concerning elections, and is in the following words:

"Sec. 95. Whenever it shall satisfactorily appear that any person has received a plurality of the legal votes cast at any election for any office, the canvassers shall give to such person a certificate of election, notwithstanding the provisions of law may not have been fully complied with, in noticing or conducting the election, or canvassing or returning the votes, so that the real will of the plurality may not be defeated by any informality."

It is perfectly apparent that this provision extends to the whole chapter, and is intended to direct all the various boards of canvassers alike. The language of the section absolutely precludes any special application of its provisions to the board of state canvassers. "Whenever it shall satisfactorily appear that any person has received a plurality of the legal votes cast at any election, for any office, the canvassers shall give to such person a certificate," &c., evidently referring to, and directing the conduct of the several boards of canvassers provided for by the statute. If the decision of one board is final and conclusive, so is that of all and each. If the decision of one board can oust the supreme judicial tribunal of the state of jurisdiction, and paralyze its functions, so can another. The clerk of a board of supervisors and two justices of the peace of his own selection, become the court of first and last resort, in which the most sacred rights of freemen are adjudged and determined without appeal: and that too, without a chance of being heard, without process, without testimony, without a jury, without the privilege of appearing before the power which may pronounce upon their rights. By the same construction the clerk of this court and state treasurer may constitute a "judicial" tribunal, superior to the court of which one of its members is clerk, and so, "determine" that the services of the supreme judicial tribunal may be dispensed with.

I would not have felt justified in quoting and arguing upon these provisions of the statute so far as I have, were it not for

the fact that such an extraordinary position has been assumed, and with apparent earnestness. I shall dwell upon it no longer; but barely remark, that the constitution has vested the judicial power of the state in certain courts, and there it must remain until it is otherwise. disposed of by an amendment of the constitution, or by "revolution." Time after time, since the organization of this government, and at all times, without question as to jurisdiction, have the courts of the country been called upon to inquire into the right of contesting claimants to public office. But never before in any court, or in any country, was it contended that the determination of a town, county or state board of canvassers could wrest from the highest judicial tribunals of the state, jurisdiction of the appropriate writ, whereby such right or title could be tried and established. And when it is perceived that the powers of the county, district and state board of canvassers are precisely the same, it would seem that further comment upon a proposition so new and startling, so incompatible with the premises of the counsel who contend for it, and so destructive to the conservative defences of the constitution, was wholly unnecessary.

Upon these and the like considerations we have felt ourselves impelled to overrule this plea to the jurisdiction. Thereupon an order was entered for the defendant to answer over, and a term of four days was ordered for the respective parties to plead until an issue should be made up, when it was hoped questions of fact might be raised to determine which, would require the introduction of evidence and the intervention of a jury. But on the 4th day of March, the time for pleading over having elapsed, the defendant made default, and afterwards on the 11th day of March, the counsel for the relator moved the court for judgment by default. This motion was argued by the counsel for the relator, and the attorney-general, being present, was asked if he, as the representative of the people, had anything to propose, when he answered that he had not, nor should he have until judgment should be pronounced.

Upon this state of the record we have carefully and anxiously considered of the judgment proper to be rendered.

It is needless to say that I would gladly have avoided the labor and anxiety which this case has occasioned. But my duty

to the office I hold has left me no alternative, but to proceed in the discharge of such duties as the constitution and the law have from time to time demanded.

On Tuesday last the attorney-general came into court and discontinued the suit and all proceedings, so far as the people of the state were concerned. But he had made the relator a party. The relator had rights involved in the suit. He had employed counsel who had appeared with the assent of the attorney-general. He had been kept two months in court, attending upon the progress of the case, and, though the attorney-general might think proper to withdraw from the case so far as the people were, in his judgment interested therein, he had no power to withdraw the relator from the case against his own will. The defendant having made default, and the attorney-general having withdrawn on behalf of the people, but one party is left before the court, and that party is the relator.

It is most deeply regretted that such is the state of the case. It would have been much more satisfactory had the parties made up an issue, and enabled the court to award process that would meet all the exigencies of the case. But the conduct of the defendant in making default, and of the attorney-general in withdrawing, has rendered such a proceeding impossible. By the strict rules of legal practice, probably, judgment might now pass of ouster against the defendant, and also establishing the right of the relator. The default of the defendant most certainly confesses the allegations of the information, so far as he is concerned, and perhaps might have like force upon the claims of the relator. But owing to the importance of the office in dispute, we think the relator should be required to show by proof, at least a *prima facie* title.

*Chief Justice.*—The court has no doubt but that everything which was well pleaded in the information was confessed by the default of the respondent. By strict usage a final judgment would follow; but the court has come to the conclusion to call upon the relator to adduce proof showing his right, at such time as will be most convenient.

*March 20th. Chief Justice.*—Yesterday we intimated that we

would indicate the amount of proof necessary to establish the claim of the relator. We assume the statement of the board of canvassers to be true and correct until disproved.

*Mr. Ryan*, for the relator, intimated his readiness to produce his proofs.

*Mr. Attorney-General* said : " In the exercise of what I deemed an act of justice to the people of the state, I, day before yesterday, filed a motion to dismiss these proceedings. The ruling of the court upon it, went no farther than to acknowledge the right of the attorney-general to withdraw from the case. The attorney-general does not now appear for the relator, but to inquire in what position he shall appear, in order to protect the interests of the people. The people will not be satisfied with anything less, nor can I, as their elected officer, be satisfied with anything less than a full investigation. I want to know my position. I want to know to what extent the judgment of the court goes, in indicating the amount of proof demanded. I now demand a full investigation of the election throughout the state. I deny on the part of the state, that an issue can be created in the canvass of one particular county. I now ask, if the whole case is to be opened up, and the whole state to be canvassed. If this is to be done, I wish to obtain such evidence as it may be possible for me to obtain to a thorough, complete and satisfactory investigation of all the facts. Nothing less than all the facts. Nothing less than all the facts, and their thorough investigation, can I, as the representative of the people—the most important party to this suit, be satisfied with. For such a labor I am not now prepared. I enter my solemn protest against any proceeding short of the most complete inquiry and investigation, and against any other proceeding than the most thorough canvass of the state, and I am not now ready for so laborious a task. I want the court to tell me my position."

The court then proceeded to hear testimony at length, touching the character of the returns of election made to the state canvassers, showing gross frauds and forgeries in such returns to the state board, as well as several returns made to the state board of elections held, or purporting to have been held, at towns and precincts, which had never been returned to, or canvassed by

the county boards of canvassers, modifications and corrections made by the state board, from statements made, or purporting to have been made, by the clerks of the board of supervisors, as to the action of the county boards, in canvassing the votes and in making their statements, &c., from all of which it appeared by the finding of the court, that Coles Bashford, the relator, had received a majority of the legal votes cast and returned in conformity to the law.

As the judgment of the court is not based entirely upon the particular points of evidence produced, and as from the testimony adduced, it appeared that the relator had received the highest number of the legal votes cast at the election, and as the points both of fact and of law determined by the court, are considered in the opinion, it is not deemed necessary to report the evidence given on the hearing.

*By the Court,* WHITON, C. J.. After the very full expression which we have given of our opinions in regard to this case, it will not be necessary in finally disposing of this' motion, to say more than is required to show our views upon the questions which have arisen since we.concluded to call upon the relator to show his title to the office by testimony, notwithstanding the default of the respondent. In the opinions which were given on a previous occasion, it was stated that under our statute, according to strict legal right, the court was authorized, by the default of the respondent, to pronounce a judgment, which would not only oust him from the office, but which would also establish the right of the relator to it; but that, as the office was one of great importance, and as the people of the state had a deep interest in the question as to the right of the relator to fill it, we would call upon him to show by testimony that he had this right, so that, while our judgment would oust an intruder, it would also establish the right of the relator upon the foundation of an election by the people. We have deeply regretted that the course which the respondent and the attorney-general have pursued, has put it out of our power to refer this question to the determination of a jury, but, while we have thus regretted it, we have not allowed it to deter us from the endeavor to ascertain the truth in regard to the alleged election of the relator, by the

only means remaining in our power. In pursuing this inquiry, we have considered the canvass of the vote for governor by the state canvassers as correct, granting the relator permission, however, to impeach it by testimony. A statement of this canvass has been laid before us, and shows that the respondent received at the late election thirty-six thousand, three hundred and fifty-five votes for governor, and that the relator received at the said election for the same office thirty-six thousand, one hundred and ninety-eight votes. It however appears, from the returns of votes in the office of the secretary of state, that in order to arrive at the result above stated, the state canvassers allowed the relator and the respondent certain votes, statements of which were not sent by the town canvassers to the clerk of the board of supervisors of the county, as provided by law, and that the votes were not canvassed by the county canvassers, nor any statement of them sent by the clerk of the board of supervisors to the governor, secretary of state and state treasurer, as the statute requires; but that in some way not explained to us, statements of the town or precinct canvass came to the possession of the state canvassers, and that the votes, statements of which were thus before them, were allowed to the respective candidates.

It also appears from the returns of votes in the office of secretary of state, that, in some of the counties, the county canvassers, after they had canvassed the votes given in the several towns in the manner provided by law, and after the statement of the votes cast in the counties had been sent to the governor, secretary of state and state treasurer, by the clerk of the board of supervisors, as the statute provides, made supplementary statements of votes, which were received by the state canvassers, and that the votes mentioned in these statements were allowed to the candidates.

It also appears from the said returns, and from the statements of the votes made by the state canvassers, that, in some instances the state canvassers allowed votes to the candidates which had been rejected by the board of county canvassers, when the reason for the rejection had been stated by the county canvassers in the paper containing the statement of the votes made by them, or when the rejection of the votes was established, or attempted to be established, by other testimony.

It also appears from the said returns, and from the said state-

ment of the state canvassers, that the state canvassers added to the number of votes which the candidates received in some counties as determined by the county canvassers, and deducted from the number which the candidates received in others, as determined by the same authority. This was done in cases where the number of votes, as ascertained and determined by the county canvassers, did not correspond with a tabular statement of the votes cast in the several towns in the county contained in the same paper with the statement of the votes made by the county canvassers.

It also appears from the said returns, that two statements of the votes from Waupacca county were before the state canvassers, purporting to come from two different clerks of two different boards of supervisors, each being authenticated by a seal; and it further appears, that the votes mentioned in one of these statements were allowed to the candidates, and that the votes mentioned in the other statement were rejected.

Before proceeding to state our views in regard to the law regulating the canvass of votes by the state canvassers, we propose to consider, how far the right of a person to an office is affected by the determination of the canvassers of the votes cast at the election held to choose the officer. Under our constitution, almost all our officers are elected by the people. Thus the governor is chosen, the constitution providing that the person having the highest number of votes for that office shall be elected. But the constitution is silent as to the mode in which the election shall be conducted, and the votes cast for governor shall be canvassed and the result of the election ascertained. The duty of prescribing the mode of conducting the election, and of canvassing the votes, was, therefore, devolved upon the legislature. They have accordingly made provision for both, and the question is, whether the canvass, or the election, establishes the right of a person to an office. It seems clear that it cannot be the former, because by our constitution and laws it is expressly provided, that the election by the qualified voters shall determine the question. To hold that the canvass shall control, would subvert the foundations upon which our government rests. But it has been repeatedly contended in the course of this proceeding, that, although the election by the electors determines the

right to the office, yet the decision of the persons appointed to canvass the votes cast at the election, settles finally and completely the question, as to the persons elected, and that therefore no court can have jurisdiction to inquire into the matter. It will be seen that this view of the question, while it recognizes the principle, that the election is the foundation of the right to the office, assumes that the canvassers have authority to decide the matter finally and conclusively. We do not deem it necessary to say anything on the present occasion upon the subject of the jurisdiction of this court, as that question has already been decided, and the reasons for the decision given. Bearing in mind, then, that under our constitution and laws, it is the election to an office, and not the canvass of the votes, which determines the right to the office, we will proceed to inquire into the proceedings of the state canvassers, by which they determined that the respondent was duly elected. Before, however, we proceed with this inquiry, we will call attention to the duty of the inspectors of town elections, and also to the duty of the county canvassers, as the powers and duties of those officers are intimately connected with the question under consideration.

The provisions of the Revised Statutes, *chap.* 6, *secs.* 43 *to* 50, inclusive, are as follows:

" Sec. 43. As soon as the poll of the election shall be finally closed, the inspectors shall immediately proceed to canvass the votes given at such election; and the canvass shall be public, and continued without adjournment until completed.

" Sec. 44. The canvass shall commence by a comparison of the poll lists from the commencement, and a correction of any mistakes that may be found therein, until they shall be found or made to agree. The box shall then be opened, and the ballots contained therein taken out and counted, by the inspectors, unopened, except as far as to ascertain whether each ballot is single, and if two or more ballots shall be found so folded together as to present the appearance of a single ballot, they shall be laid aside until the count of the ballot is completed; and if, upon a comparison of the count and the appearance of such ballots, a majority of the board shall be of opinion that the ballots thus folded together were voted by one elector, they shall be destroyed.

" Sec. 45. If the ballots in the box shall be found to exceed

in number the whole number of votes on the poll lists, they shall be replaced in the box, and one of the inspectors shall publicly draw out and destroy therefrom so many ballots unopened, as shall be equal to such excess.

"Sec. 46. The ballots and poll lists agreeing, or being made to agree, the board shall then proceed to count and ascertain the number of votes.

"Sec. 47. The canvass being completed, the inspectors shall draw up a statement of the result in writing, and cause a duplicate thereof to be made; which statement and duplicate they shall certify to be correct, and subscribe with their names.

"Sec. 48. Such statement shall set forth in words at length, the whole number of votes given for each office at such election, the names of persons for whom such votes were given, and the number of votes so given for each person.

"Sec. 49. One of said statements shall forthwith be delivered to the town clerk, to be filed and preserved by him, or if made in any ward of a city, then to the clerk of such city for the like purpose, and the other, together with one of the poll lists, shall be carefully inclosed, sealed up, and directed to the clerk of the board of supervisors of the proper county, and delivered to the chairman of the board of supervisors of the town, or some one of the county board of supervisors; and such officer to whom such statement and poll list shall be so delivered, shall, within seven days after the election, deliver the same, with the seals and envelopes unbroken, to such clerk, without charge for mileage, when they receive mileage as members of the county board.

"Sec. 50. The inspectors shall carefully envelope and preserve all ballots rejected as defective, and deliver the same, together with the other poll list, to the town or city clerk, as the case may be, to be filed in his office; all the other ballots shall then be destroyed, and the board of inspectors shall be dissolved."

It will be seen, that after the canvass is completed, the inspectors are to make a statement of the whole number of votes given for each office, the names of the persons for whom the votes were given, and the number of votes given for each person. That a copy of this statement is to be made, that the statement and duplicate are to be certified by the inspectors to be correct,

that one of the statements is to be forthwith delivered to the town or city clerk, and the other carefully sealed up and directed to the clerk of the board of supervisors of the proper county. As the duties of these officers are wholly created by the statute, and in it clearly defined, it is quite apparent that they can rightfully do no act which the statute does not enjoin upon them. Their duty in regard to the statement of the votes which are given at the election, is defined with particularity, and any attempt upon their part to give any other effect to the statements than that which the statute authorizes, must be unavailing. They have no authority to transmit a copy of this statement to the state canvassers, and if one should be sent, it could not be rightfully considered as evidence of any fact before that body.

. We will now proceed to a consideration of the duty of the county canvassers as it is defined in the statute, so far as relates to the canvassing of votes for state officers.

Sections 51, 52 and 56 of chapter 6 of the Revised Statutes are as follows:

"Sec. 51. On the Tuesday next following the election, the clerk of the board of supervisors shall take to his assistance two justices of the peace of his county, who together with such clerk shall constitute the county board of canvassers, and proceed to open said returns, and make an estimate and statement of the votes as follows:

"They shall make a separate statement written out in words at length, containing the whole number of votes given in such county for the offices of governor, lieutenant governor, secretary of state, treasurer, attorney-general, state superintendent, and representatives in Congress; the names of persons to whom such votes were given, and the number of votes given to each; another similar statement of the votes given for electors of president and vice-president; another of the votes given for senator, when the county alone does not constitute a senate district; another of the votes given for members of Assembly, when the county alone does not constitute an assembly district; another of the votes given for county officers; and another of the votes given for senator and members of Assembly, when the county constitutes one or more senate or assembly district, specifying

the number of votes for each person for senator and member of Assembly in each such district respectively.

"Sec. 52. Each statement shall be certified as correct, and attested by the signatures of the said board of canvassers, and filed in the office of the clerk of the board of supervisors, and the same shall be recorded by him in a suitable book to be provided and kept in his office.

"Sec. 56. Of the statement and certificate of the votes given for the offices of governor, lieutenant governor, secretary of state, treasurer, attorney-general, state superintendent, and representatives in Congress, or either of them, the clerk of the board of supervisors shall prepare three certified copies under his signature, and sealed with his seal of office. Of these copies he shall, within three days next after the county canvass, send by mail one to the governor, one to the secretary of state, and one to the state treasurer."

It will be seen that this body is to determine the number of votes cast in the county for state officers, from the statements of the votes sent to the clerk of the board of supervisors by the town inspectors, that they are to make a statement of the votes so given, and to certify the statement to be correct; that of the statement and certificate of the votes given for state officers, the clerk of the board of supervisors is to prepare three copies, one of which is to be sent by mail to the governor, one to the secretary of state, and one to the state treasurer.

The same observations apply to the powers and duties of county canvassers as to town inspectors. Their powers and duties are clearly defined in the statute, and they can do no act which is not enjoined upon them. They are authorized and required to make a statement of the votes given in the county for state officers and to certify that statement to be correct. The statute speaks of one statement, and of but one; and it seems clear that but one is authorized. Having made the statement and certified to its correctness, their duty in that respect, is fully discharged, and their authority ended. The statute authorizes them to assemble at the time appointed, for a specified purpose and object, and that object having been accomplished, they have no power to assemble at other times or for other objects than those which the statute authorizes. They can have no authority,

therefore, after having complied with the statute by making a statement of the votes given for state officers in the county, to re-assemble at other times and make additional or supplementary statements of the votes, for the simple reason that such an act is wholly unauthorized by the statute. Deriving their authority wholly from the statute, when they have performed their duty under it, their authority is gone and their power ended; such additional or supplementary statements, therefore, if made, must be wholly unavailing for any purpose, and the state canvassers would not be authorized to consider them. in determining the number of votes given in the county for state officers.

We now come to the consideration of the law applicable to the duty of the state canvassers.

Sections 69, 70, 72, 73, 74, 75 and 76 of chapter 6 of the Revised Statutes prescribe that duty, and are to be considered in connection with section 95 of the same chapter.

These sections are as follows:

" Sec. 69. The secretary of state, state treasurer and attorney-general, shall constitute the board of state canvassers, two of whom shall be a quorum for the transaction of business; and if one only of said officers shall attend on the day appointed for a meeting of the board, the clerk of the Supreme Court at Madison, on being notified by the officer so attending, shall attend without delay, with such officer, and with him shall form the board.

" Sec. 70. The secretary of state, upon the receipt of the certified statements of the votes given in the several counties, directed to be sent to him by the clerks of the boards of supervisors, shall record the same in a suitable book to be kept by him for that purpose; and if from any county no such statement shall have been received by him, he shall. obtain the same from the governor or state treasurer, if received by either of them, and when obtained, record the same in like manner."

" Sec. 72. For the purpose of canvassing and ascertaining the result of elections, other than for electors of president and vice-president, the secretary of state shall appoint a meeting of the state canvassers to be held at his office, on or before the fifteenth day of December next after a general election, and within forty days after a special election, and shall notify the other members of the board of the same.

"Sec. 73. The board when thus formed, shall, upon the certified statements of elections made by the boards of county canvassers, proceed to examine and make a statement of the whole number of votes given at any such election for the office of governor and lieutenant governor, secretary of state, treasurer, attorney-general and state superintendent, or either of them; and another statement of the votes given for representative in Congress in each congressional district; each of which statements shall show the name of the persons to whom such votes shall have been given for either of the said offices, and the whole number of votes given to each; distinguishing the several districts and counties in which they were given.

"Sec. 74. They shall certify such statements to be correct, and subscribe their names thereto, and they shall thereupon determine what persons have been by the greatest number of votes duly elected to such offices or either of them, and shall make and subscribe on each statement a certificate of such determination, and deliver the same to the secretary of state.

"Sec. 75. The said board of canvassers when organized, shall have power to adjourn from day to day, for a term not exceeding three days.

"Sec. 76. The secretary of state shall record in his office, in a book to be kept by him for that purpose, each certified statement and determination so made by the board of state canvassers, and shall without delay make out and transmit to each of the persons thereby declared to be elected, a certificate of his election, certified by him under his seal of office; he shall also forthwith cause a copy of such certified statements and determination to be published in a newspaper printed at the seat of government."

"Sec. 95. Whenever it shall satisfactorily appear that any person has received a plurality of the legal votes at any election, for any office, the canvassers shall give to such person a certificate of election, notwithstanding the provisions of law may not have been fully complied with in noticing or conducting the election, or canvassing, or returning the votes, so that the real will of the plurality may not be defeated by any informality."

It will be observed that according to the 73d and 74th sections above quoted, the board are, upon the certified statements of

-elections made by the boards of county canvassers, to make a statement of the whole number of votes given for state officers, which shall show the names of the persons to whom such votes shall have been given, &c., and that thereupon they shall determine what persons have been, by the greatest number of votes duly elected.

It is clear from these sections of the statute, that the state canvassers are to make their statement and determination from the certified statements of the county canvassers alone. All other testimony is excluded from their consideration. The statute is too positive and explicit upon this subject to admit of any doubt. No language could have been used in the statute which would have expressed more clearly the intention of the legislature to confine the state canvassers to the statements of the county canvassers, than that contained in these sections.

But it was contended by the counsel for the respondent in an argument submitted to the court on a former occasion, that section ninety-five above quoted, gave almost unlimited discretion to the state canvassers, and enabled them to receive other testimony as to the number of votes given in the several counties, for a state office, and to determine from such testimony, that a person had received a plurality of the votes, although such a result might not be established by the statements of the county canvassers. We cannot assent to this construction of the provision of the statute in question. This section provides that whenever it shall satisfactorily appear that any person has received a plurality of legal votes, &c. How is this fact satisfactorily to appear? Manifestly by the statements made by the county canvassers. There is no intimation in this section, that any other testimony is to be resorted to by the state canvassers for the purpose of determining the question submitted to them, than that which the statute prescribes, viz: the statements of the county canvassers. To allow the construction of the statute contended for, to prevail, would be to dispense with the necessity of a statement of votes by the county canvassers in all cases, and to permit the state canvassers to substitute any proof which they might choose to hear.

This section of the statute further provides that the canvassers shall give to the person who has received a plurality of legal

votes a certificate of election, notwithstanding the provisions of law may not have been fully complied with in noticing and conducting the election, or canvassing or returning the votes, &c.

We think that this provision does not authorize the canvassers to hear other testimony than such as the statute prescribes. It gives the canvassers power to decide, that a person who has received a plurality of the votes, shall receive a certificate of election, although the statements which show this fact, may not be in all respects, in strict conformity with the statute. But it by no means gives the canvassers power to consider statements of votes made by other persons than those who by law are authorized to make them, nor by those persons, unless the statements themselves are authorized by the statute. It appears to us that this must be the correct exposition of this section of the statute, for the reason that unauthorized statements of votes made by inspectors of town elections and by county canvassers, upon general principles of law, cannot be evidence for any purpose. It is only when these officers are authorized to make these statements than any effect can be given to them. It may be replied to this construction of the statute, that a person who has a plurality of votes for an office, may be defeated on account of the neglect, fraud or ignorance of those whose duty it is to canvass the votes given at an election and to certify the result.

We have already stated that an election by the qualified electors of the state, and not a canvass of the votes, confers a right to office; and although those whose duty it is to canvass the votes are ministerial officers, and are allowed to perform no acts which are not prescribed by the statute, courts which have the power to entertain proceedings by *quo warranto*, have authority to determine who has this right, without being compelled to limit the proof of the right, to the acts of those who by law are appointed to canvass the votes and make statements of them. This court has, in repeated instances, decided that the failure of the officers appointed by law to canvass the votes given at an election, to perform their duty, does not deprive a person who has been duly elected of his right to the office. We have in all cases given effect to the election, and have uniformly decided that a person who proved the fact of his election to an office, by

competent testimony, was entitled to the office, although another person might have the certificate of the canvassers. It follows from the view which we have taken of the law applicable to the powers and duties of the state canvassers, that the statements made by town or precinct inspectors of election which the state canvassers had before them, and also the additional or supplemental statements which came from the clerks of the board of supervisors, furnished no evidence that the votes mentioned in the statements were given at the election, for the reason that the statements were wholly unauthorized. We are also of opinion that the additions which the state canvassers made to, and the deductions made from the votes mentioned in the statements of votes made by the county canvassers, for the reason that such statements did not correspond with the tabular statements of the votes of the several towns, were wholly unauthorized; because the tabular statements were not authorized by law, and of course could not be evidence of the facts stated in them.

In regard to the two statements of votes made by the two separate boards of county canvassers in the county of Waupacca, we give no opinion. There could of course be but one lawful board of county canvassers in the county, and we have no evidence before us to show which of the boards was authorized to canvass the votes and make the statement of them which the statute specifies.

Testimony was introduced tending to show that frauds of a very gross character were perpetrated either by the inspectors of elections of one of the towns in the county of Waupacca, or by the board of county canvassers of that county, whose statement of votes was considered authentic by the state canvassers. Testimony was also introduced tending to show that some of the additional or supplementary statements were fraudulent, and that the statements of votes purporting to be made by town or precinct inspectors, and which came to the possession of the state canvassers, were many of them forgeries. Upon this testimony we do not intend to comment. As the judgment which we are about to pronounce in this case, will not in any degree be based upon it, we desire to pass it by in silence. But we cannot refrain from again expressing our regret that the course which the respondent and the attorney-general have seen fit to pursue, has

prevented us from referring these questions to a jury in order to have the facts in the case judicially determined.

It has been repeatedly said by this court that the default of the respondent authorized the court to give a judgment of ouster against him, and also a judgment in favor of the relator, establishing his right to the office.

In addition to this, it now appears from the state canvass, and from the returns in the secretary's office, by rejecting the votes mentioned in the additional, or supplementary statements, and the statements made by the town or precinct inspectors before mentioned, which were wholly unauthorized, and by allowing the respondent and the relator each the number of votes mentioned in the statements of the county canvassers lawfully made, that the relator was elected to the office of governor by a plurality of votes.

It follows from the view which we have taken of the matter, that there must be a judgment of ouster against the respondent, and also one in favor of the relator.

Judgment accordingly.

NOTE.—The great interest felt in this case, the character of the parties, as well as the dignity of the office in dispute, and the questions raised in the course of the proceedings, seemed to render a full report essential to its due appreciation. Anything short of this would have failed to satisfy the demands of justice, and to present the case here as it was presented and conducted in court.—REPORTER.